**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| THOMAS D. ARTHUR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:07-cv-319-WKW |
| | ) | |
| TROY KING, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO DISMISS**

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, Defendants Troy King, Alabama Attorney General; Bryce Graham, Jr., Colbert County District Attorney; David Barber, Jefferson County District Attorney; and Ronnie May, Sheriff of Colbert County, move to dismiss this action on the grounds stated in this motion. In support, defendants state as follows:

**I.   LEGAL STANDARD**

A defendant may move to dismiss a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, if the plaintiff has failed to state a claim for which relief may be granted. Fed. R. Civ. P. 12(b)(6). In regard to the sufficiency of the complaint, the Supreme Court has found that "a complaint should not be dismissed for failure

1

to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45, 78 S.Ct. 99, 102 (1957). A 12(b)(6) motion tests the legal sufficiency of a plaintiff's claim and the court construes all allegations set forth in plaintiff's complaint as true and resolves all inferences in favor of the plaintiff. United States v. Gaubert, 499 U.S. 315, 327 (1991). The Eleventh Circuit has held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." In re Johannessen, 76 F.3d 347, 349 (11th Cir. 1996)(quoting Conley, 355 U.S. at 45-46). Even assuming the facts alleged in the complaint to be true, plaintiff's claim should be dismissed.

## II. BACKGROUND OF ARTHUR'S CRIME, CONVICTION, AND PREVIOUS LITIGATION.

The underlying capital murder conviction involves a scheme whereby Thomas Arthur ("Arthur") was hired to kill Troy Wicker, the husband of Judy Wicker. Judy Wicker and Theresa Rowland, Judy's sister, began to have discussions concerning killing Troy Wicker in the early part of 1981.

R. 748.[1]  They had at least two reasons for wanting Troy Wicker dead.  First, there was an insurance policy worth $90,000 that was payable to Judy Wicker upon Troy Wicker's death.  R. 748.  Second, Theresa Rowland had previously hired Troy Wicker to burn her house down for insurance proceeds and Troy Wicker was threatening to expose that fact.  R. 799-800.  Theron McKinney, Theresa's husband, was also involved in some of the discussions concerning the killing of Troy Wicker.  R. 800-802.  Judy Wicker paid Arthur $10,000 after he had murdered Troy Wicker.  R. 778-780.  She paid her sister, Theresa Rowland, $6000, and gave Theron McKinney a Pontiac Trans Am and some jewelry.  R. 780.

Before the murder was carried out, Judy Wicker and Arthur agreed that she would tell the police that a black person murdered her husband.  R. 773-74.  When Arthur murdered Troy Wicker on February 1, 1982, he darkened his face and wore an "Afro" wig in an apparent attempt to disguise himself as an African-American.  R. 757-59.  After carrying out the murder, to further deflect suspicion away

---

[1]  "R. __" refers to pages in the transcript of Arthur's 1991 capital murder trial.  The defendants have not included a copy of the 1991 trial transcript because it is voluminous (11 volumes) and it is not necessary to decide the defendants' motion.  Of course, the trial transcript can be provided to the court if such a need exists.

from Judy Wicker, he struck Judy with a blow that knocked out several of her teeth and lacerated her lip, injuries that resulted in her staying in the hospital for several days. R. 771-76. Judy Wicker stuck to the agreed-upon version of events at her own trial where she was convicted of murder. Wicker v. State, 433 So. 2d 1190, 1195-96 (Ala. Crim. App. 1983). She gave her first truthful testimony regarding Troy Wicker's murder at Arthur's second trial. Arthur v. State, 575 So. 2d 1165, 1167 (Ala. Crim. App. 1990). She admitted in her testimony that the prosecutor told her that, if she testified truthfully, he would put in a "good word … for her with the parole board." Id.

**A. Procedural History**

On December 5, 1991, Arthur was convicted for the 1982 capital murder of Troy Wicker.[2]    C. 11, R. 1150.[3]    The murder was made capital because Arthur had previously been convicted of murder in the second degree in 1977. Arthur

---

[2] Arthur was originally convicted and sentenced to death for the capital murder of Troy Wicker in 1982. Arthur v. State, 472 So. 2d 650 (Ala. Crim. App. 1984). The Alabama Supreme Court reversed Arthur's first conviction, holding that details of Arthur's prior second-degree murder conviction were improperly admitted at trial under the identity exception to the general exclusionary rule. Ex parte Arthur, 472 So. 2d 665 (Ala. 1985). Arthur was again convicted of capital murder and sentenced to death. The Alabama Court of Criminal Appeals reversed Arthur's second conviction, holding that the admission into evidence a statement made by Arthur to a police officer two weeks after Arthur had asserted his right to remain silent constituted plain error because Arthur did not initiate the conversation and there was no evidence that he had been given access to an attorney following assertion of his right to remain silent. Arthur v. State, 575 So. 2d 1165 (Ala. Crim. App. 1990), cert. denied, 575 So. 2d 1191 (1991).

[3] "C. __" refers to pages of the clerk's record of Arthur's 1991 capital murder trial.

v. State, 711 So. 2d 1031, 1043 (Ala. Crim. App. 1996), citing Ala. Code § 13A-5-40(a)(13).  After a sentencing hearing wherein Arthur – who represented himself but also had the assistance of a lawyer – requested the death penalty, the jury recommended, by an eleven-to-one vote, that Arthur be sentenced to death.  C. 12, R. 1237.  On January 24, 1992, the trial court entered a sentencing order in which it followed the jury's recommendation and sentenced Arthur to death.  C. 14-26, R. 1291-1300.

On March 8, 1996, the Alabama Court of Criminal Appeals affirmed Arthur's conviction and death sentence.  Arthur v. State, 711 So. 2d 1031 (Ala. Crim. App. 1996).  On November 21, 1997, the Supreme Court of Alabama affirmed the judgment of the Court of Criminal Appeals.  Ex parte Arthur, 711 So. 2d 1097 (Ala. 1997).  Arthur never filed a petition for certiorari in the United States Supreme Court.

Arthur was required to file his Rule 32 petition within two years of the Alabama Court of Criminal Appeals issuing the certificate of judgment on April 7, 1998.  See Rule 32.2(c), Ala.R.Crim.P.  Arthur waived his opportunity to seek state post-conviction relief by failing to timely file within this two-year period that ended on April 7, 2000.

Arthur additionally failed to file a habeas corpus petition in federal court under 28 U.S.C. § 2254 before the federal statute of limitation expired on June 18, 1999.  See 28 U.S.C. § 2244(a)(1).  Because the time for Arthur to seek either state or federal postconviction review had long passed, the State filed a motion to set an execution date with the Alabama Supreme Court on September 8, 2000.  An amended motion to set an execution date was filed on September 15, 2000, correcting an error in the September 8 motion.

On January 25, 2001, Arthur, proceeding through counsel, filed a Rule 32 petition in the Jefferson County Circuit Court.  C32. 60-187.[4]  The Rule 32 petition was dismissed as untimely on March 5, 2001.  C32. 201-11.  The Alabama Court of Criminal Appeals affirmed the denial and dismissal of Arthur's Rule 32 petition.  Arthur v. State, 820 So. 2d 886, 889 (Ala. Crim. App. 2001).  The Court of Criminal Appeals agreed with the trial court that "the two-year limitations period in Rule 32.2(c), Ala.R.Crim.P., is mandatory and jurisdictional."  Id.  The Alabama Court of Criminal Appeals denied Arthur's application for rehearing

---

[4] "C32. __" refers to pages of the clerk's record from Arthur's Rule 32 state post-conviction proceedings.

on July 27, 2001, and the Alabama Supreme Court denied certiorari review on November 2, 2001.  Id.  The United States Supreme Court, on May 13, 2002, denied Arthur's petition for writ of certiorari.  Arthur v. Alabama, 535 U.S. 1053 (2002).

The Alabama Supreme Court, on March 23, 2001, set Arthur's date of execution for April 27, 2001.  On April 20, 2001, Arthur filed a petition for writ of habeas corpus, along with a motion to stay the execution, in the United States District Court for the Northern District of Alabama, which issued a stay of execution on April 25, 2001.  On April 25, 2001 the district court entered an order staying this habeas proceeding pending a resolution of Arthur's state post-conviction petition in the state appellate courts.  R1-11.

The federal district court (United States District Judge Edwin Nelson), on December 4, 2002, entered an order that dismissed Arthur's habeas petition as untimely.[5]  On December 18, Arthur filed a motion for reconsideration. That motion was denied following the reassignment of the

---

[5] Judge Nelson's order is attached as Exhibit A and will be referred to as such.

case to the Honorable L. Scott Coogler.[6]  On August 6, 2003, Arthur filed a motion for a certificate of appealability, which was granted by the district court on August 11, 2003.

The Eleventh Circuit affirmed the denial of habeas relief.  See Arthur v. Allen, 452 F.3d 1234 (11th Cir. 2006).  The Court addressed four issues: (1) whether the affidavits presented by Arthur were unreliable because (a) they were not presented at Arthur's first, second, or third state court trials, (b) with no explanation for the delay and (c) because the affiants recanted their testimony; (2) whether the district court correctly denied Arthur's request for discovery and an evidentiary hearing; (3) whether the district court correctly denied Arthur's request for statutory tolling of the limitations period; and (4) whether the district court correctly ruled that Arthur was not entitled to equitable tolling of the limitations period.  The Eleventh Circuit subsequently modified their opinion on rehearing.  See Arthur v. Allen, 459 F.3d 1310 (11th Cir. 2006).  The United States Supreme Court denied Arthur's petition for certiorari.  Arthur v.

---

[6] Judge Coogler's order denying the motion to alter or amend is attached as Exhibit B and will be referred to as such.

<u>Allen</u>, ---S.Ct.----, 2007 WL 121124 (Apr. 16, 2006).

**B.  Facts of the Crime**

The evidence at Arthur's third trial established that Troy Wicker was murdered on February 1, 1982, while he lay in bed at his home in Muscle Shoals.  The prosecution presented the testimony of Judy Wicker, who was still serving time for her role in Troy Wicker's murder.  Judy Wicker testified that she began a sexual relationship with Arthur after he committed to killing her husband and that she paid him $10,000 to carry out the murder.  R. 753-54.

Talmadge Sterling, the custodian of records at the Decatur Work Release Center, where Arthur resided, testified that on February 1, 1982, Arthur had signed out for work at 6:00 a.m., that at 7:10 p.m. Arthur had called for a ride back to the center, and that Arthur returned to the center at 7:50 p.m.  R. 502.  On his work release program, Arthur was assigned to work for Joel Reagan at Reagan Mobile Homes.  R. 454-457.  Reagan, an old acquaintance of Arthur's, R. 452, admitted that he did not keep track of Arthur's daily whereabouts, R. 459, and "did not know Arthur's whereabouts on the day of the murder." Exhibit A at 11.  Patricia Green testified that Arthur

frequented a local bar called Cher's Lounge "four or five times a week," sometimes in the company of Joel Reagan, where she worked part-time as a bartender. R. 558. Debra Phillips, the operator of Cher's Lounge, likewise testified that Arthur came to the bar four to five times a week. R. 617-619. Phillips and Arthur had a romantic relationship and even discussed the possibility of marriage. R. 622-24. Pat Halliday, a shift supervisor at the Decatur Work Release Center in 1982, "testified there was a discrepancy between the number of hours Arthur was away from the center and the number of hours he was actually paid for working in February and March of 1982." R1-61 at 11; R. 536-538.

On the afternoon before the day of the murder, Arthur, while at Cher's Lounge, took Patricia Green into the kitchen to speak with her out of hearing range of other bar patrons. R. 560-562. At Arthur's request, Green sent a friend across the street to purchase .22 caliber mini magnum long rifle bullets. Id. After Green's friend purchased the bullets and brought them back to her, Green gave them to Arthur. Id. Brent Wheeler, an expert in firearm identification, testified that the bullet removed from the victim's body was a .22 caliber long rifle

consistent with a CCI brand bullet.  R. 404-405.  The four shell casings found near the body were CCI brand .22 long or long rifle casings.  Id.

As the federal district court correctly stated, the above evidence tended to show that "Arthur had the opportunity and means to kill Troy Wicker." R1-11 at 11. Furthermore, other evidence corroborated Judy Wicker's testimony.  Joel Reagan saw Judy Wicker and Arthur together at the mobile home business.  R. 467.  Judy Wicker stated that, on the morning of the murder, she took her sons to school, drove back and forth on Avalon Avenue a couple of times and then picked Arthur up at the airport.  R. 754-59. This testimony was consistent with the testimony of Sergeant Eddie Lang, a Muscle Shoals police officer who was serving as a school crossing guard on Avalon Avenue that morning.  Lang observed Judy Wicker twice pass by the crossing before 8:00 a.m., when he left his post.  R. 306-07.

Judy also testified that Arthur wore an Afro wig and makeup to disguise himself as a black man.  Joseph Wallace, an evidence technician with the Alabama Department of Forensic Sciences, removed an Afro wig from the car that

Arthur used to make his getaway.  R. 374.  Judy testified
that Arthur shot Troy Wicker one time and ransacked the
house.  R. 768-70.  Mr. Wallace, the evidence technician,
testified that he found the Wicker home in disarray.  R.
365-67.  Dr. Josefino Aguilar, a forensic pathologist,
testified that the autopsy performed revealed that the
victim had been shot one time.  R. 697-99.  Judy testified
that on the day of the murder Arthur was carrying a gun and
a garbage bag.  R. 760.  Debra Phillips testified that
Arthur was supposed to meet her for lunch on the day of the
murder, but he was late and, instead of going to lunch,
they rode to a bridge over the Tennessee River where Arthur
stopped the car and threw a garbage bag, that was half-full
and bulky and wrapped in a sheet, into the river.  R. 627-
34.  As he disposed of the garbage bag, Arthur said he was
"trying to get rid of some old memories."  R. 632.

Consistent with Judy Wicker's testimony that Arthur was
paid $10,000 for murdering her husband, Arthur had a large
amount of money in his possession after the murder.  Pat
Halliday, an employee with the Decatur Work Release Center,
testified that Arthur was transferred to the Morgan County
Jail after the discovery of the discrepancy between the

number of hours he was away from the center and the number of hours he was actually paid for working. Upon routine inspection of his effects before the transfer, twenty one hundred dollar bills were discovered in an envelope in Arthur's overcoat pocket. R. 543.

Arthur was his own lead counsel at his trial, but was also represented by Harold Walden, and Walden's son served as stand-by counsel. Arthur conducted the majority of voir dire questioning, examination of witnesses, argument to the jury, and argument to the court. In fact, Arthur cross-examined virtually every one of the prosecution's 13 witnesses, often at length. See, e.g., R. 375-85. Arthur presented four witnesses in his defense. Bruce Coan, a police detective, testified about his observations of the crime scene. R. 867. Two of Arthur's four witnesses were called in an apparent attempt to offer an explanation of how, as a prisoner, he came to possess $2100. Bruce Carroll, a friend and fellow inmate, testified that he lost $6500 to Arthur in a poker game. R. 879-83. Gene Moon, who resided in the Cullman County Jail at the time of his testimony, said that another inmate gave him an envelope with $2000 in it and that Moon put it in Arthur's coat. R.

927-29.    The fourth and final witness, Ronald Spears, an inmate at West Jefferson prison, stated that Patricia Green told him that the police were forcing her to lie about Arthur asking her to buy some bullets for him.  R. 901-07.

The record also reveals that Arthur was searching for witnesses to provide him with an alibi.  During cross-examination of Joel Reagan, Arthur asked: "…[D]o you remember Larry Whitman telling you that he saw me the morning that Mr. Wicker was murdered over in Muscle Shoals?" R. 473-74.  There are no references in the trial record to either Alphonso High or Ray Melson, the two individuals (of which more later) who signed affidavits filed in the federal district court stating they talked to Arthur around the same time Troy Wicker was being murdered, having seen Arthur on the day of the murder.

At the penalty phase, the lawyer who assisted Arthur, Harold Walden, argued that the jury should recommend a sentence of life without parole because of several mitigating factors.  First, Walden argued that Arthur had been a model prisoner and had spoken to high school groups as a part of correctional programs to deter young people from committing crimes.  R. 1170.  Walden also argued that

Arthur's punishment was disproportionate in relation to the other persons that had involvement in Troy Wicker's murder. He told the jury that Judy Wicker, who was just as culpable as Arthur, was soon to be released from prison, and that Theresa Rowland and Theron McKinney had never been prosecuted for their roles. R. 1171-72.

Arthur followed Walden and argued to the jury that he should be sentenced to death. Arthur said that Walden was morally opposed to the death penalty and urged the jury to disregard Walden's argument. R. 1178. Arthur told the jury that he didn't have a death wish; in fact, he said "I wouldn't dare ask you for it if I thought for a minute that I would be executed." R. 1181. Arthur argued that a death sentence would allow him to have more visitations from his children, R. 1183, and to have more privacy in his death row cell as opposed to living in general population, R. 1190, and would allow him to have more control over his appeals. R. 1186-1194. Arthur told the jury that he had already managed to overturn his capital murder conviction on two previous occasions and that, if the jury sentenced him to death, he would be in a better position to overturn his latest capital murder conviction. R. 1188-89.

### C. State and Federal Post-Conviction

1. Rule 32.2(c), of the Alabama Rules of Criminal Procedure, requires that a petition for post-conviction relief be filed within two years after the issuance of the certificate of judgment by the Court of Criminal Appeals. A certificate of judgment was issued by the Court of Criminal Appeals on April 7, 1998, establishing April 7, 2000, as the last date on which Arthur could file his Rule 32 petition. On or about January 25, 2001, Arthur, by and through his pro bono counsel, Arnold Levine, filed a Rule 32 petition in the Jefferson County Circuit Court. C32. 60-187. The Rule 32 trial court appropriately granted the State's motion to summarily dismiss the untimely Rule 32 petition because "the two-year limitations period in Rule 32.2(c), Ala.R.Crim.P., is mandatory and jurisdictional." *Arthur v. State,* 820 So. 2d 886, 889 (Ala. Crim. App. 2001). State court review of Arthur's untimely Rule 32 petition concluded when the Alabama Supreme Court denied Arthur's petition for the writ of certiorari on November 2, 2001. Id.

2. The federal district court then had to decide whether Arthur's habeas petition – filed on April 20, 2001,

and placed in abeyance until state proceedings concluded – should be dismissed as untimely. Arthur argued three reasons in the district court why his untimely filing should be excused: actual innocence, statutory tolling, and equitable tolling.

*Actual Innocence*. Arthur first contended that the district court should not have dismissed his habeas petition because, he said, there is an "actual innocence" exception to AEDPA's limitation period. The district court correctly determined that, even assuming such an exception exists (an issue the court left undecided), Arthur failed to establish actual innocence under even the most lenient actual-innocence standard that could be applied – *i.e.*, whether it was "more likely than not" that no reasonable juror would have found Arthur guilty . Exhibit A at 8-15.

On the basis of two affidavits that purport to establish an alibi, Arthur contended that he is factually innocent of a crime for which he has been thrice convicted and sentenced to death. R1-36 (Affidavit of Alphonso

High); R1-41 (Affidavit of Ray Melson).[7]   Both affidavits
purport to place Arthur in Decatur, approximately an hour
away from the crime scene in Muscle Shoals, when the murder
of Troy Wicker was taking place.[8]   Although both affiants
state that they spoke with Arthur on the morning of
February 1, 1982 – presumably giving Arthur knowledge of
the information contained in these affidavits – Arthur, who
was lead counsel at this third trial, never once presented
the information contained in these affidavits until he
filed his federal habeas petition.   The lateness with which
the "facts" contained in these affidavits alone undermines
their credibility.   The fact that the affiants subsequently
executed affidavits stating that, in fact, they were not
sure on what day they saw Arthur renders Arthur's purported
alibi completely unreliable.   R1-39 (Affidavit of Alphonso
High); R1-53 (Affidavit of Ray Melson).[9]   Against the
backdrop of the "significant evidence of guilt presented at

---

[7] Arthur submitted a third affidavit that was also apparently offered to establish an alibi.  R1-36 (Affidavit of Billy Peebles).  Arthur does not rely on this affidavit in his brief to this Court.  In the affidavit, Billy Peebles attested that it was Arthur's practice to take a bubble bath from 7:30 a.m.-8:00 a.m every day upon reporting to his work-release job.  The apparent inference from the Peebles's affidavit would be that Arthur was taking a bubble bath when Troy Wicker was murdered.

[8] The defendants do not include any of the evidentiary matters that were presented to the district court because they are not necessary to decide this motion.  Of course, any matter previously presented to the federal district court can be produced if this Court so orders.

[9] These affidavits were obtained by David Clark, the Assistant Attorney General who handled this case in the federal district court.

Arthur's trial," Exhibit A at 14, it is clear that Arthur's request for an exception to the federal statute of limitations based upon his "actual innocence" was correctly rejected.

*Statutory Tolling.* The federal district court also correctly rejected Arthur's contention that he was entitled to statutory tolling because the State created an impediment – either by denying appointed counsel or by failing to provide an appropriate prison library – that prevented him from filing a habeas petition. *See* 28 U.S.C. § 2244(d)(1)(B). If Arthur wanted legal representation to pursue either state or federal post-conviction relief, all he had to do was request counsel. The United States Code provides that an indigent inmate seeking federal habeas relief "shall be entitled to the appointment of one or more attorneys...." 21 U.S.C. § 848(q)(4)(B). Part of Arthur's claim is that the State did not provide legal counsel to him during his state post-conviction proceedings which affected his ability to timely pursue his federal habeas relief. However, Arthur never requested in state court that an attorney be appointed for him. Rule 32.7(c),

Ala.R.Crim.P., allows for counsel to be appointed for indigent inmates.

Instead of taking these conventional (and prescribed) approaches to obtaining counsel, Arthur posted pleas on various websites seeking representation. See, e.g. R1-40 (Exhibit D). In one such request, Arthur stated that his time for timely filing appeals was "running out" and that he needed a lawyer. Id. In that same request, he stated that he did not want any assistance from the death penalty resource centers in Alabama and Georgia because he had "unpleasant and non-productive relations" with them. Id. Arthur apparently sent a copy of this website posting to Elizabeth Semel, who is the director of the American Bar Association Death Penalty Representation Project. Id.

Arthur also could have filed a pro se post-conviction petition in either state or federal court. Arthur's trial, where he served as his own lead counsel, demonstrated his working knowledge of legal issues. The federal district court, citing an affidavit executed by a correctional officer at Holman State Prison whose duties include oversight of the prison law library, found that the general library contains a current United States Code. The federal

district court rejected Arthur's unfounded contention that the alleged deficiencies in the law library caused his untimely filings.

*Equitable Tolling.* The district court also correctly rejected Arthur's contention that he was entitled to equitable tolling of the federal statute of limitations for various reasons. First, Arthur contended that he did not receive the certificate of judgment triggering the limitations period and that he was not represented by counsel when it was issued on April 7, 1998. In a letter to the United States Supreme Court dated June 8, 1998, Arthur plainly indicated his awareness that the Alabama Supreme Court had "issued a final ruling on the first level of state appeals" on March 20, 1998, which is the date that the Alabama Supreme Court denied rehearing. R1-40 (Exhibit C). Second, Arthur's argument based on any lack of legal assistance was appropriately rejected because he did not act with due diligence to secure counsel. Indeed, Arthur *never* requested that a state or federal court appoint him a lawyer. Third, Arthur contended the State hampered his efforts to obtain counsel by placing restrictions on his ability to communicate with an investigator that allegedly

wanted to help him.  The State presented a series of four letters, *see* R1-40 (Exhibit F), indicating that a lawyer from Fairhope was considering representing Arthur and wanted an investigator to talk with Arthur.  The Warden did not deny access to the investigator, but merely informed the lawyer that he had to notify the prison that he was Arthur's attorney before attorney and investigator visits would be approved.  *Id.*  Finally, Arthur repeated his contention that his efforts to obtain post-conviction relief were hampered by the State's failure to provide an adequate legal library.  The district court appropriately rejected this argument because Arthur did not demonstrate that the library facilities were inadequate.

As previously stated, the Eleventh Circuit affirmed the district court's ruling on all grounds.  <u>Arthur</u>, 452 F.3d 1234.

## III. ARTHUR'S COMPLAINT

On April 13, 2007, Arthur filed a complaint pursuant to 42 U.S.C. § 1983, requesting, among other things, DNA testing of certain items.[10]  Complaint, ¶ 30.  Arthur does

---

[10] Arthur's assertion at paragraph 55 of his complaint that DNA testing technology was not available in 1991 at the time of his trial is false.  The Eleventh Circuit made a finding in <u>Grayson</u> that DNA testing has been available since 1986.  <u>See</u> <u>Grayson</u>, 460 F.3d at 1335.

not specifically assert which items he seeks to have tested for DNA testing. Arthur's complaint also requests "other testing" be performed but does not assert what kind of testing or what items are to be tested. Finally, Arthur's complaint requests "photographs taken at the crime scene." Complaint, ¶ 30. Arthur asserts that defendants will not release evidence without a court order.

Arthur raises five claims for relief based upon defendants' refusal to release the requested evidence. First, he claims that his right to due process of law has been violated because defendants are preventing him from access to evidence which he contends could lead to a conclusion of innocence. Complaint, ¶ 65-67. Second, he claims that the defendants by not releasing the evidence are subjecting him to a cruel and unusual punishment. Complaint, ¶ 68-69. Third, he claims that his right of access to courts is being violated. Complaint, ¶ 70-71. Fourth, he contends that if he cannot perform testing that his right to avail himself of the opportunity to apply for executive clemency will be adversely affected. Complaint, ¶ 72-73. Finally, Arthur contends that his right to equal protection is being violated. Complaint, ¶ 74-75. None of

these claims are made with any specificity, instead they are stated in conclusory fashion.

## IV. ARTHUR'S REQUEST FOR DNA TESTING SHOULD BE DISMISSED BECAUSE HE HAS NO CONSTITUTIONAL RIGHT TO SUCH TESTING

The plaintiff has not demonstrated that a denial of post-conviction access to biological evidence for the purpose of DNA testing deprived him of a federally protected right, therefore plaintiff has failed to state a claim under § 1983.

### A.  Due Process Right to Exculpatory Evidence

This Court should follow the decision of the Eleventh Circuit in Grayson v. King, 460 F.3d 1328 (2006), and reject Arthur's argument that his due process right to release of favorable evidence under Brady has been violated.  Arthur does not contend that the evidence was suppressed at trial or that he was denied a fair trial. Arthur also fails to demonstrate with any specificity how favorable results would prove his actual innocence.

In Grayson, the Eleventh Circuit stated that the "Brady rule is grounded in a defendant's right to a fair trial" and that "it is the suppression of evidence before and during trial that carried Brady's constitutional implications.  460 F.3d at 1337.  The Eleventh Circuit

found that Grayson had "no valid due process right of post-conviction access to the biological evidence under <u>Brady</u> and its progeny in order to retest that evidence under new technology." <u>Grayson</u>, 460 F.3d at 1338. The Court stated:

> As discussed later, we do not foreclose the possibility that a § 1983 plaintiff could, under some extraordinary circumstances, be entitled to post-conviction access to biological evidence for the purpose of performing DNA testing. Instead, we simply hold that Grayson has no such constitutional or federally protected right under <u>Brady</u> because the evidence was available prior to trial, he received a fair trial, and he cannot show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Bagley</u>, 473 U.S. at 682, 105 S.Ct. at 3383. In other words, the asserted right at issue is not one to material, exculpatory evidence necessary to ensure a fair trial. <u>See</u> <u>Brady</u>, 373 U.S. at 87, 83 S.Ct. at 1196-97.
>
> Thus, we conclude that Grayson has no valid <u>Brady</u> – based claim to the biological evidence.

<u>Id.</u> at 1339-40. In sum, the Eleventh Circuit did not extend <u>Brady</u> or recognize a <u>Brady</u> based constitutional or federally protected right to post-trial access to potentially exculpatory evidence. Moreover, as in <u>Grayson</u>, the evidence Arthur seeks was available to him before

trial, there is no allegation that he did not receive a fair trial, and he cannot show at this point that the evidence he seeks would result in a different outcome.

Furthermore, DNA testing could not demonstrate that Arthur is actually innocent of capital murder. Both United States District Judges that entered dispositive orders during the federal habeas proceedings said so. United States District Judge Edwin Nelson, in his order dismissing Arthur's habeas petition, stated the following:

> Although Arthur generally claims that a new examination of the evidence might obtain results contrary to Wicker's version of events, his specific allegations do not support his claim. He has a notion that blood typing or DNA testing of Judy Wicker's bloody clothing might show someone else assaulted her, but there is no basis in the record for his belief that the blood on her clothing belonged to her assailant. Rather, the evidence was that Wicker was assaulted from behind, did not struggle, and was bleeding due to extensive head and face injuries. Arthur contends examination of the rape kit and vacuum sweepings could support Wicker's prior testimony about being assaulted and raped by someone else, but merely showing another person was with Judy Wicker or in her home at some unspecified time does little to support her prior testimony or further impeach her testimony about Arthur's involvement. At best, it would provide some additional inference about Judy Wicker's veracity, a subject which was

amply covered during the trial. Arthur also speculates that DNA tests of the wig and hair samples from the car could show Wicker fabricated her testimony that Arthur wore a wig and dark face makeup to disguise himself as a 'black man.' However, expert testimony at the trial indicated the hair samples were of African American origin. Arthur provides no support for his speculation that different tests could impeach Wicker's testimony. Experts testified the cartridge casings and bullets were consistent with the type of ammunition Patricia Green obtained for Arthur on the day prior to the murder. Arthur hopes that his tests might now show an inconsistency, but does not explain the reasons for his expectation. Finally, Arthur seeks to resolve a discrepancy he perceives in the evidence. He points to expert testimony indicating gunpowder residue on the pillowcase found beneath Troy Wicker's head show the murder weapon was not discharged at close range. This, he argues, conflicts with Wicker's testimony that her husband was shot while sleeping and the autopsy report that Troy Wicker died of a gunshot wound to the right eyelid 'fired at a close range.' He seeks to examine the pillowcase and crime scene photographs to resolve this discrepancy. Judy Wicker did not testify about the distance between the killer and her husband so the discrepancy is not relevant to her testimony. Any discrepancy between the expert witnesses was heard and resolved by the jury and no further investigation is warranted.

Exhibit A at 7 n.6.  Arthur's complaint does not attempt to overcome Judge Nelson's findings that any test results would not establish actual innocence.

United States District Judge Scott Coogler, in denying Arthur's motion to alter or amend the judgment, likewise ruled that any test results would not establish factual innocence:

> …Arthur's conjectures about the relevance of the evidence of his claim of actual innocence fall far short of 'specific allegations showing reason to believe' that the fully developed facts might entitle him to relief. Bracy, 520 U.S. at 908-09.  Arthur seeks DNA testing of the blood on Judy Wicker's clothing, stating that he wants to show her assailant was someone other than him, but offers no 'reason to believe' that the blood on Judy Wicker's clothing came from anyone other than Judy Wicker.  Arthur seeks to examine the 'afro' wig and Negroid hair samples taken from Judy Wicker's car, contending testimony that the hair was forcibly removed and the inside of the wig was free of hair was inconsistent with Wicker's testimony that Arthur wore a black wig to disguise himself.  While there has been no explanation for the hair found in the car and the lack of hair in the wig, the findings are not inconsistent with Wicker's testimony.  Further, Arthur offers no 'reason to believe' his examination would reveal anything other than what is already established, and therefore, there is no 'reason to

believe' his examination could show he is 'more than likely' innocent.

Arthur seeks access to the bullet recovered from Troy Wicker's body and four spent cartridge casings found at the scene, claiming Patricia Green's testimony that she sent a third party to purchase .22 mini magnum long rifle bullets for Arthur on the day before the murder was insufficiently corroborated by the ballistic expert's testimony that the recovered bullet was a .22 long rifle caliber consistent with a CCI brand mini mag and the four shell casings were CCI brand .22 long or long rifle casings. But, Green's testimony was consistent with the testimony of the ballistic expert and does not require corroboration. Moreover, Arthur does not offer 'reason to believe' that his examination of the bullet and casings will reveal any different information from that already discovered by the experts.

Arthur seeks access to a gunpowder-tainted pillowcase and crime scene photographs arguing he must resolve an inconsistency between the ballistic expert's testimony and the autopsy report regarding the 'critical issue' of whether the gun was fired at close or far range. However, he offers no explanation for his conclusory claim that this discrepancy is 'critical' to his claim of actual innocence. He implies that he might be able to impeach Judy Wicker's testimony that her husband was sleeping when he was shot, but Wicker did not testify about the distance from which Troy Wicker was shot.

Arthur seeks to test Judy Wicker's rape kit. He alleged in his initial motion and in his present motion that Judy Wicker previously testified a 'black man' forced his way into her home, beat her, raped her, and killed her husband, but he did not point to any evidence of record that supports his assertion. This Court's review of the published opinions and the transcript of Arthur's last trial did not uncover any testimony that Judy Wicker was raped or that she had sexual intercourse on the morning of her husband's murder. Arthur has not offered any reason to believe that testing the rape kit would help show he was 'more likely than not' actually innocent of Troy Wicker's murder. Similarly, Arthur has not explained how examination of vacuum sweepings of the Wicker home could show he is 'more likely than not' actually innocenct.

Finally, none of the physical evidence can help Arthur establish his gateway claim of actual innocence because such a claim must rest on 'new reliable evidence' which was 'not presented at trial.' Schlup v. Delo, 513 U.S. 298, 324 (1995). Although Arthur claims some of the items were not tested, he does not claim or show that the items or proposed tests were unavailable at the time of his trial. Many of the items were admitted at trial. Thus, this evidence is not 'new' as required by Schlup.

Exhibit B at 5-7.

In conclusion, this Court should rule, just as the Eleventh Circuit did in Grayson, that "[Arthur] has no such constitutional or federally protected right under Brady

because the evidence was available prior to trial, he received a fair trial, and he cannot show 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Grayson, 460 F.3d at 1339-40, quoting Bagley, 473 U.S. at 682, 105 S.Ct. at 3383. "In other words, the asserted right at issue is not one to material, exculpatory evidence necessary to ensure a fair trial." Id. at 1340 (citation omitted).

### B. Cruel and Unusual Punishment

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. It limits the kinds of punishment that can be imposed on a person convicted of a crime, proscribes punishment grossly disproportionate to the severity of the crime, and imposes substantive limits on what can be deemed criminal and punished as such. Ingraham v. Wright, 430 U.S. 651, 668, 97 S.Ct. 1401, 1410 (1977). "The primary purpose of (the Cruel and Unusual Punishments Clause) has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statues…." Powell v. Texas, 392

U.S. 514, 531-32, 88 S.Ct. 2145, 2154 (1968)(plurality opinion).

Presumably, Arthur is arguing that it is cruel and unusual punishment to subject him to a sentence of death if there is evidence that might exonerate him. However, in light of the overwhelming evidence and the fact that DNA test results would not exonerate him, no purpose would be served in allowing DNA testing. Arthur is not being subjected to cruel and unusual punishment. To the extent he is challenging the constitutionality of the death penalty, this is a claim that could have been raised in his appeal and post-conviction proceedings and should not be considered here.

### C. Right of Access to Courts and Equal Protection

There exists a constitutional right of access to the courts. Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491 (1977). However, a plaintiff alleging a deprivation of that right must establish "relevant actual injury." Lewis v. Casey, 518 U.S. 343, 348-51, 116 S.Ct. 2174, 2178-80 (1996). Arthur must establish prejudice by "demonstrat[ing] that [he has been] hindered in his efforts to pursue a legal claim." Id. at 348, 116 S.Ct. at 2180.

The Eleventh Circuit has not specifically addressed an access-to-court claim in the context of a demand from the State for biological evidence for DNA testing. However, in addressing generally the scope of the constitutional right to access court, the Eleventh Circuit has provided the following guidance:

> Bounds was a limited decision. At the time it was decided, Bounds was the culmination of a series of cases holding that imprisonment should not deprive persons of access to courts…. All of these decisions simply removed barriers to court access that imprisonment or indigency erected. They in effect tended to place prisoners in the same position as nonprisoners and indigent prisoners in the same position as nonindigent prisoners.

Hooks v. Wainwright, 775 F.2d 1433, 1436 (11th Cir. 1985). There is no allegation or indication that the denial of Arthur's request to access the evidence is related to his status as a prisoner or indigent. Moreover, the procedural history of Arthur's criminal case and subsequent challenges to his conviction and sentence make it clear that he cannot establish "relevant actual injury" as Lewis requires because he has been accessing the courts for over 20 years. See Exhibit A at 1-4 (summarizing Arthur's procedural history).

D.   **Right to Apply For Executive Clemency**

Arthur contends that without access to the biological evidence for DNA testing, he will be unable to apply for executive clemency.  Leaving aside that Arthur has no federal constitutional right for DNA testing pursuant to executive clemency, Arthur can petition the Governor in the clemency process to allow for DNA testing.

Under the Constitution of Alabama, the power to commute a death sentence is vested exclusively in the Governor. Ala. Const. § 124 (amended 1939); Wilson v. State, 105 So. 2d 66, 71 (Ala. 1958).  As a part of the clemency proceedings, the State is required to appear and provide the Governor with any materials deemed necessary or pertinent.  Ala. Code § 12-17-184(16).  The Governor's clemency authority is extensive and exclusive.  Montgomery v. State, 163 So. 2d 365, 368 (Ala. 1935)("But where the pardoning power is conferred on the executive without express or implied limitations, the grant is exclusive, and the legislature can neither exercise such power itself nor delegate it elsewhere, nor interfere with or control the proper exercise thereof…").  Thus, had Arthur asked, the

Governor could have ordered the State to produce the evidence for testing.

In any event, Arthur has not established a federal constitutional right to DNA testing in order to pursue executive clemency of his death sentence.

### E.    This Lawsuit is Barred by the Statute of Limitations

Where a federal statute does not contain a limitation period, courts should look to the most analogous state statute of limitations. See Owens v. Okure, 488 U.S. 235, 249-50 (1989); Wilson v. Garcia, 471 U.S. 261, 266-67 (1985). The Eleventh Circuit applies the personal injury statute of the state in which the federal court is sitting. See Hill v. Metropolitan Atlanta Rapid Transit Authority, 841 F.2d 1533, 1545-46, modified on other grounds, 848 F.2d 1522 (11th Cir. 1988). All § 1983 actions commenced in Alabama are subject to a two-year statute of limitations. Shows v. Morgan, 40 F.Supp.2d 1345 (M.D. Ala. 1999); Anderson-Free v. Steptoe, 970 F.Supp. 945 (M.D. Ala. 1997).

Arthur has known of the existence of this physical evidence since his first trial in 1982. Yet, he requests DNA testing of the items listed in his complaint for the

first time in 2007.[11]    Death-row inmates have decades to challenge their conviction and death sentence in throughout layers upon layers of review.  A device currently in vogue is to attempt to delay that sentence even further by filing § 1983 lawsuits at or near the end of post-conviction review and then to seek a stay of execution for time to litigate that claim.  But enough is enough.  This lawsuit should be dismissed because it was filed beyond the expiration of the statute of limitations.

### F.    Arthur's Claims Are Also Barred By Laches

Plaintiffs' claims are also due to be dismissed based on the doctrine of laches.[12]  A claim is barred by laches if the following three elements are present: "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted."  Kason Indus., Inc. v. Component hardware Group, Inc., 120 F.3d 1199, 1203 (11th Cir. 1997).  The first two elements are met because Arthur knew or should have known of his claim

---

[11] As previously stated, the Eleventh Circuit has found that DNA testing has been available since 1986.  Grayson, 460 F.3d at 1335-36.

[12] Plaintiff may argue that Defendants' two theories, laches and statute of limitations, are inconsistent.  To that extent, Defendants' grounds should be considered as alternative theories.

years ago because he has known of the existence of the evidence and the availability of DNA testing. He could have asserted his claims much earlier and there is no excuse for his having failed to do so.

The unreasonable delay has likewise caused defendants undue prejudice. "Both the State and the victims of crime have an important interest in the timely enforcement of a sentence." Hill v. McDonough, 547 U.S. __, __, 126 S.Ct. 2096, 2104 (2006). Alabama has a "significant interest in meting out a sentence of death in a timely fashion." Nelson v. Campbell, 541 U.S. 637, 644 (2004). Similarly, the public has an interest in seeing Arthur held accountable for their crimes. Arthur's lawsuit, asserted at the eleventh hour, will impede these interests.

Thus, the State and the victims of Arthur's crimes have a recognized and powerful interest in the timely enforcement of Arthur's duly-adjudicated sentence. This interest is impeded, and thus prejudice is caused, by Arthur's unreasonable delay in filing his § 1983 action.

Even though no execution date has yet been set, that does not, however, mean that defendants have not been or

cannot be prejudiced.[13]   Arthur has exhausted all review available to him and Alabama has moved for an execution date, and Arthur knows that an execution date is eminent. The Eleventh Circuit recently emphasized that § 1983 challenges filed with unreasonable delay will not stop an execution from happening:

> We agree with the district court's finding of fact that one of the most naturally foreseeable risks facing an inmate who waits to file his method-of-execution challenge until many months after his federal habeas petition has been denied on appeal is that an execution date will be set during the pendency of the proceedings, thus necessitating the entry of a stay if full adjudication and an appeal are to be had. This risk is particularly foreseeable in Alabama, where the Alabama Supreme Court is authorized to enter an order fixing an inmate's date of execution "at the appropriate time." Ala. R.App. P. 8(d) ("The supreme court *shall at the appropriate time* enter an order fixing a date of execution." (emphasis added)). It is common practice in Alabama for the State to seek an execution date soon after the Supreme Court denies *certiorari* review of an inmate's federal habeas petition. As a matter of common sense, completion of collateral review eliminates the last possible obstacle to execution, and Jones should have foreseen that the execution date would likely be set promptly upon completion of

---

[13] On April 17, 2007, the State of Alabama filed a motion in the Alabama Supreme Court requesting that court to set Arthur's execution.

> collateral review. Although Jones
> suggests that the State acted
> inappropriately in seeking an execution
> date in this case, we note that the
> district court expressly found as a fact
> that "there is no evidence in this case
> that the State sought and obtained an
> execution date for Jones in bad faith."
> *Jones v. Allen,* No. 2:06-cv-00986-MHT-
> TFM, slip. op. at 37 (M.D. Ala. April 17,
> 2007).

<u>Jones v. Allen</u>, ___ F.3d at ___, n.2. The pendency of this action, then, will interfere with the State's interest in seeing its judgments carried out. The lateness of the filing prejudices the defendants, and this action is due to be dismissed on grounds of laches.

Arthur filed this action sixteen years after he was thrice convicted for this capital murder; nine years after his direct appeal ended; five years after the end of his untimely-filed state Rule 32; five years after he initiated habeas proceedings; five years after the State of Alabama made lethal injections its method of execution. He filed <u>after</u> the conclusion of habeas review and <u>after</u> the State moved for an execution date. Binding Eleventh Circuit precedent provides that Arthur could have filed his claim earlier and that he should have known that the State would move for execution. Now, the case cannot be litigated to

conclusion without prejudicing the State, without requiring a stay and interfering with the State's interest in enforcement of its judgment. Laches, then, is an absolute bar and requires dismissal.

## V. ARTHUR'S REQUEST FOR "OTHER TESTING" SHOULD BE DISMISSED

The request in Arthur's complaint that seeks "other testing" of unspecified items should be dismissed. The Eleventh Circuit has recognized that claims seeking post-conviction access to biological evidence for DNA testing purposes may be brought as a § 1983 action. Bradley v. Pryor, 305 F.3d 1287, 1290 (11th Cir. 2002). However, in Grayson, the Eleventh Circuit decided that the inmate did not demonstrate a "federal constitutional right to post-conviction access to biological evidence for DNA testing." Grayson, 460 F.3d at 1336. The Grayson Court recognized the accuracy and importance of DNA testing in "identifying and/or excluding suspects of violent crime. Id. at 1342-43. Of course, a sub-part of Bradley and Grayson is that DNA testing was not available when these defendants were tried for capital murder.

The Eleventh Circuit has not extended Bradley to allow § 1983 actions to encompass other forms of testing.

Moreover, Arthur does not even assert what form of "other testing" he seeks or whether or not such testing was available at the time of his third capital murder trial held in 1991. Thus, the part of Arthur's complaint that requests "other testing" and access to photographic evidence should be dismissed because such requests are not allowed in a § 1983 action. Arthur could have (and did) raised such claims in his previously-filed post-conviction petition.

### CONCLUSION

Wherefore, for the foregoing reasons, Arthur's complaint should be dismissed.

<div style="margin-left:40%">

Respectfully submitted,

TROY KING
ALABAMA ATTORNEY GENERAL


/s/ J. Clayton Crenshaw
J. CLAYTON CRENSHAW
ASSISTANT ATTORNEY GENERAL

</div>

Alabama Attorney General's Office
11 South Union Street
Montgomery, Alabama 36130
(334)242-7408
ccrenshaw@ago.state.al.us

41

**CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to the following: **Charles E. Vercelli, Jr., Benjamin Howard Albritton, Sultana L. Bennett, Suhana S. Han, Jordan T. Razza.**

I also served a copy of the foregoing document on the following attorney by placing a copy of the same in the United States mail, first class postage prepaid and addressed as follows:

M. David Barber
District Attorney
Tenth Judicial Circuit of Alabama
801 Richard Arrington Jr. Blvd. N. - Suite L-01
Birmingham, AL 35203

/s/ J. Clayton Crenshaw

J. CLAYTON CRENSHAW
ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:
Office of the Attorney General
Capital Litigation Division
Alabama State House
11 South Union Street
Montgomery, AL 36130
(334) 242-7300

# United States District Court
## Northern District of Alabama
## Southern Division

02 DEC -4 PM 3: 14

DISTRICT COURT
N.D. OF ALABAMA

Thomas D. Arthur,       ]
                        ]
    Petitioner,         ]
                        ]
    vs.                 ]     CV-01-N-0983-S
                        ]
Michael Haley, Commissioner,   ]
Alabama Department of   ]
Corrections,            ]
                        ]
    Respondent.         ]

**ENTERED**

DEC 0 4 2002

## Memorandum of Opinion

    This is an action for habeas corpus relief under 28 U.S.C. § 2254 by an Alabama state prisoner under a sentence of death. With the assistance of counsel, Thomas D. Arthur ("Arthur") filed his petition on April 20, 2001, challenging his December 5, 1991, state court murder conviction. The cause is presently before the court to determine if there is sufficient reason to excuse Arthur's failure to file his petition within the one-year period imposed by The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244(d)(1). The AEDPA statute of limitations was raised in the Respondent's April 23, 2001, Motion to Dismiss, and the issue has been fully briefed by the parties. For the reasons set out below, the court finds no lawful ground to excuse the untimeliness of the petition. Accordingly, the petition for the writ of habeas corpus is due to be, and will be, dismissed.

## BACKGROUND

1.    Arthur's first conviction and sentence of death for the murder of Troy Wicker was reversed by the Alabama Supreme Court on May 10, 1985. *Ex parte Arthur*, 472 So. 2d 665

5'

(Ala. 1985)(details of a prior murder were improperly admitted at trial under the identity exception to general exclusionary rule).

2.    Arthur was convicted and sentenced to death a second time for the Troy Wicker murder, but his second conviction and sentence were reversed by the Alabama Court of Criminal Appeals. *Arthur v. State*, 575 So. 2d 1165 (Ala. Crim. App. 1990)(trial court improperly admitted a statement made by the defendant to a police officer in the absence of counsel two weeks after he had asserted his right to remain silent), *cert. denied, Ex parte State of Alabama [Re Arthur v. State]*, 575 So. 2d 1191 (Ala. 1991).

3.    Arthur was tried a third time for the murder of Troy Wicker and convicted on December 5, 1991. (CR. 11, R. 1150).[1] The trial court, following the jury's recommendation, sentenced Arthur to death on January 24, 1992. (CR. 12, 14-27; R. 1237, 1291-1300).

4.    The Alabama Court of Criminal Appeals affirmed Arthur's conviction and death sentence on March 8, 1996. *Arthur v. State*, 711 So. 2d 1031 (Ala. Crim. App. 1996).

5.    The Alabama Supreme Court affirmed the decision of the Court of Criminal Appeals on November 21, 1997. *Ex parte Arthur*, 711 So. 2d 1097 (Ala. 1997). Arthur's application for rehearing was denied on March 20, 1998. (State's Answer and Motion to Dismiss, Doc. 6, Ex. A).

---

[1]The record in this case consists of eleven numbered volumes comprising the proceedings at Arthur's capital murder trial, one volume comprising a supplemental record on appeal, and various loose documents memorializing the state collateral proceedings which have been attached to various pleadings filed in this court. The eleven numbered volumes include 880 numbered pages comprising the clerk's record, followed by the separately numbered transcript of the proceedings before Judge Hard. For citation purposes, the court will follow the state's example and refer to the initial 880 pages of the eleven numbered volumes as the "Clerk's Record"("CR.") to distinguish them from the separately numbered transcript "Record" ("R."). Similarly, the initial pages in the single Supplemental Volume will be referred to as "Supplemental Clerk's Record" ("SCR.") and the following transcript pages will be referred to as the "Supplemental Record" ("SR."). Documents filed in this court will be referenced, as is this court's usual practice, by the docket number and exhibit reference, if any.

2

6.    Arthur did not petition for the writ of certiorari to the Supreme Court of the United States, nor did he seek state or federal collateral review at any time before January 25, 2001.

7.    On September 15, 2000, the State filed an "Amended Motion to Set Execution Date" in the Supreme Court of Alabama. (Doc. 46, Ex. 1).

8.    On January 25, 2001, Arthur, proceeding through counsel, filed his Rule 32 Petition in the Tenth Judicial Circuit Court of Jefferson County, Alabama. (Doc. 47, Ex. 1, 2). The Rule 32 Petition was dismissed as untimely on March 5, 2001. (Doc. 47, Ex. 4).

9.    On March 23, 2001, the Alabama Supreme Court entered its order setting Friday, April 27, 2001, as Arthur's execution date. (Doc. 46, Ex. 3).

10.    On March 28, 2001, Arthur filed a motion to reconsider the dismissal of his Rule 32 petition in the Tenth Judicial Circuit Court of Jefferson County Alabama, (Doc. 47, Ex. 5), and on April 4, 2001, Arthur filed a "Motion for Stay of Execution" in the Alabama Supreme Court. (Doc. 47, Ex. 6).

11.    On April 11, 2001, the Alabama Supreme Court denied Arthur's motion to stay his execution. (Doc. 47, Ex. 8).

12.    On April 20, 2001, Arthur filed his "Petition for Writ of Habeas Corpus" and his "Motion for Stay of Execution" in this court. (Doc. 1, 3). After consideration of written and oral arguments, this court entered its order granting Arthur's motion for stay on April 25, 2001. (Doc. 11). The Eleventh Circuit Court of Appeals denied Respondent's motion to vacate or dissolve the stay on April 26, 2001. (Doc. 16).

13.    Because Arthur's March 28, 2001, motion to reconsider was pending in the Tenth Judicial Circuit Court of Jefferson County Alabama, (Doc. 47, Ex. 5), this court stayed

3

consideration of the present habeas corpus petition until the conclusion of the state court proceedings initiated by Arthur's Rule 32 petition. (Doc. 11).

14.    The Alabama Court of Criminal Appeals affirmed the denial and dismissal of the state post-conviction petition on April 25, 2001. *Arthur v. State*, 820 So. 2d 886 (Ala. Crim. App. 2001). State court review of Arthur's Rule 32 petition concluded when the Alabama Supreme Court denied Arthur's petition for the writ of certiorari on November 2, 2001. (Doc. 49).

15.    On May 13, 2002, the United States Supreme Court denied Arthur's petition for writ of certiorari from his state court Rule 32 proceedings. (Doc. 32).

## DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year period of limitations for writs of habeas corpus. 28 U.S.C. § 2244(d)(1).[2] Unless the exceptions set out in § 2244(d)(1)(B), (C), or (D) apply, the limitation period runs from the latest of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). In Arthur's case, direct review concluded when the Alabama Supreme Court denied the motion for reconsideration on March 20, 1998, and, therefore, the time for seeking review in the United States Supreme Court expired on June 18, 1998. S. Ct. R. 13 (". . . a petition for writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last

---

[2] The one-year limitations period does not include the time during which a "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim" is pending in the state court. 28 U.S.C. § 2244(d)(2). *Artuz v. Bennett*, 531 U.S. 4 (2000). Arthur did not seek post-conviction or collateral review in the Alabama courts prior to the expiration of the one-year AEDPA limitations period and he does not claim here that the limitations period was tolled at any time pursuant to 28 U.S.C. § 2244(d)(2). *See Webster v. Moore*, 199 F.3d 1256, 1259 (11th Cir. 2000)(state court petition filed after the expiration of the AEDPA limitations period does not toll the period because there is no period remaining to be tolled).

4

resort, . . . is timely when it is filed with the Clerk of this Court within 90 days after entry of judgment).[3] Arthur did not file his current habeas petition until April 20, 2001, approximately 21 months after AEDPA's one year limitation period expired.

Arthur claims this court should excuse his dilatory filing and reach the merits of his claim because he is actually innocent of the crime for which he was thrice convicted. Arthur further claims he is entitled to statutory or equitable tolling of the one-year limitations period. Arthur has also filed a "Motion for Leave to Conduct Discovery" (Doc. 33), seeking access to physical evidence and documents he claims are applicable to his threshold claims.

## I.    Discovery

Arthur seeks access to physical evidence, including Judy Wicker's clothing, a rape kit created the day of the murder, a wig and hair samples collected from Judy Wicker's car, vacuum sweepings and a hair sample from the Wicker residence, a bullet, spent cartridge casings, and a pillowcase. He also seeks documents covering the period 1998 through 2000 concerning the death row law library at Holman Prison, showing which books and materials were carried, how they were organized, the library's budget, availability of materials, other activities in the vicinity, and access to the library. Arthur claims he has shown the "good cause" required by Rule 6(a) of the Rules Governing Section 2254 Cases because the discovery requests are "directly relevant" to his claim that the AEDPA statute of limitations should not bar review of his petition.

---

[3] The United States Court of Appeals has recently held that AEDPA's one year limitations period begins to run when the time for filing a petition for the writ of certiorari with the United States Supreme Court has expired. *Bond v. Moore*, 309 F.3d 770, (11th Cir. 2002) (No.00-16544, October 10, 2002).

A habeas petitioner is not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rule 6(a) of the Rules Governing § 2254 Cases permits discovery upon a showing of good cause, which requires "specific allegations" showing reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to habeas relief. *Id.* at 908-09. "In passing AEDPA . . . Congress modified the discretion afforded to the district court and erected additional barriers limiting a habeas petitioner's right to discovery or an evidentiary hearing." *Isaacs v. Head*, 300 F.3d 1232, 1248-49 (11th Cir. 2002) (applying the diligence standard of 28 U.S.C. § 2254(e)(2) to petitioner's request for discovery and evidentiary hearing). When a habeas petitioner has failed to develop the factual basis for his claims in State court proceedings he must satisfy the stringent conditions of 28 U.S.C. § 2254(e)(2). *See Williams v. Taylor*, 529 U.S. 420 (2000).[4]

Arthur theorizes that tests of the rape kit and other evidence might place another malefactor at the scene and thereby undermine Judy Wicker's testimony that she hired Arthur to kill her husband. He points to Wicker's prior testimony that an African American man forced his way into her home, beat her, raped her, and killed her husband,[5] and he speculates that the test results might support this alternate version of events. Arthur's conjectures fall far short of the specific allegations required by *Bracy* to establish good

---

[4] In his June 3, 2002, brief, petitioner argued that he need not satisfy the more stringent AEDPA standard to obtain discovery because he is not requesting an evidentiary hearing. The Eleventh Circuit's subsequent decision in *Isaacs* indicates otherwise. In any event, Arthur has failed to establish the "good cause" required for obtaining Rule 6 discovery under *Bracy*.

[5] In response to questioning at Arthur's last trial, Wicker testified that Arthur concocted the earlier story.

cause for discovery.[6] Moreover, discovery must be aimed at obtaining evidence to support a constitutional claim. *Bracy*, 520 U.S. at 905-06. At best, Arthur proposes to impeach Judy Wicker's testimony, and none of his speculations, if proven, would establish he is *actually innocent* under either the "more likely than not" standard or the "clear and convincing" standard. *Compare Schlup v. Delo*, 513 U.S. 298 (1995)(gateway claim that petitioner is actually innocent of crime is established by evidence that petitioner is "more likely than not" innocent) and 28 U.S.C. § 2254(e)(2)(evidentiary hearing warranted if, *inter alia*, the facts underlying claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense).[7] *See Sawyer v. Whitley*, 505 U.S. 333, 349 (1992)(". . .latter-day

---

[6] Although Arthur generally claims that a new examination of the evidence might obtain results contrary to Wicker's version of events, his specific allegations do not support his claim. He has a notion that blood typing or DNA testing of Judy Wicker's bloody clothing might show someone else assaulted her, but there is no basis in the record for his belief that the blood on her clothing belonged to her assailant. Rather, the evidence was that Wicker was assaulted from behind, did not struggle, and was bleeding due to extensive head and face injuries. Arthur contends examination of the rape kit and vacuum sweepings could support Wicker's prior testimony about being assaulted and raped by someone else, but merely showing another person was with Judy Wicker or in her home at some unspecified time does little to support her prior testimony or further impeach her testimony about Arthur's involvement. At best, it would provide some additional inference about Judy Wicker's veracity, a subject which was amply covered during the trial. Arthur also speculates that DNA tests of the wig and hair samples from the car could show Wicker fabricated her testimony that Arthur wore a wig and dark face makeup to disguise himself as a "black man." However, expert testimony at the trial indicated the hair samples were of African American origin. Arthur provides no support for his speculation that different tests could impeach Wicker's testimony. Experts testified the cartridge casings and bullets were consistent with the type of ammunition Patricia Green obtained for Arthur on the day prior to the murder. Arthur hopes that his tests might now show an inconsistency, but does not explain the reasons for his expectation. Finally, Arthur seeks to resolve a discrepancy he perceives in the evidence. He points to expert testimony indicating gunpowder residue on the pillowcase found beneath Troy Wicker's head show the murder weapon was not discharged at close range. This, he argues, conflicts with Wicker's testimony that her husband was shot while sleeping and the autopsy report that Troy Wicker died of a gunshot wound to the right eyelid "fired at a close range." He seeks to examine the pillowcase and crime scene photographs to resolve this discrepancy. Judy Wicker did not testify about the distance between the killer and her husband so the discrepancy is not relevant to her testimony. Any discrepancy between the expert witnesses was heard and resolved by the jury and no further investigation is warranted.

[7] *Isaacs v. Head*, 300 F.3d 1232 (11th Cir. 2002), further indicates that Arthur's request for release of the physical evidence is due to be denied because he failed to exercise "due diligence" in pursuing the facts during the state proceedings.

evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of [the witness's] account. . . ."). Discovery is not warranted unless there is reason to believe the results would demonstrate entitlement to habeas relief. *Bracy*, 520 U.S. at 908-09.

Arthur's request for discovery regarding the death row law library is similarly deficient. The request relates solely to his tolling claims, and the results would not bear any relation to his guilt or innocence of the crime or otherwise support a constitutional claim entitling him to habeas relief. *Bracy*, 520 U.S. at 905-06 (court must identify the essential elements of constitutional claim in order to determine whether discovery would establish claim); *Harris v. Nelson*, 394 U.S. 286, 300 (1969) (court should facilitate discovery where full development of specifically alleged facts would demonstrate petitioner is confined illegally and is thus entitled to habeas relief); 28 U.S.C. § 2254(e)(2)(B) (evidentiary hearing is warranted where underlying facts could not be previously discovered through exercise of due diligence and would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found applicant guilty of underlying offense).

For the foregoing reasons, Arthur's request for discovery will be denied.

## II.    Actual Innocence

Like others before him, Arthur claims an "actual innocence" exception to the AEDPA limitation period is necessary to avoid an unconstitutional suspension of the writ. *See Wyzkowski v. Dep't of Corrections*, 226 F.3d 1213 (11th Cir. 2000). The Eleventh Circuit has yet to decide whether there is such an exception to the AEDPA limitations period, but has

8

left the door open for consideration of the constitutional question in a case in which the petitioner is able to make a showing of actual innocence. *Wyzkowski*, 226 F.3d at *Id.* at 1217-18(the constitutional question need not be addressed unless and until an untimely petitioner is able to make a sufficient showing of actual innocence). This court, then, has the initial task of determining if Arthur has made a showing of actual innocence sufficient to trigger the duty to evaluate the constitutional question. Upon examination of the evidence Arthur has proffered, the court is satisfied Arthur cannot meet that high standard.

Although the federal courts have long recognized that an otherwise barred petition should be reviewed to avoid a miscarriage of justice when the petitioner presents sufficient evidence of his actual innocence, different standards have been used to determine whether the petitioner has made the threshold showing sufficient to permit review. *Calderon v. Thompson,* 523 U.S. 538, 559 (1998)("Although demanding in all cases, the precise scope of the miscarriage of justice exception depends on the nature of the challenge brought by the habeas petitioner"). *See* 28 U.S.C. § 2244(b)(2)(except for claims based on new constitutional law made retroactive by the United States Supreme Court, consideration of any new claim in a second or successive petition is permitted when the petitioner shows, *inter alia,* the facts underlying the claim establish his innocence by clear and convincing evidence); *Schlup v. Delo*, 513 U.S. 298, 322 (1995)(petitioner claiming actual innocence of the underlying crime must show it is "more likely than not" that no reasonable juror would have convicted him in light of new evidence); *Sawyer v. Whitley*, 505 U.S. 333 (1995)(petitioner challenging death sentence must show by clear and convincing evidence that no reasonable juror would have found him eligible for the death penalty in light of new

9

evidence); *Herrera v. Collins*, 506 U.S. 390 (1993)(where petitioner has no claim of constitutional error at trial, he must show actual innocence of the crime by clear and convincing evidence to proceed with successive or abusive writ). This court need not linger over esoteric questions regarding the appropriate standard in this case, however, because the proffered evidence is insufficient to meet the "actual innocence" threshold even upon application of the more lenient "more likely than not" test. *See Calderon*, 523 U.S. at 558(tension between *Sawyer* and *Schlup* standards need not detain court where claims fail under either standard).

The miscarriage of justice standard is concerned with actual as compared to legal innocence. *Sawyer*, 505 U.S. at 339. To demonstrate actual innocence the petitioner must present "new reliable evidence that was not presented at trial" and show, in light of all the evidence, "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 299, 327-28.

The evidence at Arthur's third trial established that Troy Wicker was fatally shot on February 1, 1982, while he lay in bed at his home in Muscle Shoals, Alabama. The prosecution presented the testimony of Mary Jewel (Judy) Wicker, the wife of the victim, who testified that she had a sexual relationship with Arthur and that she paid Arthur $10,000 to murder her husband.

Talmadge Sterling, an employee of the Decatur Work Release Center at the time of the murder, testified that Arthur was an inmate of the center, but was signed out for work between 6:00 a.m. and 7:50 p.m. on the day of the murder. Arthur was assigned to work at Reagan Mobile Homes but the operator of the business, Joel Reagan, testified he was an old

10

acquaintance of Arthur's and, because Arthur's day to day activities at the business were not closely supervised, he did not know Arthur's whereabouts on the day of the murder. Patricia Yarborough Green testified that Arthur frequented Cher's Lounge, where she worked. He came in four to five days a week, sometimes in the company of Joel Reagan. Debra Lynn Phillips, the operator of Cher's Lounge and Arthur's paramour, also testified Arthur came to the bar four to five times per week, usually in the afternoon. Pat Halliday, a shift supervisor at Decatur Work Release Center in 1982, testified there was a discrepancy between the number of hours Arthur was away from the center and the number of hours he was actually paid for working in February and March of 1982.

Patricia Yarborough Green further testified that, on the day before the murder, she helped Arthur obtain .22 caliber mini mag long rifle bullets and that Arthur told her the bullets would be used to kill someone. Brent Wheeler, director of the Huntsville Forensic Lab in 1982, testified that the bullet removed from Troy Wicker's body was a .22 long rifle caliber consistent with a CCI brand mini mag. The four shell casings found near the body were CCI brand .22 long or long rifle casings.

In addition to the evidence tending to show Arthur had the opportunity and means to kill Troy Wicker, other evidence substantiated Judy Wicker's testimony. Joel Reagan testified he saw Judy Wicker and Arthur together at the mobile home business. Judy Wicker stated that, on the morning of the murder, she dropped her sons at school, drove back and forth on Avalon Avenue a couple of times and then picked Arthur up near the airport. This testimony was consistent with the testimony of Charles Eddie Lang, a Muscle Shoals Police officer who was serving as a school crossing guard on Avalon Avenue that morning, and

11

observed Ms. Wicker twice pass by the crossing prior to 8:00 a.m., when he left his post. Ms. Wicker also testified that Arthur wore an "afro" wig and makeup to disguise himself as a black man, and this was consistent with the testimony of John Kilbourne of the Alabama Department of Forensic Science at Huntsville, who stated that hair gathered by Joseph Gary Wallace from Ms. Wicker's car was negroid head hair. Wicker testified Arthur was carrying a gun and a garbage bag. Phillips testified Arthur was supposed to meet her for lunch on the day of the murder, but he was late and, instead of going to lunch, they rode to a bridge over the Tennessee River where Arthur stopped the car and threw a partially filled garbage bag wrapped in a sheet into the river.

Moreover, Arthur had a large amount of money in his possession after the murder, consistent with Wicker's testimony that she paid him for the murder out of the insurance on Troy Wicker's life. Pat Halliday testified that Arthur was transferred to the Morgan County Jail after the discovery of the discrepancy between the number of hours he was away from the center and the number of hours he was actually paid for working. Upon routine inspection of his effects prior to the transfer, twenty one hundred dollar bills were discovered in an envelope in Arthur's overcoat pocket.[8]

Arthur's claim of actual innocence rests on affidavits from Alphonso High, Ray Melson, and Billy Peebles. Doc. 36; Exhibits to Doc. 41. Mr. High attested that Arthur visited him "around 9 a.m." the morning of February 1, 1982, at his Decatur place of business,

---

[8] At trial, Arthur presented testimony from Bruce Carroll, who said he lost $6500 to Arthur in a poker game, and testimony from Gene Moon, who said that Hillard Murray gave him money to put in Arthur's coat pocket. Arthur also presented the testimony of Ronald Spears, who said Patricia Green lied in her testimony about procuring bullets for Arthur because she was threatened.

12

Copper Mobile Homes.[9] He stated that he believed Arthur was driving his Ford LTD and that they had a 30 minute conversation about setting up a trailer in Birmingham. Mr. High further stated that he heard about the murder of Troy Wicker on the following day and, when he heard Arthur was arrested for the murder about two months later, he recalled he had spoken with Arthur on the morning of the murder. Mr. Melson also stated he saw Arthur at Copper Mobile Homes between 8:00 a.m. and 9:00 a.m. that day.[10] Mr. Peebles stated that it was Arthur's habit to arrive at work at Reagan Mobile Homes at 7:30 a.m. and take a bubble bath until 8:00 a.m.

In response to Arthur's submission, the state procured additional statements from the affiants. Doc. 39, 53. In his second statement, Mr. High stated that he was not sure if he saw Arthur on February 1, 1982, or on another day in late January or early February of that same year. In his second statement, Mr. Peebles clarified that he could only state that Arthur's habit was to take a bubble bath between 7:30 and 8:00 a.m. but that he could not state that Arthur bathed every morning or that he was bathing on the morning of February 1, 1982. Finally, Mr. Melson stated that he signed the first affidavit while he was under the influence of strong prescription medication, and he revised his statement to say that he saw Arthur

---

[9]Arthur submitted the affidavit of Stephen J. Gustat, a licensed private investigator from Tampa, Florida, who attested that, on Sunday, June 9, 2002, he drove the distance between the address of the Wicker home and the former location of the Copper Mobile Homes and ascertained that the drive took approximately 60 minutes.

[10]Arthur submitted the Melson affidavit with his reply brief, triggering an unsolicited response from the State to which Arthur responded as discussed above. These dueling affidavits serve only to demonstrate the unreliability of the affiants. Moreover, submitting them, as he has, many years after the events in question, Arthur can hardly expect the necessary finding of due diligence that would entitle him to an evidentiary hearing to resolve discrepancies in the witnesses' stories. 28 U.S.C. § 2254(e)(2).

between 7:30 or 10:00 in the morning but he could not be sure that the date was February 1, 1982.[11]

In view of the witnesses' tendencies to change their statements and Arthur's long delay in presenting this evidence the affidavits Arthur submitted are not sufficiently reliable to cast doubt on the jury's verdict. A claim of actual innocence must be supported with "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324; cf. *Herrera*, 506 U.S. at 423-24 (O'Connor, J., concurring)(observing that affidavits produced at the 11th hour with no reasonable explanation for long delay were suspect).

Furthermore, pretermitting questions of credibility, Arthur's lately acquired affidavits do not raise "sufficient doubt about [his] guilt to undermine confidence in the result of the trial . . ." *Schlup*, 513 U.S. at 317. The jury heard direct evidence of Arthur's involvement in the murder in the form of Judy Wicker's testimony. Other evidence was introduced that corroborated significant portions of Wicker's testimony. Actual innocence "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Schlup*, 513 U.S. at 329. In view of the significant evidence of guilt presented at Arthur's trial, this is not that

---

[11] Arthur claims, with a supporting affidavit from one of his attorneys, the State coerced the revised statements because one of the State representatives was visibly carrying a weapon. The State responded with additional evidence tending to show the statements were not coerced. This court need not resolve the issue since the change in the statements alone strengthens the conclusion that the statements are unreliable and Arthur has not shown he was diligent in pursuing this alibi evidence, so that he is not entitled to an evidentiary hearing.

14

"extraordinary case" in which this court could say a constitutional error "probably" resulted in the conviction of one who was actually innocent. *Id.* at 322, 327.

Finally, Arthur has requested a hearing to take testimony from High, Peebles and Melson, but has made no attempt to show he diligently pursued the factual predicate of his alibi claim in state court. 28 U.S.C. § 2254(e)(2). *Isaacs*, 300 F.3d at 1248-49. Arthur claims his attorneys failed to conduct an adequate investigation, but Arthur himself was equally responsible for making "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court. . . ." *Williams v. Taylor*, 529 U.S. 420, 436 (2000) (interpreting 28 U.S.C. § 2254(e)(2)). His whereabouts at the time of Troy Wicker's murder was singularly within Arthur's knowledge, and yet he never made this claim or presented this evidence to *any* state court. In this circumstance, he did not act with due diligence.

## III.   Statutory Tolling

The AEDPA statute of limitations can be tolled until "the date on which [an] impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action." 28 U.S.C. § 2244 (d)(1)(B). "[I]n the event of illegal state action preventing the petitioner from filing, the limitation period does not begin until after the state impediment is removed." *Wyzkowski*, 226 F.3d at 1216. Arthur claims the state unconstitutionally prevented him from filing his petition for collateral relief by failing to provide him with post-conviction counsel or any form of legal assistance and by failing to provide access to adequate law library facilities. He contends that Alabama is

15

the only death penalty jurisdiction which does not provide capital prisoners with post-conviction counsel, and the failure contravenes evolving standards of decency in violation of the Eighth Amendment.

Neither the Eighth Amendment nor the due process clause requires that an indigent defendant be provided with counsel when seeking state post-conviction relief, even in a capital case. *Murray v. Giarratano*, 492 U.S. 1 (1989); *Pennsylvania v. Finley*, 481 U.S. 551 (1987). Pointing to Justice Kennedy's concurrence, Arthur argues that *Giarratano* does not apply to Alabama's capital prisoners because Virginia's death row prisoners had otherwise obtained counsel and Virginia's prison system was staffed with institutional lawyers to assist in preparing for post-conviction relief.[12] 492 U.S. at 14-15. Arthur contends that, unlike the Virginia petitioner in *Giarratano*, he suffered actual injury because he was unable to obtain counsel to represent him and he had no legal assistance. The State correctly points out that the Supreme Court has subsequently applied *Giarratano* without apparent limitation.[13] Moreover, Arthur's evidence that he failed to obtain private counsel does not satisfy his burden of showing he was actually injured by the State's procedures.

In *Bounds v. Smith*, 430 U.S. 817 (1977), the Supreme Court held that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the

---

[12] Arthur contends the concurring opinion operates as the holding of the Court because *Giarratano* was a plurality opinion, citing *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . .'")(quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)).

[13] The State cites *Smith v. Robbins*, 528 U.S. 259, 276 (2000); *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 281 (1998); and *Coleman v. Thompson*, 501 U.S. 722, 752 (1991)(disallowing claim of ineffective assistance of post-conviction counsel because there is no constitutional right to such counsel).

16

preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance of counsel. *See Lewis v. Casey*, 518 U.S. 343, 346 (1996)(discussing *Bounds*). However, Bounds did not create an abstract, free standing right to a law library or legal assistance. *Casey*, 518 U.S. at 351. An inmate alleging a *Bounds* violation must show actual injury. *Id.* at 349. Alabama provides counsel for inmates pursuing state post-conviction relief whose petitions survive a summary review and Arthur has not presented any evidence that he, or any other Alabama death row prisoner who sought post-conviction counsel from the State, were denied such relief. Rule 32.7(c) of the Alabama Rules of Criminal Procedure provides:

> If the court does not summarily dismiss the petition, and if it appears that the petitioner is indigent or otherwise unable to obtain the assistance of counsel, and it further appears that counsel is necessary to assert or protect the rights of petitioner, the court shall appoint counsel.

*Id.* Summary disposition is an alternative to leave to amend, and leave to amend "shall be freely granted." Rule 32.7(d). Alabama's scheme is similar to the Virginia scheme considered and approved by the Supreme Court plurality in *Giarratano*. 492 U.S. at 5-6 and n.3. Arthur did not avail himself of the Alabama procedures for obtaining post-conviction counsel and thus cannot show he would not have obtained representation if he had made a request under Rule 32.7. His failure to obtain counsel cannot be laid at the State's door in these circumstances.[14]

---

[14] Moreover, nothing the State did prevented Arthur from obtaining counsel to proceed with his federal habeas petition in a timely manner under AEDPA because he could have requested counsel from the federal court. 21 U.S.C. § 848(q)(4)(B); *McFarland v. Scott*, 512 U.S. 849 (1994).

17

Arthur further contends that *Coleman v. Thompson*, 501 U.S. 722, 755-56 (1991) requires appointment of post-conviction counsel when, as in his case, the post-conviction proceedings are the first opportunity to raise claims of ineffective assistance of trial and appellate counsel. In *Hill v. Jones*, 81 F.3d 1015, 1024-26 (11th Cir. 1996), the Eleventh Circuit declined to find that such an exception to *Finley* and *Giarratano*. Arthur contends *Hill* and the other cases[15] rejecting the argument that *Coleman* created an exception to the *Finley* and *Giarratano* holdings are inapposite, because none involved a petitioner under sentence of death "entirely deprived" of any counsel in post conviction proceedings. However, Arthur's circumstances are similar to the capital petitioner in *Hill*, who had procedurally defaulted his ineffective assistance claims and was barred from any review of those claims. Furthermore, as stated above, Arthur has not shown that any state action "deprived" him of counsel for pursuit of post-conviction proceedings.

Arthur contends that it is of no consequence that post-conviction counsel is made available to Alabama petitioners who survive summary review because the main concern is to protect the ability of an inmate to prepare a petition or complaint. *Bounds v. Smith*, 430 U.S. 817 (1977). However, the *Giarratano* court rejected the notion that *Bounds* required appointment of post-conviction counsel before the filing of a petition. 492 U.S. at 10, n. 5. Again, there is no evidence that Arthur or any other Alabama death row inmate requested

---

[15] Arthur concedes that a number of circuits in addition to the Eleventh Circuit have considered and rejected his argument that *Coleman* created an exception to *Giarratano* when the post-conviction proceedings are the first opportunity to raise an ineffective assistance claim. *Mackall v. Angelone*, 131 F.3d 442 (4th Cir. 1997) (en banc); *Martinez v. Johnson*, 255 F.3d 229, 240-41 (5th Cir. 2001); *Nolan v. Armontrout*, 973 F.2d 615, 617 (8th Cir. 1992); *Bonin v. Calderon*, 77 F.3d 1155 (9th Cir. 1996); *Parkhurst v. Shillinger*, 128 F.3d 1366 (10th Cir. 1997). Doc. 35, p. 19-20, n. 4.

DEC 04 2002 17:21                    205-278-1772 USDC            PAGE.05

counsel from the State court and was refused or suffered a summary disposition of his claims.

Arthur further argues that the State deprived him of his constitutional right of access to the courts because the death row law library at Holman Prison is inadequate in that volumes are missing and books are scattered about the room. He claims the poor library coupled with the lack of counsel prevented him from having the tools he needed to attack his sentence. *Lewis,* 518 U.S. at 345, citing *Bounds,* 430 U.S. 817 (1977).

In a June 21, 2002, affidavit, Naomi Lyons, a correctional officer at Holman State Prison whose duties include oversight of the prison law library, stated that there is one general library in Holman Prison which contains the current United States Code. Doc. 40, Ex. G. She attested that the death row law library has not been kept current and is used primarily as a day room but death row inmates may request books from the prison law library. *Id.*[16] Arthur does not dispute Ms. Lyon's statement that he had access to the materials from the general prison library, but restricts his argument to the inadequacies of the death row library. See Arthur's Affidavit, attached to Doc. 36. He, therefore, has failed to allege or show any actual injury resulting from the Holman Prison library facilities. *Lewis,* 518 U.S. at 343 (to establish a *Bounds* violation, the "actual injury" that an inmate must demonstrate is that the alleged shortcomings in the prison library have hindered his efforts to pursue a nonfrivolous legal claim). *Again, Bounds* did not create an abstract, free

---

[16]Arthur "reserves the right to dispute the State's factual assertions about the library system" because he was unable to interview Ms. Lyons. Doc. 41, p. 10, n. 2. He further argues that the State did not show that death row inmates were notified they no longer had a library, when and how the death row library was changed to a day room, what procedures exist for requesting a book from the general population library or how many books may be requested and how long they might be kept. As discussed above, Arthur did not disclaim access to the general population library.

19

standing right to a law library and an inmate claiming a *Bounds* violation must show actual injury. *Lewis*, 518 U.S. at 351, 355.[17]

Arthur contends that merely providing a law library, without counsel, failed to ensure that he would be able to avail himself of the state or federal court process in any meaningful way. However, the *Bounds* court specifically concluded that states must supply a law library *or* counsel. 430 U.S. 817 (1977). The *Giarratano* court specifically concluded that the *Bounds* "meaningful access" language did not abrogate the subsequent conclusion in *Finley* that states were not required to provide counsel for inmates in post conviction proceedings. *Giarratano*, 492 U.S. at 11-12.

In summary, Arthur has not established that he was actually injured by Alabama's scheme for providing inmate access to the courts. *Lewis*, 518 U.S. at 351. He did not avail himself of the procedure for obtaining an attorney under Rule 32.7 and he cannot now show that he would have been denied counsel had he pursued that avenue of relief. Furthermore, he has provided no support for any claim that the death row inmates at Holman Prison have inadequate access to library facilities. In short, the State did not place any unconstitutional impediment to Arthur's filing of his federal habeas petition sufficient to statutorily toll the AEDPA limitations period.

---

[17] In *Helton v. Sec'y for the Dep't of Corrections*, the Eleventh Circuit found that equitable tolling was not warranted based on allegations that prison library facilities lacked the latest amendments to the habeas statute where the inmate made no specific allegations about his attempts to otherwise obtain the statute. *Helton*, 259 F.3d 1310 (11th Cir. 2001).

IV.    **Equitable Tolling**

AEDPA's statute of limitations can be equitably tolled "when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence." *Steed v. Head*, 219 F.3d 1298, 1300 (11th Cir. 2000); *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999). Equitable tolling is an extraordinary remedy which is typically applied sparingly. *Steed*, 219 F.3d at 1300.

To obtain the benefit of equitable tolling, the petitioner bears the burden of showing (1) "extraordinary circumstances;" (2) which prevented him from timely filing his petition; and (3) due diligence. *Helton v. Sec'y for the Dep't of Corrections*, 259 F.3d 1310 (11th Cir. 2001).[18] The "extraordinary circumstances" standard applied by the Eleventh Circuit focuses on the circumstances surrounding the late filing, rather than the circumstances surrounding the underlying conviction. *Id.* at 1314-15. The petitioner bears the burden of proving entitlement to equitable tolling. *Jones v. United States*, 304 F.3d 1035, 1040 (11th Cir. 2002). Arthur argues that his failure to file a timely petition is due to the State's failure to provide him with notice, legal assistance, visits from investigators who wanted to help him, or adequate law library facilities.

First, Arthur argues that he did not receive the certificate of judgment triggering the limitations period and he was not represented by counsel when it was issued on April 7,

---

[18]Arthur contends that, because there is a particular need for collateral review of capital cases, the threshold at which a court is willing to find the "extraordinary circumstances" to warrant tolling must be lower, citing *Fahy v. Horn*, 240 F.3d 239, 245 (3d Cir. 2001). *But see Cantu-Tzin v. Johnson*, 162 F.3d 295 (5th Cir. 1998)(denying stay of execution where petitioner filed a time-barred habeas petition and no facts warranted equitable tolling). The Eleventh Circuit has not indicated that the standard for equitable tolling of the AEDPA statute of limitations should be different in capital and non-capital cases.

21

1998.[19] The Eleventh Circuit considered a similar argument in *Drew v. Dep't of Corrections*, 297 F.3d 1278, 1287 (11th Cir. 2002). Drew claimed equitable tolling applied to his delay in filing because he did not receive a court order until almost a year after it was issued. *Id.* The Eleventh Circuit rejected this argument because Drew "made virtually no effort to ascertain the status" of his claim and his lack of diligence ultimately prevented him from filing his habeas petition until long after the AEDPA limitations period had expired. *Id.* The court said,

> A lengthy delay between the issuance of a necessary order and an inmate's receipt of it might provide a basis for equitable tolling if the petitioner has diligently attempted to ascertain the status of that order and if the delay prevented the inmate from filing a timely federal habeas corpus petition.

*Id.* at 1288, *citing Knight v. Schofield*, 292 F.3d 709 (11th Cir. 2002). Arthur has made no attempt to show he diligently attempted to ascertain the status of his case in the state court. In view of the long period of time in which Arthur did nothing to pursue his claims, his failure to show that the lack of notice prevented him from making a timely filing, and his failure to show he attempted to ascertain the status of his case, this court will not say he acted with diligence with regard to the notice.

Second, Arthur contends the statute should be equitably tolled because he was unable to obtain legal assistance. He claims Holman Prison inmates have no access to paralegal or attorney assistance. Arthur Affidavit, Doc. 36. However, Arthur is not entitled to counsel on collateral review and his failure to procure outside counsel is not an

---

[19] The State presented evidence tending to show that Arthur was aware that his initial appeal through the state courts was complete and that the Alabama Supreme Court had issued a final ruling on March 20, 1998, even though no certificate of judgment was filed 18 days thereafter as required by Ala. R. App. P. 41(a).

extraordinary circumstance warranting equitable tolling. Even if his failure to obtain private counsel were extraordinary, Arthur has not shown he acted with due diligence. His extensive mail and internet campaign to obtain private counsel did not satisfy his obligation to pursue his habeas claims with diligence.[20]

Third, Arthur contends the State hampered his efforts to obtain outside counsel by placing restrictions on his ability to communicate with anyone who might have been able to help him. He presents evidence showing that the warden of Holman Prison refused to permit visits from investigators who were interested in his case.[21] In this regard, the court notes that the record includes copies of numerous letters Arthur sent in his attempt to find private counsel. *See, e.g.* Doc. 36, Ex. A and B. The voluminous correspondence belies his claim that he was unduly restricted in his search for private representation. Moreover, restrictions on visitors for prison inmates is not an extraordinary circumstance and Arthur's evidence that he tried to meet with private investigators does not show that he diligently pursued his claims.

Finally, Arthur contends his efforts to obtain post-conviction relief were hampered by the State's failure to provide adequate law library facilities. As discussed above, Arthur limited his contentions to the death row library and did not acknowledge the existence of

---

[20] Arthur's claim that he failed to file a timely petition because he lacked counsel is peculiarly lacking in force in view of the evidence that Arthur insisted on acting as his own counsel during his trial. Particularly in this case, this court is unwilling to say that a quest for counsel, without more, showed diligence in pursuing habeas claims.

[21] Arthur does not claim the warden's action was unconstitutional. The Constitution does not require that prisoners be able to conduct generalized research, but only that they be able to present their grievances to the courts. *Lewis v. Casey*, 518 U.S. at 360. As the *Lewis* court noted, even as to constitutional rights, certain restrictions are permissible if they are related to legitimate penological interests.

the general prison library. There is no evidence the general prison library was inaccessible or otherwise inadequate. Furthermore, like the petitioner in *Helton*, Arthur makes no showing that he asked for the amendments to the habeas corpus statute or otherwise made an independent effort to determine the limitations period. 259 F.3d at 1314.[22] Again, the evidence fails to show an extraordinary circumstance beyond the petitioners control. And, like the petitioner in *Helton*, Arthur has not shown he was diligent in ascertaining the applicable limitations period.

Arthur finally argues that, even if these factors did not separately amount to extraordinary circumstances, combined together they satisfy his burden. To the contrary, nothing is extraordinary about an inmate who is subject to limitations on visitors and who must follow procedures to obtain counsel and library materials. Only Arthur's failure to avail himself of those procedures is extraordinary, but that failure was not outside his control. Other circuits have concluded that a lack of legal knowledge is not an extraordinary circumstance warranting equitable tolling. *Kreutzer v. Bowersox*, 231 F.3d 460, 463 (8th Cir. 2000); *Felder v. Johnson*, 204 F.3d 168, 171-72 (5th Cir. 2000); *and see Tower v. Phillips*, 7 F.3d 206, 211 (11th Cir. 1993)(ignorance of post-conviction remedies does not excuse a procedural default). Moreover, Arthur has not shown he exercised due diligence in pursuing his claims within the limitations period. *Sandvik*, 177 F.3d at 1271-72. "Employment of equitable tolling in [these circumstances] would cause the precise abuse that the AEDPA

---

[22]The District Court found *Helton* received misinformation from his counsel regarding the applicable statute of limitations, but the Eleventh Circuit concluded the attorney's miscalculation or mistake was not an extraordinary circumstance. *See Steed v. Head*, 219 F.3d 1298 (11th Cir. 2000).

24

was enacted to prevent by creating opportunities for convicted prisoners to delay filing motions for post-conviction relief . . . ." *Jones*, F.3d at 1044.

## V.    Conclusion

Arthur's petition for habeas corpus relief is barred by the AEDPA limitations period. The court has examined Arthur's claims of actual innocence, statutory tolling and equitable tolling and finds them without merit. Accordingly, the petition will be DISMISSED with prejudice. The "Motion for Leave to Conduct Discovery," Doc. 33 will be DENIED. A separate order in conformity with this opinion will be entered.

Done, this 4ᵗʰ of December, 2002.

Edwin Nelson
United States District Judge

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

03 JUN -5 AM 9: 37

U.S. DISTRICT COURT
N.D. OF ALABAMA

THOMAS D. ARTHUR,                    ]
                                     ]
    Petitioner,                  ]
                                     ]
vs.                                  ]   CV-01-N-0983-S
                                     ]
MICHAEL HALEY, Commissioner,         ]
Alabama Department of                ]   **ENTERED**
Corrections,,                        ]
                                     ]   JUN 0 5 2003
    Respondent.                  ]

### Memorandum of Opinion

    This is an action for habeas corpus relief under 28 U.S.C. § 2254 by an Alabama state prisoner under a sentence of death.  On December 4, 2002, this court entered its opinion and order denying Arthur's petition, concluding that his failure to file his petition within the one-year period imposed by The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") could not be excused because he did not show he was actually innocent of the crime for which he was convicted[1] and he otherwise failed to establish he was entitled to statutory or equitable tolling of the one-year limitations period.  This court also denied Arthur's "Motion for Leave to Conduct Discovery." (Doc. 33.) The cause is presently before the court for consideration of Arthur's "Motion to Alter or Amend Judgment," filed December 18, 2003. (Doc. 57.)  Arthur claims the court erred in failing to permit discovery on the threshold questions of actual innocence and equitable and statutory tolling. The motion has

---

[1] Arthur was tried, convicted and sentenced to death for the murder of Troy Wicker.



been fully briefed by the parties and is ready for submission. Upon due consideration, the motion will be DENIED.

Arthur seeks discovery of certain physical evidence and an evidentiary hearing to get testimony from lately-proffered witnesses who claim knowledge of his whereabouts on the date of Troy Wicker's murder. He claims the evidence may support his gateway claim of actual innocence. This court has previously denied his requests. (Doc. 55, pp. 5-8, 15.)

A habeas petitioner is not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rule 6(a) of the Rules Governing § 2254 Cases provides:

> A party shall be entitled to invoke processes of discovery available under Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

A demonstration of "good cause" requires "specific allegations" showing reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to habeas relief. *Id.* at 908-09. Furthermore, "[i]n passing AEDPA . . . Congress modified the discretion afforded to the district court and erected additional barriers limiting a habeas petitioner's right to discovery or an evidentiary hearing." *Isaacs v. Head*, 300 F.3d 1232, 1248-49 (11th Cir. 2002) (applying the diligence standard of 28 U.S.C. § 2254(e)(2) to petitioner's request for discovery and evidentiary hearing). *See Williams v. Taylor*, 529 U.S. 420 (2000). Section 2254(e)(2), which governs hearings under AEDPA, provides, in pertinent part:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that
> (A) the claim relies on–

2

(i) A new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable;
or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

Section 2254(e)(2) applies only when "the applicant has failed to develop the factual basis of a claim in State court proceedings." *Id.* Thus, a prisoner can avoid application of § 2254(e)(2) by showing he was diligent in his efforts to discover the facts. *Williams*, 529 U.S. at 434-35. Arthur cannot satisfy this threshold inquiry.

The physical evidence Arthur seeks to test includes Judy Wicker's bloody clothing, a rape kit created the day of the murder, a wig and hair samples from the Wicker residence, the bullet removed from the victim's body, spent cartridge casings found at the murder scene, and a pillowcase found beneath the victim's head. None of this evidence is new or was unknown to Arthur during the state court proceedings. Arthur belatedly claims he diligently sought to test this evidence during the state court proceedings, and points to a motion made by counsel at his third trial, seeking "[a]ll clothing taken as evidence from . . . any person," and "[a]ll other physical evidence taken by the state from the scene of the alleged crime or from any victim as part of its investigation in this case, including but not limited to, seminal fluid, spent bullets, bullet casings, and so forth."[2] However, he has not

---

[2] "Motion to Inspect, Examine, and Test Physical Evidence," dated July 5, 1991, cited at n.1, "Thomas D. Arthur's Motion to Alter or Amend Judgment," Doc. 57.

shown that he pursued this request any further.[3] A similar one-time request was found to be insufficient evidence of diligence in *Williams v. Taylor*. 529 U.S. at 439-40.

Arthur has not pointed to any record of an attempt in state court to show that Alphonso High, Ray Melson, or Billy Peebles had information about his whereabouts on the morning of Troy Wicker's murder.[4] He does not contend that he was previously unaware that these men might have knowledge of his whereabouts on the day of the murder, and to do so would be incredible since the testimony now proffered would be that he was in their company on that day. Again, this claim was known to Arthur, but not diligently pursued in state court.[5]

When a habeas petitioner fails to "make a reasonable attempt, in light of information available at the time, to investigate and pursue claims in state court," he may not obtain discovery or an evidentiary hearing unless he satisfies the requirements in the balance of § 2254(e)(2). *Williams*, 529 U.S. at 440. Arthur has not attempted to show that he can satisfy

---

[3]Testimony about the bullet, casings, wig and hair samples was received at Arthur's third trial. *See Memo. Opinion*, Doc. 55, pp. 10-12. There is no indication that the defense pursued any claim regarding testing of the these or other materials during the subsequent state court proceedings. *Arthur v. State*, 711 So. 2d 1031, 1047, 1065, 1068-69 (Ala. Cr. App. 1996). DNA testing was available in Alabama before Arthur's third trial in 1991. *See, e.g.*, *Dubose v. State*, 662 So. 2d 1156 (Ala. Cr. App. 1993).

[4]The court notes that, in conjunction with a request for continuance, Arthur made a non-specific claim that other witnesses needed to be examined. He did not specifically name any witness. *Arthur*, 711 So. 2d at 1068-69. Arthur has not pointed to any place in the state court record that would evidence a previous attempt to obtain testimony from these affiants.

[5]The court has considered Arthur's renewed arguments that the affidavits are sufficient to support his gateway claim of actual innocence, and finds no reason to change its initial conclusion that the affidavits were not the "new, reliable evidence" required by *Schlup v. Delo*, 513 U.S. 298 (1995). Arthur offers no explanation for his long delay in submitting this evidence. Although he claims his counsel was constitutionally deficient, he has not pointed to any single instance in any of his three trials or in any of his appeals in which he informed a state court of the existence of these witnesses. Specifically, the court notes that Arthur substantially participated in the presentation of his defense at the third trial and he had many exchanges with the trial court, but he did not tell the court that he knew of relevant alibi witnesses his attorneys failed to investigate.

4

the requirements of Subparagraph (A), and there is no evidence that the discovery he is seeking relates to a "new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable or a factual predicate that could not have been previously discovered through the exercise of due diligence." Neither has he met the additional requirements of Subparagraph (B), by showing that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."[6]

Furthermore, if Rule 6(a) applies rather than Section 2254(e)(2), Arthur's conjectures about the relevance of the evidence to his claim of actual innocence fall far short of "specific allegations showing reason to believe" that the fully developed facts might entitle him to relief. *Bracy*, 520 U.S. at 908-09. Arthur seeks DNA testing of the blood on Judy Wicker's clothing, stating that he wants to show her assailant was someone other than him, but he offers no "reason to believe" that the blood on Judy Wicker's clothing came from anyone other than Judy Wicker. Arthur seeks to examine the "afro" wig and Negroid hair samples taken from Judy Wicker's car, contending testimony that the hair was forcibly removed and the inside of the wig was free of

---

[6] Relying on *O'Neal v. Lampert*, 199 F. Supp. 2d 1064 (D. Oregon 2002), Arthur argues that the *Schlup v. Delo* "more likely than not" standard should apply to his discovery requests because he is seeking discovery to establish his "gateway" claim of actual innocence. Although the *O'Neal* court made a distinction, for discovery purposes, between claims on the merits and claims brought to toll the statute of limitations, it did not offer any explanation for doing so. The Eleventh Circuit has recognized that discovery in habeas cases, previously pursued under *Bracy* and Rule 6(a) of the Rules Governing § 2254 Cases, was further limited by AEDPA. *Isaacs v. Head*, 300 F.3d 1232, 1248-49 (11th Cir. 2002) (discussing *Bracy* and Rule 6(a) and adding, "[i]n passing AEDPA, however, Congress modified the discretion afforded to the district court and erected additional barriers limiting a habeas petitioner's right to discovery or an evidentiary hearing.") *See also Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002) (same). Nothing in § 2254(e)(2), *Isaacs*, or *Crawford* supports Arthur's claim that § 2254(e)(2) does not apply to his discovery for "gateway" claims. Indeed, such an interpretation would appear to be contrary to the purposes of AEDPA. Moreover, this court is satisfied that the proposed discovery would not yield evidence showing Arthur's factual innocence even under the more lenient "more likely than not" standard. Accordingly, this court concludes *O'Neal v. Lampert* is not persuasive.

hair was inconsistent with Wicker's testimony that Arthur wore a black wig to disguise himself. While there has been no explanation for the hair found in the car and the lack of hair in the wig, the findings are not inconsistent with Wicker's testimony. Further, Arthur offers no "reason to believe" his examination would reveal anything other than what is already established, and therefore, there is no "reason to believe" his examination could show he is "more than likely" innocent.

Arthur seeks access to the bullet recovered from Troy Wicker's body and four spent cartridge casings found at the scene, claiming Patricia Green's testimony that she sent a third party to purchase .22 mini magnum long rifle bullets for Arthur on the day before the murder was insufficiently corroborated by the ballistic expert's testimony that the recovered bullet was a .22 long rifle caliber consistent with a CCI brand mini mag and the four shell casings were CCI brand .22 long or long rifle casings. But, Green's testimony was consistent with the testimony of the ballistic expert and does not require corroboration. Moreover, Arthur does not offer "reason to believe" that his examination of the bullet and casings will reveal any different information from that already discovered by the experts.

Arthur seeks access to a gunpowder-tainted pillowcase and crime scene photographs arguing he must resolve an inconsistency between the ballistic expert's testimony and the autopsy report regarding the "critical issue" of whether the gun was fired at close or far range. However, he offers no explanation for his conclusory claim that this discrepancy is "critical" to his claim of actual innocence. He implies that he might be able to impeach Judy Wicker's testimony that her husband was sleeping when he was shot, but Wicker did not testify about the distance from which Troy Wicker was shot.

6

Arthur seeks to test Judy Wicker's rape kit. He alleged in his initial motion and in his present motion that Judy Wicker previously testified a "black man" forced his way into her home, beat her, raped her, and killed her husband, but he did not point to any evidence of record that supports his assertion. (Doc. 33, 57.) This court's review of the published opinions and the transcript of Arthur's last trial did not uncover any testimony that Judy Wicker was raped or that she had sexual intercourse on the morning of her husband's murder. Arthur has not offered any reason to believe that testing the rape kit would help show he was "more likely than not" actually innocent of Troy Wicker's murder. Similarly, Arthur has not explained how examination of vacuum sweepings of the Wicker home could show he is "more likely than not" actually innocent.

Finally, none of the physical evidence can help Arthur establish his gateway claim of actual innocence because such a claim must rest on "new reliable evidence" which was "not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Although Arthur claims some of the items were not tested, he does not claim or show that the items or proposed tests were unavailable at the time of his trial. Many of the items were admitted at trial. Thus, this evidence is not "new" as required by *Schlup*.

Arthur also seeks discovery of material regarding the availability of law library facilities at Holman Prison, contending that the AEDPA statute of limitations should be equitably tolled because the death row law library did not have a copy of the new statute. The AEDPA statute of limitations can be tolled until "the date on which [an] impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action." 28 U.S.C. §

7

2244(d)(1)(B). As discussed in the initial opinion, Arthur did not show he suffered any "actual injury" resulting from the Holman Prison library facilities.[7] (Doc. 55, pp. 19-20.) *Lewis v. Casey*, 518 U.S. 343, 351, 355 (1996)(inmate does not have abstract, free-standing right to a law library and must show "actual injury" in that the alleged shortcomings hindered his efforts to pursue a nonfrivolous legal claim). Like the petitioner in *Helton v. Secretary for the Department of Corrections*, 259 F.3d 1310 (11th Cir. 2001), Arthur claims only that the Holman death row library is deficient and makes no specific allegations about his attempts to otherwise ascertain the applicable statute of limitations. (Arthur Affidavit, Doc. 36.) The discovery he seeks[8] may or may not reveal shortcomings in the Holman library system, but it will not lead to information about the efforts Arthur made to ascertain his rights, which is an essential element lacking in his constitutional claim. There is no "good cause" for discovery when the proposed discovery is

---

[7]The State provided evidence that the "death row" library no longer existed and that death row inmates had access to a general population library containing a current United States Code. The court previously noted that Arthur did not dispute this evidence but limited his argument to a claim that the death row library was inadequate. Arthur now contends that he failed to rebut the evidence because his affidavit was submitted before the State's submission of evidence. (Doc. 57, p. 8.) However, Arthur had an opportunity to reply to the State's submission and this court accepted other evidence Arthur offered in connection with his reply. He offers no explanation for his failure to submit a responsive affidavit or to otherwise dispute the State's evidence about the library at Holman Prison. Arthur has never stated that he was unaware of the availability of the general library.

[8]Arthur seeks to discover "documents covering the period from 1998 through 2000 and concerning (1) books and other written materials carried by the (death row) library, including their titles, volumes, versions, copyright dates, and number of copies; (2) the organization and categorization of books and written materials carried by the library; (3) federal habeas corpus statutes carried by the library, including amendments, volumes, titles, and sections; (4) the budget of the death row library, including itemizations of funds earmarked for books, staffing, repairs to the premises, and other expenses; (5) the number of typewriters, photocopying machines, stamps, paper and pens available to death row inmates, including their costs and complaints about malfunctions, and the schedule of mail pickup and delivery; (6) any activities or services located in or available at the death row library not directly related to reading, writing, and research; (7) the schedule and hours during which the library can be accessed, and the number of death row inmates who have accessed the library, including any unsuccessful attempts; and (8) document retention or destruction policies of Holman in effect from January 1, 1998 to the present." Doc. 33, attached memo., pp. 12-13.

not aimed at obtaining evidence to support a constitutional claim. *Bracy v. Gramley*, 520 U.S. 898, 905-06 (1997).

Upon reconsideration, the court finds no reason to alter its previous decision in this matter. Accordingly, Arthur's "Motion to Alter or Amend Judgment," filed December 18, 2003, will be denied by separate order.

Done, this ___4th___ of ~~May~~ June, 2003.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE