IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

-------------------------------------------------------x
                        :

THOMAS D. ARTHUR,          :

            Plaintiff,     :

      v.            :

TROY KING, ATTORNEY GENERAL :
FOR THE STATE OF ALABAMA,   :
in his official capacity,     :

                     :

BRYCE U. GRAHAM, JR., DISTRICT :
ATTORNEY FOR COLBERT COUNTY,     No. 2:07-cv-319-WKW
in his official capacity,     :

                     :

RONNIE MAY, SHERIFF FOR     :
COLBERT COUNTY,         :
in his official capacity,     :

                     :

M. DAVID BARBER, DISTRICT   :
ATTORNEY FOR JEFFERSON COUNTY,:
in his official capacity,     :

         Defendants.    :

                     :

-------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Charles E. Vercelli, Jr. (VER003)        Suhana S. Han
VERCELLI & ASSOCIATES, P.C.         Jennifer L. Parkinson
1019 S. Perry Street            Sara L. Manaugh
Montgomery, Alabama 36104       Jordan T. Razza
Telephone: (334) 834-8805       Sultana L. Bennett
                                 125 Broad Street
                                 New York, New York 10004
                                 Telephone: (212) 558-4000

*Counsel for Plaintiff*

June 18, 2007

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ....................................................................................... i

**TABLE OF AUTHORITIES** ............................................................................... iii

**PRELIMINARY STATEMENT** ...........................................................................1

**BACKGROUND** ...................................................................................................4

    I.      Mr. Arthur's Trial and Conviction...........................................................4
    II.     The Physical Evidence Sought in Mr. Arthur's Complaint ....................7

**ARGUMENT** .........................................................................................................8

    I.      Mr. Arthur Has Stated a Claim for Access to the Evidence He Seeks
           Under the Due Process Clause of the Fourteenth Amendment to the United
           States Constitution. ...............................................................................8
           A.     Defendants' Reliance on *Grayson* and the Decisions from Mr.
                    Arthur's Federal Habeas Proceedings is Misplaced. ...................8
                1.    *Grayson* Is Distinguishable......................................8
                2.    Consideration of the Federal Habeas Court's Decision Is
                      Wholly Inappropriate on a Motion to Dismiss. ............................11
           B.     Mr. Arthur Has Properly Alleged a Substantive Due Process Right
                    to the Physical Evidence He Seeks. ...........................................13
           C.     Mr. Arthur Has Properly Alleged a Procedural Due Process Right
                    to the Physical Evidence He Seeks. ...........................................15
    II.     Mr. Arthur Has Stated a Claim for Access to Evidence Under the Eighth
           Amendment's Prohibition of Cruel and Unusual Punishment..............18
    III.    Mr. Arthur Has Stated a Claim for Violation of His Right of Access to the
           Courts........................................................................................21
    IV.    The Defendants Have a Duty to Permit DNA Testing to Enable Mr. Arthur
           to Petition for Clemency. .....................................................................23
    V.     Mr. Arthur's Claims Are Not Barred by the Statute of Limitations. .....26
           A.     Defendants' Statute-of-Limitations Defense Is Not Amenable to
                    Resolution on a Rule 12(b)(6) Motion.......................................26
           B.     Mr. Arthur's Claims Are Timely. .............................................27
            C.     Even If the Statute of Limitations Had Expired, It Should Be
                    Equitably Tolled.......................................................................31
    VI.    Mr. Arthur's Claims Are Not Barred by Laches...................................32
           A.     Defendants' Laches Defense Is Not Amenable to Resolution on a
                    Rule 12(b)(6) Motion.................................................................32
           B.     Defendants Have Not Established the Elements of Laches. ........34

1.    Any Delay on Mr. Arthur's Part Is Excusable.................................34

2.    The State Has Not Sufficiently Made Out Prejudice to Its
      Case...........................................................................................35

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Advanced Cardiovascular Systems, Inc.* v. *Scimed Life Systems, Inc.*,
  988 F.2d 1157 (Fed. Cir. 1993) ................................................................33

*Ake* v. *Oklahoma*,
  470 U.S. 68 (1985) ..................................................................................22

*America Pipe & Construction Co.* v. *Utah*,
  414 U.S. 538 (1974) ................................................................................30

*Atkins* v. *Virginia*,
  536 U.S. 304 (2002) ................................................................................19

*Boddie* v. *Connecticut*,
  401 U.S. 371 (1971) ................................................................................21

*Bounds* v. *Smith*,
  430 U.S. 817 (1977) ........................................................................20, 21, 22

*Bradley* v. *Pryor*,
  305 F.3d 1287 (11th Cir. 2002) ......................................................18, 31, 36

*Brady* v. *Maryland*,
  373 U.S. 83 (1963) ..........................................................................8, 13, 15

*Breest* v. *N.H. Attorney General*,
  472 F. Supp. 2d 116 (D.N.H. 2007) ..........................................................17

*Brooks* v. *Blue Cross & Blue Shield of Florida, Inc.*,
  116 F.3d 1364 (11th Cir. 1997) ................................................................11

*Christopher* v. *Harbury*,
  536 U.S. 403 (2002) ................................................................................21

*Collier* v. *City of Chicopee*,
  1998 U.S. Dist. LEXIS 21901 (D. Mass. Feb. 5, 1998) ..............................12

*Daker* v. *Ferrero*,
  2007 U.S. Dist. LEXIS 23617 (N.D. Ga. Mar. 30, 2007) ............................22

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ................................................................................28

*Duvall* v. *Keating*,
  162 F.3d 1058 (10th Cir. 1998) ................................................................25

*Enmund* v. *Florida*,
458 U.S. 782 (1982).............................................................................18

*Fortner* v. *Thomas*,
983 F.2d 1024 (11th Cir. 1993) ...........................................................26

*Frye* v. *United States*,
293 F. 1013 (D.C. Cir. 1923) ...............................................................28

*Giles* v. *Maryland*,
386 U.S. 66 (1967)...............................................................................17

*Godschalk* v. *Montgomery County District Attorney's Office*,
177 F. Supp. 2d 366 (E.D. Pa. 2001) .............................................14, 29

*Grayson* v. *Allen*,
2007 U.S. Dist. LEXIS 37063 (M.D. Ala. May 21, 2007) .................32

*Grayson* v. *King*,
460 F.3d 1328 (11th Cir. 2006) ................................................... *passim*

*Harmelin* v. *Michigan*,
501 U.S. 957 (1991).............................................................................19

*Harvey* v. *Horan*,
285 F.3d 298 (4th Cir. 2002) ..........................................16, 17, 19, 30

*Harvey* v. *Horan*,
278 F.3d 370 (4th Cir. 2002) ...............................................................17

*Harvey* v. *Horan*,
119 F. Supp. 2d 581 (E.D. Va. 2000) ..................................................17

*Hernandez* v. *City of El Monte*,
138 F.3d 393 (9th Cir. 1998) ...............................................................34

*Jackson* v. *Procunier*,
789 F.2d 307 (5th Cir. 1986) ...............................................................24

*Jeter* v. *Montgomery County*,
2007 U.S. Dist. LEXIS 19882 (M.D. Ala. Mar. 19, 2007)..................12

*Jones* v. *Allen*,
2007 U.S. App. LEXIS 9571 (11th Cir. Apr. 27, 2007)......................35

*Jones* v. *Automobile Insurance Co. of Hartford, Conn.*,
917 F.2d 1528 (11th Cir. 1990) ...........................................................12

*Kason Industrial, Inc.* v. *Component Hardware Group, Inc.*,
    120 F.3d 1199 (11th Cir. 1997) .................................................................. 32-33

*Lewis* v. *Casey*,
    518 U.S. 343 (1996) ...................................................................................21

*Lufkin* v. *McCallum*,
    956 F.2d 1104 (11th Cir. 1992) .................................................................27

*Mathews* v. *Eldridge*,
    424 U.S. 319 (1976) ...............................................................................15, 16

*McKithen* v. *Brown*,
    481 F.3d 89 (2d Cir. 2007) ...............................................................14, 16, 24

*Mullinax* v. *McElhenney*,
    817 F.2d 711 (11th Cir. 1987) .................................................................27

*Ohio Adult Parole Authority* v. *Woodard*,
    523 U.S. 272 (1998) ...........................................................................16, 24

*Osborne* v. *District Attorney's Office*,
    423 F.3d 1050 (9th Cir. 2005) .................................................................31

*Osborne* v. *District Attorney's Office*,
    445 F. Supp. 2d 1079 (D. Alaska 2006) .............................................14, 17

*Parker* v. *State Board of Pardons & Paroles*,
    275 F.3d 1032 (11th Cir. 2001) .................................................................25

*Penry* v. *Lynaugh*,
    492 U.S. 302 (1989) ...................................................................................19

*Roper* v. *Simmons*,
    543 U.S. 551 (2005) .............................................................................18, 19

*Sanders* v. *Elyea*,
    1998 U.S. Dist. LEXIS 1705 (N.D. Ill. Feb. 10, 1998) .............................12

*Sandvik* v. *United States*,
    177 F.3d 1269 (11th Cir. 1999) .................................................................31

*Savory* v. *Lyons*,
    469 F.3d 667 (7th Cir. 2006) .....................................................................31

*Smith* v. *Duff & Phelps, Inc.*,
    5 F.3d 488 (11th Cir. 1993) .......................................................................27

*Stearns* v. *Page*,
    48 U.S. 819 (1849)................................................................35

*Straub* v. *Monge*,
    815 F.2d 1467 (11th Cir. 1987) .........................................21

*Supermail Cargo, Inc.* v. *United States*,
    68 F.3d 1204 (9th Cir. 1995) ..............................................32

*Tello* v. *Dean Witter Reynolds, Inc.*,
    410 F.3d 1275 (11th Cir. 2005) .........................................26

*Trop* v. *Dulles*,
    356 U.S. 86 (1958).......................................................18, 20

*United States* v. *Jones*,
    29 F.3d 1549 (11th Cir. 1994) ...........................................12

*Urbanique Products* v. *City of Montgomery*,
    428 F. Supp. 2d 1193 (M.D. Ala. 2006) ...........................12

*Vistamar, Inc.* v. *Fagundo-Fagundo*,
    430 F.3d 66 (1st Cir. 2005)................................................32

*Wade* v. *Brady*,
    460 F. Supp. 2d 226 (D. Mass. 2006) .................13, 17, 23, 29

*Wallace* v. *Kato*,
    127 S. Ct. 1091 (2007)......................................................27

*Wanlass* v. *General Electric Co.*,
    148 F.3d 1334 (Fed. Cir. 1998).........................................36

*Wilson* v. *Calderon*,
    161 F.3d 1185 (9th Cir. 1998) ...........................................25

*Workman* v. *Bell*,
    245 F.3d 849 (6th Cir. 2001) .............................................25

*Young* v. *Hayes*,
    218 F.3d 850 (8th Cir. 2000) .............................................25

## STATE CASES

*Dabbs* v. *Vergari (In re Dabbs)*,
    570 N.Y.S.2d 765 (N.Y. Sup. Ct. 1990) .........................15, 17

*Gayle* v. *Pennington*,
    64 So. 572 (Ala. 1914)...................................................34, 35

*Ex parte Grubbs*,
    542 So. 2d 927 (Ala. 1989) .......................................................................35

*Merrill* v. *Merrill*,
    71 So. 2d 44 (Ala. 1954) ...........................................................................35

*Patton* v. *Jones*,
    2006 WL 2246441 (W.D. Okla. Aug. 4, 2006) ...................................32, 33

*Thompson* v. *Suttle*,
    15 So. 2d 590 (1943) .................................................................................34

*Turner* v. *State*,
    746 So. 2d 355 (Ala. 1998) .......................................................................28

*Woods* v. *Sanders*,
    25 So. 2d 141 (Ala. 1946) .........................................................................35

## DOCKETED CASE

*Nooner* v. *Norris*,
    No. 5:06-cv-0110 (Doc. #24) (E.D. Ark. June 19, 2006) ...........................32

## FEDERAL STATUTES

42 U.S.C. § 1983 ........................................................................ *passim*

108 Stat. 1796 (1994) ........................................................................10

## STATE STATUTES

Ala. Code § 12-17-184(16) ...............................................................24

Ala. Code §§ 36-18-20 *et seq.* .........................................................10

994 Ala. Adv. Legis. Serv. 804 (LexisNexis) .....................................10

## OTHER AUTHORITY

5B Wright & Miller, FEDERAL PRACTICE & PROCEDURE CIVIL 3D § 1357 (2007)...........23

Plaintiff Thomas D. Arthur, by and through undersigned counsel, respectfully submits this memorandum in opposition to the motion of Defendants Troy King, Bryce Graham, Jr., M. David Barber, and Ronnie May to dismiss his Complaint brought pursuant to 42 U.S.C. § 1983 (attached hereto as Exhibit A).

## PRELIMINARY STATEMENT

In 1991, Mr. Arthur was convicted of murdering Troy Wicker at his home in Muscle Shoals, Alabama. No physical evidence linked Mr. Arthur to the crime. Instead, his conviction was based almost exclusively on the testimony of a convicted murderer and admitted perjurer, the victim's wife, Judy Wicker. At the time she testified against Mr. Arthur, Judy Wicker was serving a life sentence for the same crime. At her own trial, she testified that—consistent with what had she told investigators on the morning of the murder—she found a burglar in her home, who raped her, knocked her unconscious and then shot Troy Wicker. At Mr. Arthur's trial, however, Judy Wicker gave a totally different account of the murder. Although she had previously sworn under oath that Mr. Arthur was not involved, Judy Wicker now claimed that she had paid Mr. Arthur to pull the trigger. Judy Wicker thus testified against Mr. Arthur and obtained early parole.

Notwithstanding the lack of any reliable evidence implicating Mr. Arthur, Defendants have refused to grant him access to physical evidence—including a rape kit and blood stained clothing that have never been subjected to DNA testing—that could demonstrate that Mr. Arthur was wrongfully convicted and sentenced to death. Defendants instead dispute the facts, rely on materials outside the Complaint, and

highlight cases that are distinguishable.  None of these futile efforts warrants dismissal of any of Mr. Arthur's claims.

First, Defendants rely on *Grayson* v. *King*, 460 F.3d 1328 (11th Cir. 2006), to argue that the Eleventh Circuit has not recognized a constitutional right to post-trial access to potentially exculpatory evidence.  Defendants are wrong.  *Grayson* explicitly stated that under extraordinary circumstances a § 1983 plaintiff "could be entitled to post-conviction access to biological evidence for the purpose of performing DNA testing."  *Id*. at 1339.  Mr. Arthur's case represents such extraordinary circumstances.  *Grayson* also relied on facts that are not present here:  physical evidence linking Grayson to the crime and his confessions on three separate occasions.  Consistent with the testimony of two alibi witnesses who swore that they saw Mr. Arthur on the morning of Troy Wicker's murder, Mr. Arthur has steadfastly maintained his innocence.

Defendants' attempt to demonstrate that the requested evidence would not prove his innocence fares no better.  Although it is black-letter law that a defendant may not rely upon materials outside of the complaint in a motion to dismiss, Defendants urge this Court to adopt essentially the decision from a previous habeas proceeding.  This is wholly inappropriate.  As his well-pleaded allegations in the Complaint make clear, DNA testing could demonstrate that Mr. Arthur was nowhere near the Wicker residence on the morning of the murder.

Second, Defendants rely on the same argument that the requested evidence would not exonerate Mr. Arthur in opposing Mr. Arthur's Eighth Amendment claim. This argument ignores the evolving standards of decency that overwhelmingly support post-conviction DNA testing.  Indeed, the Attorney General of the State of Alabama has

adopted a policy relating to such testing.  Defendants' refusal to grant Mr. Arthur access to physical evidence for DNA testing at his expense violates the Eighth Amendment.

Third, without citing any supporting authority, Defendants state in conclusory fashion that the constitutional right of access to the courts is cognizable only when one's status as a prisoner or indigent person causes the deprivation.  Defendants next argue that Mr. Arthur has been "accessing the courts for over 20 years," ignoring the central teaching that the touchstone must be *meaningful* access to the courts.  Defendants cannot seriously dispute that Mr. Arthur has been denied such access in light of the fact that no post-conviction court—state or federal—has ever reviewed his constitutional claims on the merits.  Mr. Arthur seeks access to physical evidence to establish his actual innocence and finally have the opportunity to present his claims of  constitutional violations that deprived him of a fair trial.  Mr. Arthur has stated a right of access claim.

Fourth, Defendants argue that Mr. Arthur has no federal constitutional right to DNA testing in support of his clemency application. Although the power to commute a death sentence is vested in the governor, the district attorneys are statutorily required to provide pertinent information to the governor.  It is beyond dispute that DNA test results would be pertinent to Mr. Arthur's clemency application.  Clemency proceedings are subject to minimal procedural safeguards.  Defendant's refusal to grant Mr. Arthur access to physical evidence is therefore arbitrary and violates due process.

Fifth, Defendants argue that Mr. Arthur's claims are barred by the statute of limitations.  Defendants' argument fails.  As a threshold matter, a statute of limitations defense is not amenable to resolution on a motion to dismiss because it depends on facts beyond the pleadings.  Defendants' attempt to identify the date on which Mr. Arthur's

claims accrued is futile.  Defendants cannot show that Mr. Arthur should have sought

DNA testing during his first trial in 1982.  Nor can Defendants rely on *Grayson* to

establish the accrual date, since that court merely pointed to an exhibit to the complaint

showing when the plaintiff thought DNA testing was available.  As set forth in his

Complaint, Mr. Arthur has made many requests for DNA testing.  Various possible

accrual dates render all of Mr. Arthur's claims timely.  Even if the claims were not

timely, equitable considerations warrant tolling of the statue of limitations.

Sixth, like the statue of limitations defense, a laches defense requires the

Court to engage in a fact-intensive inquiry that cannot be performed at the motion to

dismiss stage.  In any event, Defendants have not established the elements of laches.  Mr.

Arthur has been diligently pursuing access to physical evidence throughout his post-

conviction proceedings, which only concluded in April 2007.  Courts have long

recognized that the pendency of another suit to enforce the same right can excuse delay.

Nor have Defendants established that they will suffer undue prejudice.  On balancing the

equities—which requires close inquiry into the totality of the circumstances—the State's

interest in timely enforcing a death sentence is outweighed by the interests of the public

and Mr. Arthur in ensuring that he is granted access to evidence that could demonstrate

he was nowhere near the Wicker residence on the morning of the murder.

## BACKGROUND

### I.    MR. ARTHUR'S TRIAL AND CONVICTION

On February 1, 1982 at 9:12 a.m., the police responded to a call at the

Wicker residence in Muscle Shoals, Alabama, where they found Judy Wicker lying on

the floor with traces of blood on her face and her sister Teresa Rowland kneeling beside

her.  The police also found Troy Wicker's body in the bedroom with a single gunshot wound to the right eye.  (Compl. ¶ 18.)

The police collected physical evidence from the crime scene, including Judy Wicker's blood-stained clothing and torn undergarments, vacuum sweepings, hair samples, shell casings, and a pillowcase with gunpowder flakes.  (Compl. ¶ 19.)  The police also dusted the area for latent fingerprints, but did not search Judy Wicker, her sister, or any of their possessions.  (*Id.*)  The police located Judy Wicker's 1981 Buick Riviera, which had been abandoned in a parking lot; the police searched it and found a wig, hair samples, and latent fingerprints.  (*Id.*)  The murder weapon was never recovered.

After the shooting, Judy Wicker was taken to the hospital and remained there for several days.  She suffered a bruise around her left eye, a laceration of her left upper lip, two chipped teeth, and an abrasion on her left hip.  (Compl. ¶ 20.)  Moreover, a rape kit was prepared and seminal fluid collected.  (*Id.*)  In response to questioning by investigators at the hospital, Judy Wicker provided the following account of the crime: She returned home after dropping her children off at school.  When she entered her house, she found an African-American man burglarizing her home.  The intruder raped her, knocked her unconscious, and then shot Troy Wicker.  (*Id.*)

Judy Wicker was eventually charged with her husband's murder under the theory that she killed him to collect approximately $90,000 in life insurance proceeds.  At her trial in 1982, she testified under penalty of perjury to the same version of events that she had related to the investigators.  (Compl. ¶ 21.)  Despite her claim of innocence, Judy Wicker was convicted of murdering her husband and was sentenced to life imprisonment.

At Mr. Arthur's trial in 1991, Judy Wicker gave a completely different account of the murder. Although she previously had sworn under oath that Mr. Arthur was not involved, she now claimed that she, along with Teresa Rowland and her sister's boyfriend, Theron McKinney, had decided to kill Troy Wicker, and that she had paid Mr. Arthur to pull the trigger. (Compl. ¶ 22.) She also paid Rowland $6,000 and gave McKinney jewelry and a Trans Am in exchange for their assistance in carrying out the murder. (*Id*.) The State of Alabama, however, never prosecuted Rowland or McKinney.

The failure of the State to pursue the investigation and prosecution of these two suspects is particularly troublesome considering that Teresa Rowland had her own reasons for wanting Troy Wicker dead. (Compl. ¶ 23.) She had previously hired Troy Wicker to burn her house down so that she could collect insurance proceeds; however, she was unable to pay him the promised amount, so he had threatened to have her arrested for arson. (*Id*.) Rowland also had the opportunity to murder Troy Wicker— she had her own key to the Wicker residence and was free to come and go as she pleased. (*Id*.) Most significantly, Rowland was present at the Wicker house on the morning of the murder. (*Id*.)

At the time she testified against Mr. Arthur, Judy Wicker was serving a life sentence for the same crime. In return for her testimony, the state prosecutor, Gary Alverson, promised to make a parole recommendation on her behalf. (Compl. ¶ 24.) Prior to becoming a state prosecutor, Alverson had represented Judy Wicker and assisted her in procuring a deal from the then-prosecutor in exchange for her testimony during Mr. Arthur's previous trial. (*Id*.) Thus, the state prosecutor offered his former client the ultimate deal: assist in the prosecution of Mr. Arthur and obtain early parole.

On December 5, 1991, Mr. Arthur was convicted of capital murder for the killing of Troy Wicker after a three-day trial at which he was permitted to represent himself. The trial court did not hold a hearing or engage in a colloquy to determine whether Mr. Arthur's decision was knowing and voluntary prior to granting Mr. Arthur's request to represent himself. (Compl. ¶ 25.) The penalty phase that followed lasted less than an hour and a half. Mr. Arthur's counsel conducted no independent investigation and offered no mitigation testimony. (*Id.* ¶ 27.) On the same day, the jury recommended the death penalty by a vote of 11–1.

## II. THE PHYSICAL EVIDENCE SOUGHT IN MR. ARTHUR'S COMPLAINT

In connection with its investigation of the murder of Troy Wicker, the State of Alabama collected various pieces of evidence as set forth in memoranda prepared by officials at the State's Department of Forensics. (Compl. ¶ 29 and Exhibits 1 through 4 attached thereto). None of the evidence linked Mr. Arthur to the murder of Troy Wicker. The hair samples and fingerprints found at the crime scene and in Judy Wicker's 1981 Buick Riviera were tested, but they did not match Mr. Arthur's.

The requested evidence can be categorized into six groups: (i) Judy Wicker's clothing, (ii) the rape kit created the day of the murder, (iii) the wig and hair samples found in Judy Wicker's car, (iv) vacuum sweepings and a hair sample from the Wicker residence, (v) spent cartridges and a pillowcase found beside Troy Wicker's body, as well as the bullet removed from Troy Wicker's body, and (vi) photographs taken at the crime scene. (Compl. ¶¶ 30-38.)

## ARGUMENT

I. **MR. ARTHUR HAS STATED A CLAIM FOR ACCESS TO THE EVIDENCE HE SEEKS UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

Mr. Arthur has properly alleged a due process right to the physical evidence he seeks under *Brady* v. *Maryland*, 373 U.S. 83 (1963).  Mr. Arthur has also properly alleged substantive and procedural due process rights to the DNA evidence.  Although Defendants urge this Court to rely on *Grayson* v. *King*, 460 F.3d 1328 (11th Cir. 2006), *Grayson* is not dispositive.  Defendants also urge this Court to rely on the decision from Mr. Arthur's federal habeas corpus proceedings, but that decision cannot be considered on a motion to dismiss.  Mr. Arthur's well-pleaded Complaint states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

A. **Defendants' Reliance on *Grayson* and the Decisions from Mr. Arthur's Federal Habeas Proceedings is Misplaced.**

1. ***Grayson* Is Distinguishable.**

Defendants argue that under *Grayson*, Mr. Arthur has no due process right to test—at his own expense—the potentially exculpatory evidence in the State of Alabama's possession.  (Defendants' Motion to Dismiss ("Mot.") at 24-31.)  The *Grayson* court, however, concluded only that Grayson did not have a right to access the DNA evidence for testing purposes under the specific circumstances of his case.  The *Grayson* court did not hold that such a due process right cannot exist and expressly noted that "under some extraordinary circumstances," a § 1983 plaintiff could "be entitled to post-conviction access to biological evidence for the purpose of performing DNA

testing." 460 F.3d at 1339. Mr. Arthur's case presents such "extraordinary circumstances."

Factors that weighed against the *Grayson* court's granting access to evidence for DNA testing are not present in Mr. Arthur's case. For instance, the evidence against Grayson was overwhelming. Grayson confessed on three separate occasions, admitted to burglary, rape and murder in his trial testimony, had two of the victim's rings in his possession, and did not assert actual innocence. *Id.* at 1338, 1341. By contrast, Mr. Arthur has steadfastly maintained his innocence. No physical evidence has ever linked Mr. Arthur to the murder of Troy Wicker. The only direct evidence implicating Mr. Arthur was the testimony of Judy Wicker, an admitted perjurer and convicted murderer who testified at her own trial that Mr. Arthur was not involved in the murder of her husband, but who changed her story when she testified against Mr. Arthur and thereafter obtained early parole.

Moreover, Grayson's state and federal post-convictions claims were reviewed on the merits. *Id.* at 1334-35. Mr. Arthur's compelling constitutional claims, however, have never been reviewed on the merits. Defendants erroneously insist that Mr. Arthur does not contend that "he was denied a fair trial." (Mot. at 24.) The Complaint clearly states that Mr. Arthur was denied constitutionally effective assistance of trial counsel because his appointed counsel conducted virtually no independent investigation into either the underlying crime or potential mitigating evidence. (Compl. ¶ 4.) No post-conviction court has ever reviewed this and other meritorious claims that Mr. Arthur did not receive a fair trial.

The *Grayson* court concluded that the DNA evidence sought by Grayson could not prove that he did not commit murder; at best, it could only show he did not commit rape. 460 F.3d at 1339. DNA evidence could, however, shed light on Mr. Arthur's guilt or innocence by demonstrating that he was nowhere near the Wicker residence on the morning of the murder. DNA testing could establish that the same person who raped Judy Wicker also physically assaulted her, that this person's blood was on her blouse, that his hair was found in the Wicker residence, that he was in Judy Wicker's 1981 Buick Riviera, and that this person was not Mr. Arthur. Such evidence could discredit entirely the only direct testimony linking Mr. Arthur to the murder, because Judy Wicker's testimony does not allow for the possibility that two persons killed Troy Wicker. Unlike in *Grayson*, where the court determined that the presence of the DNA of an unknown individual would only suggest a third perpetrator, DNA evidence in Mr. Arthur's case could show that Judy Wicker's original version of the facts is correct and that Mr. Arthur was not present when Troy Wicker was killed.[1]

Such exculpatory evidence would be wholly consistent with the sworn testimony of Alphonso High and Ray Melson, who each recalled seeing Mr. Arthur in Decatur on the morning of Troy Wicker's murder. (Compl. ¶ 39.) In their affidavits submitted on behalf of Mr. Arthur, Messrs. High and Melson—independently and without communicating with each other—provided specific, consistent details about

---

[1] Furthermore, any DNA collected from a third party could potentially be matched against the Alabama or federal DNA databases to identify an alternative perpetrator or, at least, a critical witness to the crime. Alabama established a DNA database by statute in 1994. 1994 Ala. Adv. Legis. Serv. 804 (LexisNexis); *see also* ALA. CODE §§ 36-18-20 through 36-18-39 (2007). The DNA Identification Act of 1994 established a federal DNA index. 108 Stat. 1796 (1994).

Mr. Arthur's visit to Copper Mobile Homes in Decatur on the morning of Troy Wicker's murder. Both were confident in their recollections: Mr. Arthur stopped by Copper Mobile Homes some time between 8 a.m. and 9 a.m.; Messrs. Melson and High were about to leave for Birmingham to set up a trailer; Mr. Arthur stayed for approximately thirty minutes; he acted like he always did; he was looking for work; the day after Mr. Arthur's visit they heard about Troy Wicker's murder; and when they heard that Mr. Arthur had been arrested, they realized that they had seen him on the morning of the murder. (*Id*.) The recollections of Messrs. High and Melson are significant because they directly contradict Judy Wicker's testimony that Mr. Arthur was with her that morning.[2]

### 2. Consideration of the Federal Habeas Court's Decision Is Wholly Inappropriate on a Motion to Dismiss.

Defendants argue that DNA testing "could not demonstrate that Arthur is actually innocent of capital murder" based on a decision from a separate proceeding dismissing his federal habeas petition on the basis of untimeliness. (Mot. at 26-30 (citing order dismissing habeas petition and order denying motion to alter or amend judgment).) Setting aside the different standards governing federal habeas and § 1983 actions, the Court may not consider such decision in deciding Defendants' motion to dismiss. *See Brooks* v. *Blue Cross & Blue Shield of Fla., Inc*., 116 F.3d 1364, 1368 (11th Cir. 1997) (Rule 12(b)(6) motions are "limited primarily to the face of the complaint and attachments thereto"). Further, a court is precluded from taking judicial notice of a

---

[2] Although the State of Alabama subsequently procured affidavits from Messrs. Melson and High retreating in part from their prior testimony, Mr. Arthur's request for a hearing to resolve any factual disputes was denied and therefore he did not have the opportunity to explore further the questionable circumstances under which the second affidavits were obtained.

judicial finding of fact in another action. *See, e.g.*, *United States* v. *Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) ("[A] court may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation."); *Urbanique Prods.* v. *City of Montgomery*, 428 F. Supp. 2d 1193, 1213-14 (M.D. Ala. 2006) (refusing to take judicial notice of finding in prior proceeding that there was "no probable cause for an arrest" in the context of a subsequent civil lawsuit against the city for false arrest and malicious prosecution).[3]

\*    \*    \*

In sum, the physical evidence that Mr. Arthur seeks for DNA testing could demonstrate that the State of Alabama's star witness lied when she testified that Mr. Arthur was with her at the Wicker residence and killed her husband. Mr. Arthur therefore has pleaded that there is "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Grayson*, 460 F.3d at 1339-40 (internal quotation marks and citation omitted). Unlike Grayson, Mr. Arthur has alleged that he did not receive a fair trial and that the evidence at issue is "material, exculpatory evidence necessary to ensure a fair trial." *Id.* at 1340.

---

[3] Although the Court may convert Defendants' motion to dismiss into a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, *see Jeter* v. *Montgomery County*, Civ. A. No. 2:06cv1043-MHT (WO), 2007 U.S. Dist. LEXIS 19882, at \*7 (M.D. Ala. Mar. 19, 2007), Rule 56 requires the Court to give the parties ten days' notice of the contemplated conversion to allow them to supplement the record. *Jones* v. *Auto. Ins. Co. of Hartford, Conn.*, 917 F.2d 1528, 1532 (11th Cir. 1990). If the Court were to convert this motion, Mr. Arthur would be entitled to discovery on various issues relating to his claims. *See Sanders* v. *Elyea*, Case No. 96 C 4459, 1998 U.S. Dist. LEXIS 1705, at \*2-3 (N.D. Ill. Feb. 10, 1998) (after converting motion to dismiss to summary judgment motion, court provided plaintiff with opportunity to conduct discovery before filing his opposition); *Collier* v. *City of Chicopee*, Civ. A. No. 97-30123-KPN, 1998 U.S. Dist. LEXIS 21901, at \*4 (D. Mass. Feb. 5, 1998) (where motion to dismiss is converted to summary judgment, parties entitled to "ample opportunity to supplement the record").

**B.  Mr. Arthur Has Properly Alleged a Substantive Due Process Right to the Physical Evidence He Seeks.**

This Court should follow the persuasive authority of other courts and find that Mr. Arthur has properly alleged a substantive due process right to access the evidence he seeks.  In finding such a due process right, the court in *Wade* v. *Brady*, 460 F. Supp. 2d 226 (D. Mass. 2006), explained:

> This Due Process right is *analogous* to *Brady,* not a literal application of its pre-trial guarantee.  A fairer rendering of this argument, and one with which this Court agrees, is that the same motivations undergirding *Brady,* the desire to avoid wrongful convictions by providing access to evidence in the prosecutor's possession, apply in the post-conviction context.

*Id.* at 243.  Likewise, as Judge Luttig of the Fourth Circuit has noted:  "The Constitution is not so static" as to ignore the powerful historical significance of DNA evidence and the positive effect it can have on the justice system in a post-conviction setting.  *Harvey* v. *Horan*, 285 F.3d 298, 305-06 & n.1 (4th Cir. 2002) ("*Harvey II*") (Luttig, J., respecting the denial of en banc rehearing) (noting the effectiveness of STR DNA testing in situations where minimal amounts of evidence were recovered).  Judge Luttig further noted that this right is particularly critical in the case of a person who has "steadfastly maintain[ed]" his or her factual innocence, and who might be able to show his or her innocence through post-convictions tests.  *Id.* at 319-20.

The "right of access to evidence partakes of both procedural and substantive due process.  And with a claim such as this, the line of demarcation is faint." *Id.* at 318.  *See also Wade,* 460 F. Supp. 2d at 249 ("Because the individual interests implicated by DNA testing so profoundly outweigh the adverse impact on the state, . . .

-13-

the Due Process Clause provides a substantive right to post-conviction DNA testing in cases where testing could raise serious doubts about the original verdict."); *McKithen* v. *Brown*, 481 F.3d 89, 107 n.17 (2d Cir. 2007) (holding that on remand the district court should examine whether there is a right to post-conviction DNA testing under both procedural and substantive due process theories).

Judge Luttig reasoned that the substantive due process right could be rooted in the principle that it is arbitrary for the government to deny a person access to evidence when the government lacks any significant interest. *Harvey II* at 319 (citing *Daniels* v. *Williams*, 474 U.S. 327, 331 (1986)). Other district courts have allowed DNA testing of biological evidence in cases where petitioners' convictions—aside from potential DNA evidence—seemed unassailable. In *Godschalk* v. *Montgomery County District Attorney's Office*, 177 F. Supp. 2d 366 (E.D. Pa. 2001), the court held that despite a detailed confession to two rapes by the petitioner, relating information that only the person who committed the crime would know, DNA testing was warranted because "DNA testing of the genetic material could indeed provide material exculpatory evidence for a jury to consider along with the inculpatory evidence of plaintiff's detailed confession." 177 F. Supp. 2d at 370.[4] *See also Osborne* v. *Dist. Attorney's Office*, 445 F. Supp. 2d 1079, 1081 (D. Alaska 2006) (finding a constitutional right to post-conviction

---

[4] The *Grayson* court suggested that the Fourth Circuit's reversal of *Harvey* v. *Horan* somehow undermined the reasoning in *Godschalk*. *Grayson*, 460 F.3d at 1339 n.9 (citing *Harvey* v. *Horan*, 278 F.3d 370, 381 (4th Cir. 2002) ("*Harvey I*"), *rev'g Harvey* v. *Horan*, 119 F. Supp. 2d 581 (E.D. Va. 2000)). *Godschalk*, however, was never overturned by the Third Circuit; while it did note the district court decision in *Harvey*, the court ultimately provided for relief more expansive than that granted by the district court in *Harvey*. *Godschalk*, 177 F. Supp.2d at 370 (holding that despite the fact that the petitioner had confessed, which was not the case in *Harvey*, "DNA testing of the genetic material could indeed provide material exculpatory evidence").

-14-

DNA testing where testing sought was not available at the time of trial, testing can easily be performed without cost or prejudice to the government and test results could either confirm plaintiff's guilt or provide evidence upon which plaintiff could seek a new trial); *Dabbs* v. *Vergari (In re Dabbs)*, 570 N.Y.S.2d 765, 769 (N.Y. Sup. Ct. 1990) (finding a right to DNA evidence in a post-conviction setting). Because Mr. Arthur has always maintained his innocence, no direct physical evidence has ever linked him to Troy Wicker's murder, and he has presented testimony of two alibi witnesses, it would be particularly arbitrary to deny his request for physical evidence for purposes of DNA testing.

    **C. Mr. Arthur Has Properly Alleged a Procedural Due Process Right to the Physical Evidence He Seeks.**

       Even if the Court were to rule that the facts of Mr. Arthur's case do not give rise to a post-conviction *Brady* right, Mr. Arthur had a due process post-conviction liberty interest in obtaining potentially exonerating evidence, and this interest outweighs any alleged interest of the State. *See Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976).

       The *Grayson* court declined to determine whether a post-conviction liberty right exists, and assumed *arguendo* that Grayson had "some residual, continuing liberty interest." *Grayson*, 460 F.3d at 1341. Without defining the substance or scope of this interest, the court concluded that it need not decide whether *Mathews* could apply because the second and third *Mathews* factors "overwhelm [Grayson's] alleged private interest." *Id*. The court made this determination using the balancing test outlined by the Supreme Court in *Mathews*, which examines (1) the private interest affected by state action, (2) the risk of erroneous deprivation of that interest by the state action, and the

probable value of additional safeguards, and (3) the government's interest in performing its normal functions and minimizing fiscal and administrative burdens.[5]  *Mathews*, 424 U.S. at 335.  The *Grayson* court found that there was a minimal risk of erroneous deprivation, on the grounds that Grayson himself had confessed, and that the government's interest in finality, in a case with such strong evidence, was great.  Because the second and third factors of the *Mathews* test weighed heavily against Grayson, the court never determined whether the interest he sought to protect was valid.  *Grayson*, 460 F.3d at 1341.

   "'A prisoner under a death sentence remains a living person and consequently has an interest in his life.' . . . Therefore, the court finds that plaintiff has some interest in his life that is constitutionally protected."  *Bradley* v. *King*, No. 2:01-cv-01601-SLB-PWG, slip op. at 5-6 (N.D. Ala. Mar. 28, 2007) (citing *Ohio Adult Parole Authority* v. *Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, J., concurring in part and concurring in the judgment)).  While this life interest is diminished by conviction, as the *Grayson* court noted, Judge Luttig's oft-cited concurrence in *Harvey* left open the possibility of a liberty interest in the case of a person who has "steadfastly maintain[ed]" his actual innocence.  *Grayson*, 460 F.3d at 1342 (citing *Harvey II* at 304-26).  "Even those in our society who have been lawfully deprived of their freedom retain residual, substantive liberty interests protected by the Fourteenth Amendment."  *Harvey II* at 312.  At least two other federal courts have held that a post-conviction liberty right exists.  *See*

---

[5] The Second Circuit reached a similar conclusion, remanding to the district court to determine if there was a post-conviction liberty interest, but holding that if there was, the *Mathews* balancing test would apply.  *See McKithen*, 481 F.3d at 107.

*Wade*, 460 F. Supp. 2d at 249; *Breest* v. *N.H. Attorney Gen.*, 472 F. Supp. 2d 116, 120-21 (D.N.H. 2007).

Along with Mr. Arthur's residual liberty right, the other *Mathews* factors weigh strongly in his favor. The risk of erroneous deprivation is tremendous in this case, because—Judy Wicker's perjured testimony aside—the only evidence linking Mr. Arthur to the crime is wholly circumstantial. It would be senseless to run the risk of executing an innocent man when available DNA evidence could severely undermine the only direct evidence supporting the guilty verdict, especially considering the minimal burden on the State simply to release the evidence for testing at Mr. Arthur's expense. DNA testing could also prove that Judy Wicker's original explanation of the events was true—that Mr. Arthur did not kill her husband. As to the third factor, though the State may have a "strong interest in the finality of duly adjudicated criminal judgments," *Grayson*, 460 F.3d at 1342, it "has no legitimate interest in punishing the innocent," *Osborne*, 445 F. Supp. 2d at 1081. "Consistent with society's overriding concern with the justice of the finding of guilt, the courts, as well as the prosecution, must be vigilant to correct a mistake." *Dabbs*, 570 N.Y.S.2d at 769 (internal quotation marks and citations omitted) (granting access to DNA evidence which ultimately led to the petitioner's exoneration and release). "The State's obligation is not to convict, but to see that, so far as possible, truth emerges." *Giles* v. *Maryland*, 386 U.S. 66, 98 (1967) (Fortas, J., concurring) Here, where the burden on the State is so slight and the risk of executing an innocent man is so great, under *Mathews*, Mr. Arthur has a procedural due process right to access to the DNA evidence.

II.    **MR. ARTHUR HAS STATED A CLAIM FOR ACCESS TO EVIDENCE UNDER THE EIGHTH AMENDMENT'S PROHIBITION OF CRUEL AND UNUSUAL PUNISHMENT.**

Defendants argue conclusorily that "in light of the overwhelming evidence and the fact that DNA test results would not exonerate [Mr. Arthur], no purpose would be served in allowing DNA testing." (Mot. at 32.) Defendants, however, ignore society's overwhelming support for post-conviction DNA testing and fail to recognize that denying Mr. Arthur's request for evidence contravenes "the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U.S. 86, 101 (1958).

The core of the Eighth Amendment is "the duty of the government to respect the dignity of all persons." *Roper* v. *Simmons*, 543 U.S. 551, 560 (2005). Defendants' refusal to turn over evidence violates Mr. Arthur's dignity by causing him to suffer unnecessarily by depriving him any opportunity to test evidence that could save him from being executed. Such needless mental anguish is unconstitutional punishment. *See Enmund* v. *Florida*, 458 U.S. 782, 798 (1982) ("[P]urposeless and needless imposition of pain and suffering [is] an unconstitutional punishment.") (quoting *Coker* v. *Georgia*, 433 U.S 584, 592 (1977) (internal quotation marks omitted)). The State's refusal to allow DNA testing serves no penological interest and does not save the State the expense of DNA testing. Nor is the State's interest in the finality of the conviction at stake here, because Mr. Arthur is not contesting the validity of his conviction or sentence in this action. *See Bradley* v. *Pryor,* 305 F.3d 1287, 1290 (11th Cir. 2002).

The Eighth Amendment forbids government action that is not consistent with contemporary standards of decency. *See Roper*, 543 U.S. at 561. The recognition of those standards "should be informed by objective factors to the maximum possible

extent," and "the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Atkins* v. *Virginia*, 536 U.S. 304, 312 (2002) (quoting *Harmelin* v. *Michigan*, 501 U.S. 957, 1000 (1991); *Penry* v. *Lynaugh*, 492 U.S. 302, 331 (1989)) (internal quotation marks omitted). It is therefore highly significant that, over the last ten years, forty states and the federal government have enacted post-conviction DNA access statutes. *See* The Innocence Project, *Access to Post-Conviction DNA Testing*, at http://www.innocenceproject.org/Content/304.php (last visited June 8, 2007) (listing state post-conviction DNA access statutes). The Supreme Court has noted that the enactment of such statutes "carries special force in light of the general popularity of anticrime legislation." *Roper*, 543 U.S. at 566.

Other objective factors clearly indicate that contemporary standards of decency require the state to allow post-conviction DNA testing. For example, 96 percent of those surveyed in an Alabama poll support the use of DNA in cases where it might prove guilt or innocence. Death Penalty Information Center, *Public Opinion: Majority in Alabama Supports a Temporary Halt to Executions* (reporting a July 2005 poll by the Capital Survey Research Center, the polling arm of the Alabama Education Association), at http://www.deathpenaltyinfo.org/article.php?did=1522 (last visited June 18, 2007). Nationwide, 92 percent of Americans believe that prisoners convicted before DNA tests were available should be allowed to have DNA tests to prove their innocence or guilt. Nationwide, 92 percent of Americans believe that prisoners convicted before DNA tests were available should be allowed to have DNA tests to prove their innocence or guilt. Mark Gillespie, *Americans favor DNA "second chance" testing for convicts*, Gallup Poll Monthly 417:32 (June 2000), 2000 WLNR 6442267 (reporting the results of a Gallup

-19-

poll).  This opinion comes as no surprise:  an average of one death row inmate per year

has been exonerated by DNA testing since such testing became widely available in the

1990s.  *See* Death Penalty Information Center, *The Innocence List*, at

http://www.deathpenaltyinfo.org/article.php?scid=6&did=110 (last visited June 8, 2007)

(listing 124 death row inmates who have had their convictions overturned or have been

absolutely pardoned based on evidence of innocence); The Innocence Project, *Facts on*

*Post-Conviction DNA Exonerations*, at http://www.innocenceproject.org/Content/351.php

(last visited June 18, 2007) (noting 203 exonerations based on DNA evidence since

1989).  A further indication that allowing post-conviction DNA testing is required by

contemporary standards of decency is Defendants' own policy of "never oppos[ing] a

post-conviction request for DNA testing if it was not available at the time of the trial, and

if the request is supported by a reasonable assumption that the test could prove

conclusively that the defendant is factually innocent."  Dana Beyerle, *Arthur Attorney*

*Wants Evidence Tested*, Times Daily (Florence, Ala.), June 30, 2006 (quoting Alabama

Attorney General Troy King).

          Defendants' refusal to grant Mr. Arthur's request for DNA testing violates

both the Alabama Attorney General's stated policy and the widely held view that

prisoners should be able to use post-conviction DNA testing to demonstrate their

innocence.  Defendants' refusal violates contemporary standards of decency, and

therefore the Eighth Amendment.  *See Trop*, 356 U.S. at 101.

### III.    MR. ARTHUR HAS STATED A CLAIM FOR VIOLATION OF HIS RIGHT OF ACCESS TO THE COURTS.

To state a claim for denial of the right of access to the courts, a plaintiff must allege that he actually has been injured—or will be injured—by being thwarted in his efforts to assert a non-frivolous, arguable claim. *Christopher* v. *Harbury*, 536 U.S. 403, 415 (2002); *Lewis* v. *Casey*, 518 U.S. 343, 348-51 (1996); *Bounds* v. *Smith*, 430 U.S. 817 (1977). Mr. Arthur has alleged such an injury. Defendants' arguments to the contrary are at odds with Supreme Court jurisprudence and therefore must be rejected.

Without citing any supporting authority, Defendants argue that a right of access claim is cognizable only when one's status as a prisoner or poor person has caused the deprivation.   This is not the law.  This Circuit has observed that "recognition of the constitutional right of access to the courts . . . long precedes *Bounds*," *Straub* v. *Monge*, 815 F.2d 1467, 1470 (11th Cir. 1987) (quoting *Jackson* v. *Procunier*, 789 F.2d 307, 311 (5th Cir. 1986)), and the Supreme Court has consistently treated access to the courts as a fundamental right grounded in constitutional guarantees. *See*, *e.g.*, *Boddie* v. *Connecticut*, 401 U.S. 371, 380 (1971) (in upholding the right of access to the courts, stating that "[t]he State's obligations under the Fourteenth Amendment are not simply generalized ones; rather, the State owes to each individual that process which, in light of the values of a free society, can be characterized as due"). Significantly, the right of access to the courts is most in need of protection where, as here, the party asserting the right has the State as his adversary because he, in particular, must have meaningful access to the court system in order to protect his "interests, liberty or property . . . from continued harm." *Straub*, 815 F.2d at 1473-74 (Hill, J., concurring). Mr. Arthur's claim

clearly falls under this rubric, and the fact that he has not alleged that "his status as a prisoner or indigent" has led to the deprivation of his rights is not a basis for dismissal.

Defendants' argument is similarly out of step with the law concerning what it means to exercise the right of access.  In claiming that Mr. Arthur has not been injured because he has been "accessing the courts for over 20 years" (Mot. at 33), Defendants neglect the central teaching of access-to-the-courts jurisprudence from the last thirty years, namely that the right of access to the courts entitles Mr. Arthur to more than "mere access to the courthouse doors."  *Ake* v. *Oklahoma*, 470 U.S. 68, 77 (1985). "[T]he touchstone . . . is *meaningful* access to the courts," *Bounds,* 430 U.S. at 823 (emphasis added).  Mr. Arthur has alleged that the Defendants' refusal to grant him access to the evidence for DNA analysis has meant that he has not had meaningful access to the courts, despite his persistent and repeated efforts.  He has alleged that Defendants have withheld the evidence that holds the promise of allowing him to establish his claim of actual innocence and, at long last, to have the merits of his case considered in post-conviction proceedings.

Furthermore, the enormity of the injury that Mr. Arthur faces—the looming threat of being executed without ever having the opportunity to present proof of his innocence—cannot and should not be minimized by Defendants' unsupported intimation that Mr. Arthur's heretofore fruitless struggle to be heard is somehow proof that he was not injured.  That a plaintiff has filed many lawsuits does not by itself undermine the claim that his right of access to the courts has been abridged, particularly where, as here, no showing has been made that the lawsuits were dismissed as frivolous.

*Daker* v. *Ferrero*, No. 1:03-CV-2526-RWS, 2007 U.S. Dist. LEXIS 23617, at *4 (N.D. Ga. Mar. 30, 2007).

Defendants concede that this Circuit has never rejected access-to-the-court claims based upon such injuries as Mr. Arthur alleges here.  Other courts have, in fact, ruled that a prisoner suffers an injury of constitutional dimensions when he is denied DNA evidence that could undermine the legitimacy of his underlying conviction.  *See Wade*, 460 F. Supp. 2d at 250-51.  Mr. Arthur has stated a valid claim under the right of access to the courts, and the State has failed even to suggest otherwise.  Moreover, to the extent that Mr. Arthur's claim is a relatively novel one in this jurisdiction, such novelty does not justify dismissal.  "The district court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or even 'extreme,' since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions."  5B Wright & Miller, FEDERAL PRACTICE & PROCEDURE CIVIL 3D § 1357 (2007) (collecting cases).  This Court should allow the claim to proceed.

## IV.    THE DEFENDANTS HAVE A DUTY TO PERMIT DNA TESTING TO ENABLE MR. ARTHUR TO PETITION FOR CLEMENCY.

Defendants argue that Mr. Arthur has no federal constitutional right to DNA testing in support of his application for clemency because in Alabama, the "power to commute a death sentence is vested exclusively in the Governor."  (Mot. at 34.)  But as Defendants concede, in Alabama, the district attorney plays an important, statutorily mandated role in clemency proceedings.  Under Alabama law, district attorneys have a duty "[t]o attend all clemency hearings before the Governor of Alabama, in all cases

-23-

arising in their judicial circuits, and furnish to the Governor, at those hearings, all pertinent information in their possession concerning the applicant or applicants for clemency." Ala. Code § 12-17-184(16). Defendants do not, and cannot, dispute that the DNA test results of the physical evidence he seeks would be pertinent to Mr. Arthur's application for clemency. *See, e.g.*, *McKithen*, 481 F.3d at 106 (noting potential utility of DNA testing in clemency proceedings). Accordingly, Defendants have a statutory duty to provide such information to the Governor in connection with Mr. Arthur's clemency application, and Defendants' refusal to permit such testing is in contravention of that duty.

Defendants' refusal to permit DNA testing violates the procedural safeguards afforded clemency proceedings by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Defendants suggest that because "[t]he Governor's clemency authority is extensive and exclusive," (Mot. at 34) the clemency process is wholly immune to judicial intervention. This is not correct. In *Ohio Adult Parole Authority* v. *Woodard*, 523 U.S. 272 (1998), four Supreme Court Justices concluded that although clemency is committed to the discretion of the executive, it is nonetheless subject to at least some minimal procedural safeguards, and that judicial intervention may "be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." 523 U.S. 272, 289 (1998) (O'Connor, J., concurring). A fifth Justice, Justice Stevens, went even further, arguing that a prisoner has an interest in life up to the date of his execution, and that the Due

Process Clause therefore applies to all proceedings up to the final execution, including those involving clemency. *Id.* at 290 (Stevens, J., dissenting).

Following *Woodard*, federal appellate courts—including the Eleventh Circuit—have consistently "assume[d] that some minimal level of procedural due process applies to clemency proceedings." *Duvall* v. *Keating*, 162 F.3d 1058, 1061 (10th Cir. 1998); *see also Parker* v. *State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1036-37 (11th Cir. 2001); *Workman* v. *Bell*, 245 F.3d 849, 852-53 (6th Cir. 2001); *Young* v. *Hayes*, 218 F.3d 850, 852-53 (8th Cir. 2000); *Wilson* v. *Calderon*, 161 F.3d 1185, 1187 (9th Cir. 1998). As expressed by the Tenth Circuit, the Due Process Clause "ensures a death row prisoner that he or she will receive the clemency procedures explicitly set forth by state law, and that the procedure followed in rendering the clemency decision will not be wholly arbitrary, capricious or based upon whim, for example, flipping a coin." *Duvall*, 162 F.3d at 1061.

Mr. Arthur was convicted upon the testimony of a convicted murderer and admitted perjurer, Judy Wicker, and in the absence of any physical evidence linking Mr. Arthur to the crime. Defendants' refusal to permit Mr. Arthur to access to the physical evidence within their control and to test that evidence, which is irrefutably pertinent to his clemency application, renders the clemency process wholly arbitrary, in contravention of the State's explicit statutory duties and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

V.    **MR. ARTHUR'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS.**

Defendants argue that Mr. Arthur's § 1983 claims for access to potentially exculpatory evidence should be dismissed because they are barred by the applicable statute of limitations.  Defendants are wrong.  They have not shown—and cannot show—that Mr. Arthur's claims are time-barred for three reasons.  First, as a threshold matter, Defendants' statute-of-limitations defense is not amenable to resolution on a motion to dismiss pursuant to Rule 12(b)(6), because it depends on facts beyond the pleadings.  Second, Mr. Arthur's § 1983 claims are timely brought.  Third, even if this Court were to find that the generally applicable time period expired before Mr. Arthur asserted his claims, the Complaint contains factual allegations sufficient to make out a case for equitable tolling and making dismissal inappropriate.

A.    **Defendants' Statute-of-Limitations Defense Is Not Amenable to Resolution on a Rule 12(b)(6) Motion.**

As an initial matter, Defendants' statute-of-limitations defense is not amenable to resolution on a motion to dismiss pursuant to Rule 12(b)(6), because it depends on facts beyond the pleadings.  Generally, an affirmative defense will not support a Rule 12(b)(6) motion to dismiss.  *Fortner* v. *Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993).  "Dismissal under [Rule] 12(b)(6) on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred. . . . [and] it appears beyond a doubt that [p]laintiffs can prove no set of facts that toll the statute."  *Tello* v. *Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 & n.12 (11th Cir. 2005) (internal quotations omitted).  Defendants do not point to any part of the Complaint suggesting that Mr. Arthur's claims are time-barred or that tolling is

inappropriate.  If a limitations defense is available to Defendants, therefore, such a defense can be resolved only after further development of the record.

**B.  Mr. Arthur's Claims Are Timely.**

Mr. Arthur has timely asserted his claims, and Defendants' sparse recitation of the law and pleadings to support their statute-of-limitations defense fails to demonstrate otherwise.  Defendants correctly note that the statute of limitations for § 1983 actions in Alabama is two years, borrowing from the state statute for personal injury actions. *Lufkin* v. *McCallum*, 956 F.2d 1104, 1105-06 (11th Cir. 1992).  However, Defendants fail to offer any legal or factual basis for determining when Mr. Arthur's injury accrued.

"[I]t is the standard rule that [accrual occurs] when the plaintiff has a complete and present cause of action."  *Wallace* v. *Kato*, 127 S. Ct. 1091, 1095 (2007) (citation omitted).  In the Eleventh Circuit, "Section 1983 actions do not accrue until the plaintiff knows or has reason to know that he has been injured."  *Mullinax* v. *McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987) (citation omitted).  Defendants bear the burden of proof on the issue of when the plaintiff's cause of action has begun to accrue. *See Smith* v. *Duff & Phelps, Inc.*, 5 F.3d 488, 492 n.9 (11th Cir. 1993).  Here, Defendants appear to propose several possible accrual dates, but fail to provide more than a perfunctory rationale for them or to acknowledge their patent flaws.

Defendants first imply that Mr. Arthur's injury accrued sometime in 1982, asserting that Mr. Arthur "has known of the existence of this physical evidence since his first trial in 1982." (Mot. at 35.)  In 1982, however, Mr. Arthur could not have known he had a cause of action, because the results of DNA testing were not generally accepted nor

-27-

were they deemed sufficiently reliable to be introduced as evidence. *See generally Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) (requiring that trial judges make an independent judicial determination whether the scientific evidence is sufficiently relevant and reliable); *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923) (scientific evidence held admissible only when the methodology used is generally accepted in the relevant scientific community); *Turner* v. *State*, 746 So. 2d 355 (Ala. 1998) (adopting a flexible *Daubert* standard for admission of DNA evidence in Alabama). Since that time, technological advances in DNA testing, "represent[ing] historic scientific developments," exponentially increased the accuracy of forensic identification. *Harvey II*, 285 F.3d at 305 (Luttig, J., respecting denial of rehearing en banc).

Defendants next appear to suggest that Mr. Arthur's injury accrued sometime in 1986. Citing *Grayson* v. *King*, 460 F.3d at 1335-36, Defendants assert that "the Eleventh Circuit has found that DNA testing has been available since 1986." (Mot. at 36 n.11.) This assertion both misrepresents *Grayson* and fails to establish an appropriate accrual date. The *Grayson* court did not "find" that DNA testing became available in 1986, but merely noted that exhibits attached to the complaint "indicated" that DNA testing was available "as early as 1986." *Grayson*, 460 F.3d at 1335. That court neither took judicial notice of these "indications" nor made a factual determination as to the relevance of these exhibits. Indeed, the *Grayson* court expressly declined to address any statute-of-limitations issues. *Id.* at 1343 n.12. Moreover, Mr. Arthur could not reasonably have believed he had a cause of action as early as 1986, because the first federal court decision finding a constitutional right to post-conviction DNA testing was

-28-

not issued until 2001.  *See Godschalk* v. *Montgomery County District Attorney's Office*, 177 F. Supp. 2d 366 (E.D. Pa. 2001).

Furthermore, Mr. Arthur presumably would not have a cause of action based on denial of access to evidence for DNA testing until he had requested such evidence and been refused.  Mr. Arthur has made several requests for such evidence:  as set forth in the Complaint, over the past several years, Mr. Arthur has sent letters to the Alabama Attorney General's Office on three separate occasions requesting access to physical evidence for DNA testing to be conducted at Mr. Arthur's expense.  However, Defendants have neither responded nor even acknowledged receipt of these letters. (Compl. ¶ 52.)  The question of when, or indeed whether, Defendants' failure to respond could or should have given Mr. Arthur reason to know that he had been injured so as to trigger the running of the statute is one that cannot be resolved at this stage of the litigation.

It is not merely the complex facts of this case that make it difficult to determine when Mr. Arthur's cause of action accrued; it is also the nature of the claim itself.  As one court has recently observed, fixing the date of accrual relating to the denial of a "newly emergent right" such as the right of access to DNA evidence compounds the difficulty.  *Wade*, 460 F. Supp. 2d at 235.  When various possible accrual dates suggest themselves, and when at least one of these dates would render the claim timely, the court should refrain from dismissing on statute-of-limitations grounds.

Moreover, the underlying technology that has given rise to the claim makes it difficult to determine whether and to what extent the traditional statute-of-limitations framework should apply here.  This is so because DNA analysis has become

increasingly precise, reliable and accurate, so that the passage of time appears to increase rather than degrade the value of the evidence.  As the U.S. Justice Department has noted:

> The results of DNA testing do not become weaker over time in the manner of testimonial proof.  To the contrary, the probative value of DNA testing has been steadily increasing as technological advances and growing databases amplify the ability to identify perpetrators and eliminate suspects . . . .  The strong presumption that verdicts are correct, one of the underpinnings of restrictions on post-conviction relief, has been weakened by the growing number of convictions that have been vacated by exclusionary DNA test results.

Postconviction DNA Testing:  Recommendations for Handling Requests, Nat'l Inst. of Justice, U.S. Dep't of Justice, NCJ 177626, 9-10 (Sept. 1999).  Therefore, the concern about lost evidence, fading memories and unavailable witnesses that has long justified the application of statutory time limits, *see*, *e.g.*, *Am. Pipe & Constr. Co.* v. *Utah*, 414 U.S. 538, 554 (1974), would seem largely irrelevant to claims regarding access to DNA evidence.  The uncertainty that necessarily arises out of this new development further militates against resolution of Mr. Arthur's claim on a motion to dismiss.

Lacking a sustainable legal argument for their statute-of-limitations defense, Defendants resort to accusations that Mr. Arthur's Complaint is merely a delay tactic, or "[a] device currently in vogue . . . to attempt to delay [a death] sentence," and urge this Court to dismiss the action on the ground that "enough is enough."  (Mot. at 36.) Defendants' insinuations that Mr. Arthur's claims lack merit are unavailing, have nothing to do with time limits in any event, and should be rejected.  Federal courts including the Eleventh Circuit Court of Appeals have held claims relating to DNA testing, such as Mr. Arthur's, cognizable under § 1983 where the plaintiff, if he prevails, would then use the

-30-

results of the DNA testing in a subsequent proceeding.  *See e.g.*, *Bradley* v. *Pryor*, 305

F.3d 1287, 1290-93 (11th Cir. 2002); *Savory* v. *Lyons*, 469 F.3d 667, 672 (7th Cir. 2006);

*Osborne* v. *Dist. Attorney's Office*, 423 F.3d 1050, 1054-55 (9th Cir. 2005).  Mr. Arthur

is pursuing a valid claim that implicates fundamental constitutional rights, and

Defendants' conclusory and misleading statute-of-limitations defense is insufficient to

justify dismissal.

### C.  Even If the Statute of Limitations Had Expired, It Should Be Equitably Tolled.

Even if this Court were to find that Mr. Arthur's claims were not timely

brought, equitable considerations in this case should allow the statute of limitations to be

tolled.  "Equitable tolling is appropriate when a movant untimely files because of

extraordinary circumstances that are both beyond his control and unavoidable even with

diligence."  *Sandvik* v. *United States*, 177 F.3d 1269, 1271 (11th Cir. 1999).  In Mr.

Arthur's case, the actions of Defendants would justify equitable tolling.

Mr. Arthur has alleged that he diligently attempted to obtain the relief he

sought through various means, including written requests to Defendants.  Mr. Arthur's

repeated requests were never straightforwardly denied; Defendants merely ignored them.

Defendants' assertion that Mr. Arthur's claim is time-barred is particularly disingenuous,

given the State of Alabama's stated policy, noted above, of "never oppos[ing] a post-

conviction request for DNA testing if it was not available at the time of trial, and if the

request is supported by a reasonable assumption that the test could prove conclusively

that the defendant is factually innocent."  Mr. Arthur was entitled to act in reasonable

reliance on the State's representations of its own policy, and the State's promulgation of

that official policy effectively estops Defendants from asserting that Mr. Arthur's claim is barred. *See Vistamar, Inc.* v. *Fagundo-Fagundo*, 430 F.3d 66, 73 (1st Cir. 2005) (noting that, when considering whether a defendant should be estopped from asserting a statute-of-limitations defense, the critical inquiry is whether the plaintiff, to his detriment, reasonably relied on the defendant's conduct).

As equitable tolling may be available to Mr. Arthur, dismissal is not proper at this stage of the litigation. "Because the applicability of the equitable tolling doctrine often depends on matters outside the pleadings, it 'is not generally amenable to resolution on a Rule 12(b)(6) motion.'" *Hernandez* v. *City of El Monte,* 138 F.3d 393, 402 (9th Cir. 1998) (quoting *Supermail Cargo, Inc.* v. *United States*, 68 F.3d 1204, 1206 (9th Cir. 1995)). As such, this Court should allow Mr. Arthur's § 1983 claim to proceed.

## VI.    MR. ARTHUR'S CLAIMS ARE NOT BARRED BY LACHES.

### A.  Defendants' Laches Defense Is Not Amenable to Resolution on a Rule 12(b)(6) Motion.

The affirmative defense of laches requires the Court to engage in a fact-specific inquiry that is inappropriate at this stage of the litigation. The laches defense raises factual issues that cannot be determined on a motion to dismiss. *See, e.g.*, *Patton* v. *Jones*, No. Civ-06-0591-F, 2006 WL 2246441, at *4 (W.D. Okla. Aug. 4, 2006) (*cited in Grayson* v. *Allen*, No. 2:06-cv-1032, 2007 U.S. Dist. LEXIS 37063, at *17-18 (M.D. Ala. May 21, 2007) (Watkins, J.)); *Nooner* v. *Norris*, No. 5:06-cv-0110 (Doc. #24, at 7) (E.D. Ark. June 19, 2006) (same).[6]

---

[6] Notably, in *Kason Industries*, the only case cited by Defendants setting forth the elements of laches, the Eleventh Circuit *reversed* the district court's grant of summary judgment for the defendant on laches grounds, and remanded for further fact-finding, holding that "[o]n the record

Laches is dependent on the facts of each case. *Grayson*, 2007 U.S. Dist. LEXIS 37063, at *17. "The laches defense raises fact questions regarding the existence of any delays, the reasons for any such delays, the prejudice created by any delays, and the balance of equities." *Patton*, 2006 WL 2246441, at *4. Accordingly, determining whether laches applies usually requires factual development beyond the content of the complaint. *See, e.g.*, *Advanced Cardiovascular Sys., Inc.* v. *Scimed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993); *see also Grayson*, 2007 U.S. Dist. LEXIS 37063, at *18 (observing that the Court's consideration of the laches defense in the context of defendants' motion for summary judgment was proper because the Court had before it the evidentiary submissions of the parties).

Defendants' motion readily demonstrates why this is so. Defendants assert, for example, that the first two elements of laches, *i.e.*, delay that is inexcusable, are met here "because Arthur knew or should have known of his claim years ago because he has known of the existence of the evidence and the availability of DNA testing." (Mot. at 36-37.) But Mr. Arthur's *knowledge*, of the availability of DNA testing or any other issue, to the extent relevant to the Court's evaluation of whether laches bars his claims, presents questions of fact beyond the four corners of his Complaint. Defendants' motion to dismiss the Complaint based on laches should be denied.

---

submitted, . . . we cannot say as a matter of law that laches bars any claim." *Kason Indus., Inc.* v. *Component Hardware Group, Inc.*, 120 F.3d 1199, 1207 (11th Cir. 1997).

**B.  Defendants Have Not Established the Elements of Laches.**

**1.    Any Delay on Mr. Arthur's Part Is Excusable.**

If the Court were to consider Defendants' laches defense in deciding their motion to dismiss, it is readily apparent that Defendants have not established, by reference to the Complaint, the elements of laches.  Defendants assert, in conclusory fashion, that laches applies to bar Mr. Arthur's claims because "[h]e could have asserted his claims much earlier and there is no excuse for his having failed to do so."  (Mot. at 37.)  To the contrary, any delay on Mr. Arthur's part is reasonable and excusable.

Rather than sleeping on his rights, Mr. Arthur has conscientiously pursued the very same relief that he now seeks through this action—access to evidence in the sole control of Defendants that is critical to establishing his innocence—throughout his post-conviction litigation in the federal courts, which only concluded on April 16, 2007. (Compl. ¶¶ 44-48.)  Alabama courts have long recognized that the pendency of another suit to enforce the same right can excuse delay.  *Thompson* v. *Suttle*, 15 So. 2d 590, 593 (Ala. 1943); *Gayle* v. *Pennington,* 64 So. 572, 576 (Ala. 1914).  Further, as set forth above and in the Complaint, Mr. Arthur has made several written requests over the past several years to the Attorney General for access to the physical evidence for DNA testing purposes.  This Court should not penalize Mr. Arthur for exhausting other potential avenues for obtaining the requested evidence, including his pending federal habeas litigation, before filing this suit, and should be wary of encouraging duplicative litigation by creating an incentive for—and indeed, requiring—plaintiffs to file multiple claims seeking the same relief.

2.    **The State Has Not Sufficiently Made Out Prejudice to Its Case.**

Defendants quote at length from the Eleventh Circuit's recent opinion in *Jones* v. *Allen*, 2007 U.S. App. LEXIS 9571 (11th Cir. Apr. 27, 2007) in support of their argument that the State will suffer undue prejudice by virtue of delay by Mr. Arthur if his action is permitted to proceed. *Jones*, however, was a review of the district court's denial of a death penalty inmate's motion to stay his execution, and thus is inapposite. *Id*. at *6. The Supreme Court of Alabama has not set an execution date for Mr. Arthur. Accordingly, Mr. Arthur has not filed a motion to stay, and there is no evidence that the State will be impeded from timely enforcement of its judgment. Additionally, unlike in *Grayson*, there is no evidence that it is now too late to ascertain the merits of the controversy.

Defendants therefore cannot establish that they have suffered undue prejudice by virtue of inexcusable delay by Mr. Arthur. The lapse of time does not, by itself, establish laches. *Merrill* v. *Merrill*, 71 So. 2d 44, 46 (Ala. 1954). As a general matter, the types of prejudice that courts are concerned with relate to either prejudice to a party's ability to put on and defend its case, or economic prejudice. *See*, *e.g.*, *Gayle*, 64 So. at 576-77 (addressing concerns regarding the obfuscation of the truth and destruction of the evidence of past transactions that arise from the lapse of time) (quoting *Stearns* v. *Page*, 48 U.S. 819, 829 (1849)); *Ex parte Grubbs*, 542 So. 2d 927, 929 (Ala. 1989) (listing factors such as the unavailability of witnesses, changed personnel, and the loss of pertinent records as classic elements of undue prejudice); *Woods* v. *Sanders*, 25 So. 2d 141, 144 (Ala. 1946) (plaintiffs precluded from relief where, as the result of delay, any conclusion the court may arrive at must at best be conjectural and it would be difficult to

do justice due to lapse of time, loss of evidence and death of parties); *Wanlass* v. *Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998) (economic prejudice results where a defendant will lose significant monetary investments or incur significant monetary penalties as a result of conduct which could have been altered by an earlier lawsuit). No such prejudice exists here.

In sum, to determine whether Mr. Arthur has committed inexcusable delay, and whether Defendants have thereby suffered undue prejudice, the Court must weigh the equities. Such an inquiry is contextual and fact-intensive. The State's interest in timely enforcement of its judgments must be weighed against the interests of both Mr. Arthur and the people of Alabama in ensuring that a capital defendant who has consistently maintained his innocence has access to potentially exculpatory evidence.[7] Defendants' motion to dismiss on the grounds of laches should be denied.[8]

---

[7] One of the factors the Court may likely consider is the State's own role in any alleged prejudice. It would seem peculiar, indeed, to credit the State's argument that is has been unduly prejudiced when it is the State of Alabama itself that is the driving force behind setting an execution date and when it could have provided the requested evidence at no cost or burden, in accordance with its own expressed policy, at any time.

[8] Defendants argue that Mr. Arthur has not stated a claim for "other testing" of certain items identified in the complaint, arguing that "[t]he Eleventh Circuit has not extended *Bradley* [v. *Pryor*] to allow § 1983 actions to encompass other forms of testing." (Mot. at 40.) Defendants have cited to no case or other authority suggesting that the logic of *Bradley* would not apply with equal force to such other testing. However, should the Court find that the right to the other testing sought by Mr. Arthur has not been adequately established, Mr. Arthur respectfully requests the opportunity to replead as to this claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.


Dated: June 18, 2007                                    Respectfully submitted,


                                                        /s/ Suhana S. Han
Charles E. Vercelli, Jr. (VER003)                       Suhana S. Han
VERCELLI & ASSOCIATES, P.C.                             Jennifer L. Parkinson
1019 S. Perry Street                                    Sara L. Manaugh
Montgomery, AL 36104                                    Jordan T. Razza
Telephone: (334) 834-8805                               Sultana L. Bennett
Facsimile: (334) 834-8807                               125 Broad Street
cvercelli@vercelli-law.com                              New York, NY 10004
                                                        Telephone: (212) 558-4000
                                                        Facsimile: (212) 558-3588

**CERTIFICATE OF SERVICE**

I hereby certify that on June 18, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to the following:

J. Clayton Crenshaw
Assistant Attorney General
Montgomery, Alabama

/s/  Suhana S. Han_____
SUHANA S. HAN

ADDRESS OF COUNSEL:
125 Broad Street
New York, New York 10004
(212) 558-4000

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

```
-------------------------------------------------------x
                                                       :
                                                       :
THOMAS D. ARTHUR,                                      :
                                                       :
                        Plaintiff,                     :
             v.                                        :
                                                       :
TROY KING, ATTORNEY GENERAL                            :
FOR THE STATE OF ALABAMA,                              :
in his official capacity,                              :
                                                       :
BRYCE U. GRAHAM, JR., DISTRICT                         :   CIVIL ACTION NO. CV_____
ATTORNEY FOR COLBERT COUNTY,                           :
in his official capacity,                              :
                                                       :
RONNIE MAY, SHERIFF FOR                                :
COLBERT COUNTY,                                        :
in his official capacity,                              :
                                                       :
M. DAVID BARBER, DISTRICT                              :
ATTORNEY FOR JEFFERSON COUNTY,                         :
in his official capacity,                              :
                                                       :
                        Defendants.                    :
                                                       :
                                                       :
-------------------------------------------------------x
```

## **COMPLAINT**

Thomas D. Arthur brings this civil rights action under 42 U.S.C. § 1983

seeking access to physical evidence—including a rape kit and blood stained clothing—

that has never been subjected to DNA testing.  Defendants have refused to search for

and/or provide access to such evidence that could provide powerful, exculpatory evidence

demonstrating that Mr. Arthur was wrongfully convicted and sentenced to death.

**INTRODUCTION**

1.      In 1991, Mr. Arthur was convicted of murdering Troy Wicker at his home in Muscle Shoals, Alabama.  No physical evidence linked Mr. Arthur to the crime. Instead, his conviction was based almost exclusively on the testimony of a convicted murderer and admitted perjurer, the victim's wife, Judy Wicker.  Although Judy Wicker also implicated two others in the murder of Troy Wicker who had a reason for wanting him dead, they were never prosecuted by the State of Alabama.

2.      At the time she testified against Mr. Arthur, Judy Wicker was serving a life sentence for the same crime.  In exchange for Judy Wicker's testimony against Mr. Arthur, the state prosecutor—who had an unavoidable conflict of interest because he had previously represented her in connection with her parole proceedings—offered the ultimate deal:  assist in the prosecution of Mr. Arthur and obtain early parole.  Although Judy Wicker previously had testified under oath at her own trial that Mr. Arthur was not involved in her husband's murder, she changed her story when she testified against Mr. Arthur and thereby secured her freedom.

3.      Aside from Judy Wicker's clear motive to implicate Mr. Arthur and her proven track record of lying, other compelling reasons demonstrate that her testimony against Mr. Arthur was a fabrication.  For example, the physical evidence recovered from the crime scene did not support, and in some instances contradicted, the account of events she gave at Mr. Arthur's trial.  Moreover, two credible alibi witnesses (who did not testify before the jury because defense counsel failed to conduct minimal fact investigation) have corroborated Mr. Arthur's assertion that he was nowhere near the Wicker residence on the morning Troy Wicker was murdered.

4.     That Mr. Arthur could be convicted and sentenced to death on paltry and unreliable evidence is attributable largely to the fact that he was denied effective assistance of counsel.  Prior to trial, Mr. Arthur's appointed counsel conducted virtually no independent investigation into either the underlying crime or potential mitigating evidence, and they were wholly unprepared to defend this capital case.  Moreover, on the first day of trial, the trial court inexplicably permitted Mr. Arthur—whose sole experience in a courtroom was as a defendant—to represent himself.  The trial court agreed to this without first conducting an inquiry into whether Mr. Arthur's waiver of his right to counsel was made knowingly and voluntarily.  Not surprisingly, Mr. Arthur's efforts at trial were severely hampered by his inability to undertake any factual investigation, his lack of legal training, and the absence of the informed, objective advice of experienced trial counsel.

5.     Mr. Arthur's claims relating to his actual innocence and the constitutional violations at his trial and sentencing have never been reviewed by any post-conviction court.  Although Mr. Arthur filed a state post-conviction petition, the Alabama courts refused to review his claims on the merits because his petition was untimely filed.  By strictly enforcing the limitations period against Mr. Arthur—a death row inmate who did not receive notice of the certificate of judgment triggering the limitations period, who was not represented by counsel during the relevant period, who had no access to any form of legal assistance, and who was deprived of access to adequate law library facilities—the State of Alabama violated Mr. Arthur's constitutional rights to due process, counsel, and access to the courts.

6.    Mr. Arthur's substantial constitutional claims also have never been reviewed on the merits by a federal court.  Notwithstanding Mr. Arthur's diligence in attempting to present his collateral claims and the circumstances that prevented him from doing so, the district court refused to toll the limitations period and dismissed his *first* federal habeas petition as untimely.  Although Mr. Arthur presented compelling evidence of actual innocence, the district court disregarded sworn affidavits of two alibi witnesses without even holding a hearing to resolve factual disputes.

7.    Consequently, Mr. Arthur stands to be executed without ever having received *any* state or federal collateral review of his trial and death sentence.

8.    Mr. Arthur brings this lawsuit to obtain critical evidence for purposes of DNA and other testing at no cost to the State of Alabama.  Defendants have failed to assert any valid reason for refusing to search for and release the requested evidence.

## JURISDICTION

9.    This Court has jurisdiction over the subject matter of this complaint pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4). *See Bradley* v. *Pryor*, 305 F.3d 1287 (11th Cir. 2002).

10.    The relief requested is injunctive in nature.  Mr. Arthur also disclaims any attempt to challenge his conviction and sentence of death with this lawsuit, and instead focuses solely on the search for and release of physical evidence as described below for DNA and other testing.

11.    Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1), 1391(b)(2), because at least one of the Defendants maintains his principal place of business within this District. Specifically, the Attorney General for the State of Alabama, to whom all other Defendants

– 4 –

defer in their decisions to release evidence to the Plaintiff, maintains his principal place of business within this District. All of the Defendants maintain their principal places of business within the State of Alabama.

## THE PARTIES

12. Mr. Arthur is presently incarcerated under a sentence of death at the Holman Correctional Facility in Atmore, Alabama.

13. Defendant Troy King is the Attorney General for the State of Alabama. As the Attorney General, Mr. King is responsible for formulating policy relating to access to evidence within the possession and/or control of the Attorney General's Office of the State of Alabama and other state law enforcement agencies. Mr. King is also responsible for determining whether a convicted person will be provided access to biological evidence for post-conviction DNA testing.

14. Defendant Bryce U. Graham, Jr. is the District Attorney for Colbert County in the State of Alabama. As the District Attorney, Mr. Graham controls policy relating to access to evidence within the possession and control of the Office of the District Attorney of Colbert County. On information and belief, he also controls whether a convicted person will be provided access to biological evidence for post-conviction DNA testing.

15. Defendant Ronnie May is the Sheriff of Colbert County. The Colbert County Sheriff's Department is the investigating agency of the political subdivision of Colbert County.

16. Defendant M. David Barber is the District Attorney for Jefferson County in the State of Alabama. As the District Attorney, Mr. Barber controls policy relating to

access to evidence within the possession and control of the Office of the District

Attorney.  On information and belief, he also controls whether a convicted person will be

provided access to biological evidence for post-conviction DNA testing.

17.    At all times pertinent to this case, Defendants were acting under the color

of state law.  They are being sued in their official capacities.

## MR. ARTHUR'S TRIAL AND CONVICTION

18.    On February 1, 1982 at 9:12 a.m., the police responded to a call at the

Wicker residence in Muscle Shoals, Alabama, where they found Judy Wicker lying on

the floor with traces of blood on her face and her sister Teresa Rowland kneeling beside

her.  The police also found Troy Wicker's body in the bedroom with a single gunshot

wound to the right eye.

19.    The police collected physical evidence from the crime scene, including

Judy Wicker's blood-stained clothing and torn undergarment, vacuum sweepings, hair

samples, shell casings, and a pillowcase with gunpowder flakes.  The police also dusted

the area for latent fingerprints, but did not search Judy Wicker, her sister, or any of their

possessions.  The police located Judy Wicker's 1981 Buick Riviera, which had been

abandoned in a parking lot; the police searched it and found a wig, hair samples, and

latent fingerprints.  The murder weapon was never recovered.

20.    After the shooting, Judy Wicker was taken to the hospital and remained

there for several days.  She suffered a bruise around her left eye, a laceration of her left

upper lip, two chipped teeth, and an abrasion on her left hip.  Moreover, a rape kit was

prepared and seminal fluid collected.  In response to questioning by investigators at the

hospital, Judy Wicker provided the following account of the crime:  She returned home

after dropping her children off at school. When she entered her house, she found an African-American man burglarizing her home. The intruder raped her, knocked her unconscious, and then shot Troy Wicker.

21.     Judy Wicker was eventually charged with her husband's murder under the theory that she killed him to collect approximately $90,000 in life insurance proceeds. At her trial in 1982, she testified under penalty of perjury to the same version of events that she had related to the investigators. Despite her claims of innocence, Judy Wicker was convicted of murdering her husband and was sentenced to life imprisonment.

22.     At Mr. Arthur's trial in 1991, Judy Wicker gave a completely different account of the murder. Although she previously had sworn under oath that Mr. Arthur was not involved in the murder of her husband, she now claimed that she, along with Teresa Rowland and her sister's boyfriend, Theron McKinney, had decided to kill Troy Wicker, and that she had paid Mr. Arthur to pull the trigger. She also paid Rowland $6,000 and gave McKinney jewelry and a Trans Am in exchange for their assistance in carrying out the murder. The State of Alabama, however, never prosecuted Rowland or McKinney.

23.     The failure of the State to pursue the investigation and prosecution of these two suspects is particularly troublesome considering that Teresa Rowland had her own reasons for wanting Troy Wicker dead. She had previously hired Troy Wicker to burn her house down so that she could collect insurance proceeds; however, she was unable to pay him the promised amount, so he had threatened to have her arrested for arson. Rowland also had the opportunity to murder Troy Wicker—she had her own key

to the Wicker residence and was free to come and go as she pleased. Most significantly, Rowland was present at the Wicker house on the morning of the murder.

24. At the time she testified against Mr. Arthur, Judy Wicker was serving a life sentence for the same crime. In return for her testimony, the state prosecutor, Gary Alverson, promised to make a parole recommendation on her behalf. Prior to becoming a state prosecutor, Alverson had represented Judy Wicker and assisted her in procuring a deal from the then-prosecutor in exchange for her testimony. Thus, the State's prosecutor offered his former client the ultimate deal: assist in the prosecution of Mr. Arthur and obtain early parole. Mr. Arthur's rights to due process and a fair trial were violated due to the prosecutor's irreconcilable conflict of interest.

25. Mr. Arthur was convicted of capital murder after a three-day trial at which he was permitted to represent himself. The trial court did not hold a hearing or engage in a colloquy to determine whether Mr. Arthur's decision was knowing and voluntary prior to granting Mr. Arthur's request to represent himself. Such failure to ensure that Mr. Arthur's decision to represent himself was knowing and voluntary violated the Sixth and Fourteenth Amendments.

26. No physical evidence linked Mr. Arthur to the murder of Troy Wicker. The hair samples and fingerprints found at the crime scene and in Judy Wicker's 1981 Buick Riviera were tested, but they did not match Mr. Arthur's. Mr. Arthur's conviction was based almost exclusively on the testimony of Judy Wicker, a convicted murderer and admitted perjurer.

27. The penalty phase that followed lasted less than an hour and a half. Mr. Arthur's counsel conducted no independent investigation and offered no mitigation

testimony.  In violation of Mr. Arthur's constitutional right to effective assistance of counsel, Mr. Arthur's trial counsel failed to adequately investigate mitigation evidence, and appellate counsel failed to argue such failure on direct appeal.

28.    On December 5, 1991, Mr. Arthur was convicted of capital murder for the 1982 killing of Troy Wicker.  On the same day, the jury recommended the death penalty by a vote of 11–1.

## REQUESTED EVIDENCE

29.    In connection with its investigation of the murder of Troy Wicker, the State of Alabama collected various pieces of evidence as set forth in memoranda prepared by officials at the State's Department of Forensics:  (i) Memorandum to File by John H. Kilbourn, dated March 4, 1982 (Attached as Exhibit 1); (ii) Memorandum to File by Rodger Morrison, dated March 16, 1982 (Attached as Exhibit 2); (iii) Memorandum to File by J.G. Wallace, dated April 28, 1982 (Attached as Exhibit 3); and (iv) Memorandum to File by Brent A. Wheeler, dated May 7, 1982 (Attached as Exhibit 4) (collectively, the "Forensics Memoranda").  Mr. Arthur seeks access all items listed in the Forensics Memoranda, including Judy Wicker's clothing, Judy Wicker's rape kit, the wig, hair samples, vacuum sweepings, spent cartridges, the pillowcase and the bullet, as well as photographs presented as trial exhibits (the "Requested Evidence").

30.    The requested evidence can be categorized into six groups:  (i) Judy Wicker's clothing, (ii) the rape kit created the day of the murder, (iii) the wig and hair samples found in Judy Wicker's car, (iv) vacuum sweepings and a hair sample from the Wicker residence, (v) spent cartridges and a pillowcase found beside Troy Wicker's

body, as well as the bullet removed from Troy Wicker's body, and (vi) photographs taken at the crime scene.

31.  <u>Judy Wicker's Clothing</u>.  The State submitted Judy Wicker's bloodstained blouse, pants, and ripped undergarments to criminologist John Kilbourn, but Mr. Kilbourn never tested these items for blood typing or DNA.  At trial, the prosecution argued that Judy Wicker and Mr. Arthur concocted a story that she had been raped and beaten up by an African-American man who then killed Troy Wicker, but that it was actually Mr. Arthur who had assaulted her and killed her husband.  Testing Judy Wicker's clothing could show that someone other than Mr. Arthur assaulted her and was present in the Wicker residence when Troy Wicker was murdered.  These items are in the custody of the Jefferson County Circuit Court.

32.  <u>Judy Wicker's Rape Kit</u>.  Judy Wicker's rape kit was prepared when she was taken to the hospital shortly after the police arrived to investigate the murder, and the State sent the kit to criminologist Rodger Morrison.  The rape kit was never subjected to DNA testing.  But such testing could prove that someone other than Mr. Arthur raped Judy Wicker—a fact that would be consistent with her original testimony that a burglar raped her and murdered her husband.  The location of the rape kit is unknown to Mr. Arthur.

33.  <u>The Wig and Hair Samples from Judy Wicker's 1981 Buick Riviera</u>. The State submitted a wig and hair samples that were removed from Judy Wicker's 1981 Buick Riviera to criminologist John Kilbourn for microanalysis.   Her automobile was abandoned in the parking lot of Northwest Junior College in Tuscumbia and located by the police around noon on the day of the murder.  Fingerprints found in the automobile

were tested but did not match those of Mr. Arthur. At trial, Mr. Kilbourn testified that

the hair samples were "Negroid hair . . . forcibly removed." Although Judy Wicker

testified that Mr. Arthur had disguised himself by wearing this wig, Mr. Kilbourn did not

find any hair inside the wig as would be expected. DNA tests, which could establish

whether this account was indeed a fabrication, were never performed on these items.

These items are in the custody of the Jefferson County Circuit Court.

34.    <u>Den Floor Vacuum Sweepings and Hair Sample</u>. Vacuum sweepings

from the den floor and a hair sample from a shoe were collected from the Wicker

residence and submitted to Mr. Kilbourn. These sweepings consisted of numerous hairs

and fibers, none of which matched Mr. Arthur's. These items, which could reveal the

presence of otherwise individuals, were never tested for DNA. Comparing the DNA test

results for the hair samples with the test results for the rape kit could produce a match,

thereby establishing that someone other than Mr. Arthur was present at the Wicker

residence on the morning of Troy Wicker's murder. The location of the vacuum

sweepings is unknown to Mr. Arthur. The hair sample is in the custody of the Jefferson

County Circuit Court.

35.    In sum, DNA testing could demonstrate that the same person who raped

Judy Wicker also physically assaulted her, that this person's blood was on her blouse,

that his hair was found in the Wicker residence, that he was in Judy Wicker's 1981 Buick

Riviera, and that this person was not Mr. Arthur. Such evidence could discredit entirely

the only direct testimony linking Mr. Arthur to the murder, because nowhere in Judy

Wicker's testimony did she allow for the possibility that two persons killed Troy Wicker.

36.    <u>Other Evidence</u>.  Spent cartridges, a bullet, and a pillowcase with gunpowder flakes were recovered and presented as trial exhibits.  The prosecution attempted to link the spent cartridges and bullet to Mr. Arthur through the testimony of two witnesses.  First, criminologist Brent Wheeler testified that the spent cartridges were either ".22 long or .22 long rifle," "very shiny," and coated with oil.  Second, Patricia Yarbrough Green testified that Mr. Arthur had asked her to purchase ".22 mini magnum long rifle" bullets the day before the murder.  Together, these witnesses suggested that the spent cartridges recovered from the crime scene were the same ones that allegedly had been purchased recently at Mr. Arthur's request.  But no weapon was ever found, the spent cartridges were not definitely identified, and the bullet removed from Troy Wicker's body was not specifically matched to one of the casings.  Further, although four spent cartridges were left behind, only one bullet was found and Troy Wicker suffered from only one bullet wound.  The police searched but located no other bullet holes, and there was no explanation for the presence of three extra spent cartridges without evidence of more than one gunshot.  Testing the bullet and spent cartridges could determine their exact type and condition, as well as the model of weapon that was used.  Such testing could also reveal whether any of the spent cartridges match the recovered bullet or the specific bullets that Ms. Green claimed she had obtained for Mr. Arthur.

37.    Regarding the pillowcase, criminologist Brent Wheeler testified that the sparse scattering of gunpowder residue on the pillow was not consistent with the discharge of a weapon at close range.  But this testimony directly contradicted the official autopsy report, which stated that the "gunshot wound to the right eyelid [was] fired at a close range."  (Attached as Exhibit 5)  According to Judy Wicker, her sister Teresa

Rowland gave Troy Wicker a "knock out" drug the night before and Mr. Wicker was

sleeping when he was shot.  Thus, the inference to be drawn from the contradiction

between Mr. Wheeler's testimony and the autopsy report—that Troy Wicker was not in

bed when he was shot—is inconsistent with Judy Wicker's revised version of events.

The spent cartridge casings and pillowcase are in the custody of the Jefferson County

Circuit Court.  The location of the bullet is unknown to Mr. Arthur.

     38.   <u>Photographic Evidence</u>.  Photographs of the crime scene, including those

of Troy Wicker's body, were admitted into evidence.  The significant discrepancies

between witness testimony and the physical evidence—specifically as these discrepancies

relate to the four spent cartridges, the wound, the bullet, the bullet hole, and the distance

from which the gunshot was fired—cannot be adequately resolved without the crime

scene photographs.  A careful examination of the photographs of the body, the wound,

and the surrounding area, in conjunction with tests of the bullet, spent cartridges, and

pillowcase, could reveal the likely type of bullet and bullet trajectories, as well as the

model of weapon used and its position at the time of discharge.  Such evidence could

undermine confidence in Mr. Arthur's guilty verdict.  The location of the photographs is

unknown to Mr. Arthur.

     39.   Mr. Arthur is entitled to the requested evidence set forth above and in the

Forensics Memoranda.  He has consistently maintained his innocence, contending that he

was not present in Judy Wicker's house when Troy Wicker was killed.  In addition to

Judy Wicker's original testimony that corroborates Mr. Arthur's assertion, he has

presented testimony of two alibi witnesses.  In their affidavits submitted on behalf of Mr.

Arthur, both Alphonso High and Ray Melson—independently and without

communicating with each other—provided specific, consistent details about Mr. Arthur's

visit on the morning of Troy Wicker's murder.  Both were confident in their

recollections:  Mr. Arthur stopped by Copper Mobile Homes in Decatur some time

between 8 a.m. and 9 a.m.; they were on their way to Birmingham to set up a trailer;

Mr. Arthur stayed for approximately 30 minutes; he acted like he always did; he was

looking for work; the day after Mr. Arthur's visit they heard about Troy Wicker's

murder; and when they heard that Mr. Arthur had been arrested they realized that they

had seen him on the morning of the murder.  The recollections of Messrs. High and

Melson are significant because they directly contradict Judy Wicker's testimony that

Mr. Arthur was with her that morning.  Based on her testimony regarding the events

immediately preceding the murder, Mr. Arthur could not have visited Messrs. High and

Melson in Decatur and shot Troy Wicker in Muscle Shoals before 9:12 a.m. when the

police arrived at the Wicker residence.

40.     Granting Mr. Arthur access to the requested evidence is consistent with

the State of Alabama's official policy of "never oppos[ing] a post-conviction request for

DNA testing if it was not available at the time of the trial, and if the request is supported

by a reasonable assumption that the test could prove conclusively that the defendant is

factually innocent."  *See* Dana Beyerle, *Arthur Attorney Wants Evidence Tested*, TIMES

DAILY (Florence, Ala), June 30, 2006 (quoting Attorney General Troy King).

41.     Moreover, under Alabama statutory law, Mr. Arthur is entitled to the trial

exhibits.  Citizens of Alabama have a right "to inspect and take a copy of any public

writing of this state, except as otherwise expressly limited by statute."  ALA. CODE § 36-

12-40.  The Alabama Supreme Court has defined "public writing" as having the same

meaning as the term "public record," which is defined by statute. *Stone* v. *Consol. Pub. Co.*, 404 So. 2d 678, 680 (Ala. 1981). The Code defines "public record" as "any paper, pleading, exhibit or other writing filed with" an Alabama court. ALA. CODE § 41-13-1. Section 36-12-41 of the Code provides that "[e]very public officer having custody of a public writing which a citizen has a right to inspect is bound to give him, on demand, a certified copy of it," provided that the citizen making the request pays any associated fees.

### MR. ARTHUR'S EFFORTS TO OBTAIN ACCESS TO PHYSICAL EVIDENCE

42.     Mr. Arthur has diligently sought access to critical physical evidence that could wholly undermine confidence in his trial during which he was convicted and sentenced to death. Mr. Arthur, however, has been consistently denied any opportunity to obtain this critical evidence. In light of Mr. Arthur's ongoing efforts and the lack of access to necessary DNA technology (as described below) during the relevant period, this lawsuit is not barred by the statute of limitations.

43.     Mr. Arthur filed a motion for access to trial exhibits in the Circuit Court of Jefferson County but the state court declined to rule on the motion and instead transferred the exhibits to the federal district court, which denied Mr. Arthur's motion on April 30, 2002.

44.     On June 3, 2002, Mr. Arthur filed a Motion for Leave to Conduct Discovery limited to the threshold issue of whether the statute of limitations in the Antiterrorism and Effective Death Penalty Act of 1996 should bar review of his habeas

corpus petition.  On December 4, 2002, the district court denied his request and dismissed his first federal habeas petition as untimely.

45.     On December 17, 2002, Mr. Arthur filed a motion to alter or amend the judgment in the district court, which was denied on June 4, 2003.

46.     On October 6, 2003, Mr. Arthur filed his appellant's brief in the Eleventh Circuit Court of Appeals, challenging the dismissal of his habeas petition and the denial of his motion for leave to conduct discovery.  The State of Alabama filed its appellee's brief on December 23, 2003, followed by Mr. Arthur's filing of his reply brief on January 23, 2004.  On June 21, 2006, the Eleventh affirmed the district court's opinion in its entirety.

47.     On July 11, 2006, Mr. Arthur filed a petition for rehearing and rehearing en banc, which was denied on August 14, 2006.

48.     On January 11, 2007, Mr. Arthur filed a petition for certiorari with the United States Supreme Court, which is pending.

49.     Through counsel, Mr. Arthur also sent letters to Defendants or their predecessors in office, as well as to other potential custodians of evidence, in an effort to locate the evidence and request that it be preserved.  The letters asked the recipient to search available records to confirm whether the recipient is in possession of the evidence, and if so, to preserve the evidence.  More specifically:

>    i.    On November 26, 2003, Mr. Arthur sent a letter to Frank Michael Hale, Sheriff, Jefferson County Sheriff's Office, Birmingham, Alabama.  (Attached as Exhibit 6)
>
>    ii.   On November 26, 2003, Mr. Arthur sent a letter to David Barber, District Attorney, Jefferson County District Attorney's Office,

Birmingham, Alabama.  (Attached as Exhibit 7)

iii.    On November 26, 2003, Mr. Arthur sent a letter to Dr. Robert M. Brissie, Chief Coroner/Medical Examiner, Jefferson County Coroner/Medical Examiner's Office, Birmingham, Alabama. (Attached as Exhibit 8)

iv.    On November 26, 2003, Mr. Arthur sent a letter to the Birmingham City Hall, Birmingham, Alabama.  (Attached as Exhibit 9)

v.    On November 26, 2003, Mr. Arthur sent a letter to Sandra Turner, Circuit Clerk (Criminal Division), Jefferson County Courthouse, Birmingham, Alabama.  (Attached as Exhibit 10)  In a letter dated December 9, 2003, Anne-Marie Adams stated that the Jefferson County Courthouse had possession of the pillow case, hair samples, wig, clothing, and spent cartridge casings but that access to this evidence could only be obtained by filing a motion with the state court trial judge.  The letter also stated that the photographic evidence had been mailed to the Alabama Supreme Court on September 14, 2000, and that the photographic evidence had not been returned.  (Attached as Exhibit 11)

vi.    On November 26, 2003, Mr. Arthur sent a letter to Ronnie May, Sheriff, Colbert County Sheriff's Department, Tuscumbia, Alabama.  (Attached as Exhibit 12)

vii.    On November 26, 2003, Mr. Arthur sent a letter to Gary Alverson, District Attorney, 31st Judicial Circuit, Colbert County, Tuscumbia, Alabama.  (Attached as Exhibit 13)

viii.    On November 26, 2003, Mr. Arthur sent a letter to James A. Heffernan, Colbert County Coroner, Tuscumbia, Alabama. (Attached as Exhibit 14)

ix.    On November 26, 2003, Mr. Arthur sent a letter to the Tuscumbia City Hall, Tuscumbia, Alabama.  (Attached as Exhibit 15)  In a letter December 22, 2003, D. Marcel Black, City Attorney for the City of Muscle Shoals, Alabama, stated that the City of Muscle Shoals Police Department did not have possession of any of the evidence.  Mr. Black further stated that, based on information provided to him by Lanny Coan of the Muscle Shoals Police Department and Robert Hall, formerly of that department, his understanding was that the evidence was in the custody of the Colbert County District Attorney's Office or the State of

– 17 –

Alabama Department of Forensic Sciences.  (Attached as Exhibit 16)

x.   On November 26, 2003, Mr. Arthur sent a letter to C. Phillip Bowling, Circuit Clerk and Register, Colbert County, Tuscumbia, Alabama. (Attached as Exhibit 17)

xi.   On December 2, 2003, Mr. Arthur sent a letter to F. Taylor Noggle, Jr., Director, Alabama Department of Forensic Sciences, Auburn, Alabama.  (Attached as Exhibit 18)

xii.   On December 2, 2003, Mr. Arthur sent a letter to Larry Huys, Section Chief, Alabama Department of Forensic Sciences—State DNA Data Bank, Birmingham, Alabama.  (Attached as Exhibit 19)

xiii.   On December 2, 2003, Mr. Arthur sent a letter to Rodger D. Morrison, Laboratory Director, Alabama Department of Forensic Sciences—Huntsville Laboratory, Huntsville, Alabama. (Attached as Exhibit 20)  In a letter dated May 4, 2004, Mr. Morrison responded that the Huntsville Laboratory was in possession of debris from the inside of the wig, pink blouse and beige panties; 17 sticky tape slides from the wig, blouse, panties and pants; and 74 slides containing sweepings and fibers from the wig, clothing and vacuum sweepings.  (Attached as Exhibit 21)

xiv.   On December 2, 2003, Mr. Arthur sent a letter to X. Selwyn Jones, Laboratory Director, Alabama Department of Forensic Sciences—Florence Laboratory, Florence, Alabama.  (Attached as Exhibit 22)

xv.   On December 2, 2003, Mr. Arthur sent a letter to Brent A. Wheeler, Deputy Director, Alabama Department of Forensic Sciences, Auburn, Alabama.  (Attached as Exhibit 23)

xvi.   On December 9, 2003, Mr. Arthur sent a letter to Robert G. Esdale, Clerk, Alabama Supreme Court.  (Attached as Exhibit 24)

50.   On November 26, 2003, Mr. Arthur sent a letter to J. Clayton Crenshaw, Assistant Attorney General, Capital Litigation Division, State of Alabama, Montgomery, Alabama.  Mr. Arthur requested access to the evidence for the purposes of DNA and other testing to be performed at Mr. Arthur's expense.  (Attached as Exhibit 25)

51.    On August 18, 2006, Mr. Arthur further attempted to access the evidence by sending a letter to Troy King, Alabama Attorney General, Alabama State House, Montgomery, Alabama.  Mr. Arthur again requested access to physical evidence for testing to be conducted at Mr. Arthur's expense.  (Attached as Exhibit 26)

52.    Mr. Arthur's most recent attempt to access the evidence occurred on January 17, 2007, when he sent a second letter to Attorney General Troy King,  renewing his request for an opportunity to test the evidence in question.  (Attached as Exhibit 27) The Attorney General's office never responded to any of Mr. Arthur's letters.

53.    Mr. Arthur believes that the present location of the hair samples, wig, clothing, and spent cartridge casings is the Jefferson County Courthouse.  The location of the other requested evidence is not known by Mr. Arthur.

## EXCULPATORY POTENTIAL OF DNA EVIDENCE

54.    The evidence that Mr. Arthur is requesting has not been subjected to Short Tandem Repeat (STR) or polymerase chain reaction (PCR) mitochondrial DNA testing or other advanced testing techniques.

55.    At the time of Mr. Arthur's trial in 1991, DNA testing technology was neither widely available nor significantly advanced.  *See FBI Announces New DNA Policy*, EXPERT & LAW, Dec. 19, 1989, at 3, 3.  The FBI did not start using PCR DNA testing until April 1992.  *See* Sandra Skowron, *New DNA Testing Provides Hope for Some Inmates*, L.A. TIMES, July 4, 1993, at A26.

56.    With the development of PCR and STR DNA testing techniques, DNA testing can now determine whether a DNA sample is consistent with the DNA profile of a particular individual with a very high degree of accuracy.  This testing can be performed

on small amounts of evidence, and it can also be performed on degraded evidence.  *See*

NAT'L COMM'N ON THE FUTURE OF DNA EVIDENCE, U.S. DEP'T OF JUSTICE,

POSTCONVICTION DNA TESTING:  RECOMMENDATIONS FOR HANDLING REQUESTS 27-28

(1999)  With the development of mitochondrial DNA testing, DNA testing can be

performed on shafts of hair.  *Id.* at 28.

      57.    STR DNA testing techniques "represent historic scientific developments"

that exponentially increase the accuracy of forensic identification.  *Harvey* v. *Horan*, 285

F.3d 298, 305 (4th Cir. 2002) (Luttig, J., respecting denial of rehearing en banc).

      58.    Advanced DNA testing plays a critical role in strengthening the integrity

of the criminal justice system.  Such testing has resulted in the exoneration of a number

of convicted persons.  There have been 198 post-conviction DNA exonerations in United

States history.  *See* Innocence Project, http://www.innocenceproject.org (last visited April

6, 2007).

      59.    Post-conviction exonerations based on DNA evidence have been the

subject of widespread national, regional, and local media coverage, as well as the focus

of the attention of federal, state, and local legislatures, courts, and executives.

      60.    In March 2003, President Bush announced his Initiative to Advance

Justice Through DNA Technology.  The Initiative reflects the executive's understanding

that "DNA technology is increasingly vital to ensuring accuracy and fairness in the

criminal justice system."  Fact Sheet:  The President's Initiative to Advance Justice

Through DNA Technology, http://www.usdoj.gov/ag/dnaoverviewinitiative21.htm (last

visited April 6, 2007).

61.    In 2004, the United States Congress passed, and the President signed into law, the Innocence Protection Act of 2004, Pub. L. No. 108-405, tit. IV, 118 Stat. 2278 (2004). The Act requires post-conviction DNA testing where a prisoner convicted of a federal crime swears innocence of the crime (or of a State crime that served as an aggravating factor at federal sentencing) and shows that exculpatory results would either 1) support a theory of defense that would show actual innocence; or 2) raise a reasonable probability that the prisoner did not commit the crime. *Id.* § 3600.

## MR. ARTHUR WILL SUFFER IRREPARABLE INJURY

62.    Mr. Arthur is currently incarcerated at Holman Correctional Facility under a sentence of death. The Defendants possess the evidence—most of which has never been tested at all—that could undermine confidence in Mr. Arthur's guilty verdict.

63.    Nevertheless, the Defendants have refused to grant Mr. Arthur access to this evidence for DNA and other testing, which Mr. Arthur has offered to conduct at no cost to the State. In the absence of judicial intervention, Defendants have refused to provide Mr. Arthur with the evidence he has requested on multiple occasions.

64.    Mr. Arthur stands to suffer irreparable injury if the relief sought in the present complaint is denied.

## FIRST CLAIM FOR RELIEF –
## DUE PROCESS OF LAW

65.    Mr. Arthur repeats and realleges paragraphs 1 through 64 as though fully set forth herein.

66.    By refusing to search for and/or release the Requested Evidence, and thereby preventing Mr. Arthur from accessing  material and exculpatory evidence,

– 21 –

Defendants have deprived Mr. Arthur of procedural and substantive Due Process of Law in violation of the Fourteenth Amendment of the United States Constitution.

67.     By refusing to search for and/or release the Requested Evidence, and thereby preventing Mr. Arthur from accessing material and exculpatory evidence, Defendants have deprived Mr. Arthur of the opportunity to establish a gateway claim of actual innocence, in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

### SECOND CLAIM FOR RELIEF –
### CRUEL AND UNUSUAL PUNISHMENT

68.     Mr. Arthur repeats and realleges paragraphs 1 through 64 as though fully set forth herein.

69.     By refusing to search for and/or release the Requested Evidence, Defendants have deprived Mr. Arthur of the opportunity to establish a claim of actual innocence prior to the imposition of a death sentence, in violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment of the United States Constitution.

### THIRD CLAIM FOR RELIEF –
### RIGHT OF ACCESS TO COURTS

70.     Mr. Arthur repeats and realleges paragraphs 1 through 64 as though fully set forth herein.

71.     By refusing to search for and/or release the Requested Evidence, Defendants have deprived Mr. Arthur of his right of access to the courts through post-conviction proceedings, in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

**FOURTH CLAIM FOR RELIEF – CLEMENCY**

72.     Mr. Arthur repeats and realleges paragraphs 1 through 64 as though fully set forth herein.

73.     By refusing to search for and/or release the Requested Evidence, Defendants have deprived Mr. Arthur of his right to avail himself of the opportunity to apply for executive clemency, which serves in the American criminal justice system as a safety net that prevents the violation of constitutional rights that would arise from continued incarceration and execution of an inmate who can make a showing of actual innocence, in violation of the Fourteenth Amendment of the United States Constitution.

**FIFTH CLAIM FOR RELIEF –
EQUAL PROTECTION OF THE LAWS**

74.     Mr. Arthur repeats and realleges paragraphs 1 through 64 as though fully set forth herein.

75.     By refusing to search for and/or release the Requested Evidence, Defendants have deprived Mr. Arthur of his fundamental interest in the accurate determination of his own guilt, in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

WHEREFORE, Plaintiff Thomas Arthur prays for judgment as follows:

A.  Equitable relief in the form of the search for and release of the Requested Evidence and transfer of the Requested Evidence to Mr. Arthur's counsel for purposes of DNA and other testing; and

B.  Attorneys' fees and expenses pursuant to 42 U.S.C. § 1988(b); and

C.  Such other and further relief as this Court deems just and proper.

Respectfully submitted on this the 12th day of April, 2007

_____

CHARLES E. VERCELLI, JR. (VER003)
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, AL  36104-5049
Telephone:   (334) 834-8805
Fax:  (334) 834-8807
e-mail: cvercelli@vercelli-law.com

*Of Counsel*:
SUHANA S. HAN
JORDAN T. RAZZA
SULTANA L. BENNETT
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588

The Clerk is requested to serve the Summonses and Complaints upon the Defendants by certified mail, return receipt requested, at the following addresses:

Troy King, Esq.
Alabama Attorney General
Alabama State House
11 South Union Street, Third Floor
Montgomery, Alabama 36130

Bryce U. Graham Jr., Esq.
District Attorney
Post Office Box 534
Tuscumbia, AL 35674

Ronnie May
Sheriff
Colbert County Sheriff's Department
201 N. Main St.
Tuscumbia, Alabama 35674

M. David Barber, Esq.
District Attorney
Tenth Judicial Circuit of Alabama
801 Richard Arrington Jr. Boulevard North
Suite L-01
Birmingham, Alabama 35203

CHARLES E. VERCELLI, JR. (VER003)
Vercelli & Associates, P.C.
1019 S. Perry Street
Montgomery, AL  36104-5049
Telephone:   (334) 834-8805
Fax:   (334) 834-8807
e-mail: cvercelli@vercelli-law.com