IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

THOMAS D. ARTHUR,                    )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )          CASE NO. 2:07-cv-319-WKW
                                     )
TROY KING, *et al.*,                 )
                                     )
        Defendant.                   )
                                     )

## MEMORANDUM OPINION AND ORDER

Thomas D. Arthur is an inmate convicted of capital murder and sentenced to death.  Arthur brings this § 1983 complaint against Troy King, the Attorney General for the State of Alabama; Bryce U. Graham, Jr., the district attorney for Colbert County, Alabama; Ronnie May, sheriff for Colbert County, Alabama; and M. David Barber, the district attorney for Jefferson County, Alabama (collectively the "defendants"), to receive access to specific material collected at the crime scene for DNA and other testing.  On May 18, 2007, the defendants filed a Motion to Dismiss (Doc. # 8) pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, the court will GRANT the defendants' Motion to Dismiss.

## I.  FACTS AND PROCEDURAL HISTORY

### A.    *Facts*

Arthur was convicted and sentenced to death for the February 1, 1982 murder of Troy Wicker ("Troy").  It is relevant to Arthur's Section 1983 complaint to briefly discuss the evidence presented at his December 5, 1991 trial.[1]

---

[1]  The opinion of the Alabama Court of Criminal Appeals in *Arthur v. State*, 711 So. 2d 1031 (Ala. Crim. App. 1996), contains an  in-depth reiteration of the evidence in Arthur's trial.

On February 1, 1982, police officers found Troy's body in his Muscle Shoals home with a gunshot wound to his right eye. At the scene were an injured Judy Wicker ("Judy"), Troy's wife, and Teresa Rowland ("Teresa"), Judy's sister. Judy was taken to the hospital where a rape kit was prepared. An investigator with the police department later questioned Judy at the hospital regarding her husband's murder. She stated that an African-American man burglarized her home, raped her, knocked her unconscious, and shot her husband. The police gathered various pieces of evidence at the crime scene, including Judy's clothing, vacuum sweepings, a hair sample, spent gun cartridges, a pillowcase, and fingerprints. Officers later discovered Judy's 1981 Buick Riviera in an abandoned lot and recovered a wig, hair samples, and fingerprints from the car.

The police investigated Judy for the murder of her husband and concluded that she paid Arthur to murder Troy to collect the proceeds of a $90,000 life insurance policy. At her trial for murder, she maintained her innocence, and her testimony concerning the intruder was consistent with that given to the investigator. The jury disbelieved her testimony, and she was convicted of murder and sentenced to life in prison. However, at each of Arthur's three trials, Judy testified that she hired Arthur to kill her husband, providing detailed testimony about Arthur's role in the murder. She stated that she began to converse with Teresa about killing Troy in early 1981. Theron McKinney ("Theron"), Teresa's husband, was also party to these conversations. Judy acknowledged that she had known Arthur from her days of working at Tidwell Homes, and they had been having sexual relations. On the day of the murder, Judy dropped off her sons at school and twice drove across Avalon Avenue. Judy then met Teresa and Arthur at the airport. Judy testified that Arthur had blackened his face and was wearing a wig so as to look like an African-American. Further, Arthur had a gun and was carrying a garbage bag. All three individuals concocted a plan

2

in which Judy would say that her home had been burglarized and she was assaulted by a black man. After her husband was murdered, Judy paid Arthur $10,000 and Teresa $6,000, and provided jewelry and an automobile to Theron for his role in the plan. Arthur alleges the prosecutor agreed to put in a good word with the parole board if Judy would offer helpful testimony in Arthur's trial.

In addition to Judy, the State of Alabama offered the testimony of thirteen witnesses at Arthur's third trial. Sergeant Eddie Lang, a Muscle Shoals police officer, testified that he observed Judy passing Avalon Avenue twice on the day of the murder. Joseph Wallace testified about his observations of the crime scene and the items that were recovered from the Buick. Debra Tynes testified that Arthur was late for a lunch appointment with her on the day of the murder. Later that day, Tynes and Arthur drove across the Tennessee River Bridge. Tynes testified that Arthur stopped the car and threw a plain black garbage bag wrapped in a sheet into the river. Arthur stated, "I want to get rid of some old memories." *Arthur v. State*, 711 So. 2d 1031, 1044 (Ala. Crim. App. 1996). Talmadge Sterling and Pat Halliday, respectively a correctional officer and an employee of the Decatur Work Release Center, both testified as to Arthur's residency at the Center. Sterling stated that Arthur clocked out for work at 6:00 a.m., on the morning of the murder. At 7:10 p.m., Arthur called for a ride back, and at 7:50 p.m. he returned to the Center. Arthur was assigned through the Center to work at Reagan Mobile Homes, but owner Joel Reagan testified that he did not know of Arthur's whereabouts on the day of the murder.

Halliday testified about a subsequent discrepancy in Arthur's payroll records resulting in Arthur being transferred to the Morgan County Jail. On inspection of his effects, officers at the Morgan County Jail found twenty one hundred dollar bills in his coat pocket. Pat Yarbrough Green, an employee at Cher's Lounge, testified that she knew Arthur because he frequented the lounge.

3

On the day before the murder, Green stated that Arthur asked her if she could obtain .22 caliber long rifle bullets for him.  Green asked a third party to obtain the bullets, and Arthur paid her ten dollars when she delivered the bullets to him.  Green also testified that Arthur told her that "[s]omeone will be killed in Tennessee.  Don't worry, it won't be traced to us."  *Arthur*, 711 So. 2d at 1044.  Arthur also asked Green if she could get him some "jars" or "knockout pills."  *Id.*  Brent Wheeler, a forensic scientist, testified that the bullet found in Troy's body was a .22 long rifle bullet.  Moreover, he stated that the spent casings were .22 long rifle. Dr. Pirl, a toxicologist, stated that there was neither ethanol nor narcotics in Troy's body.   However, he stated that there could have been, although he was unsure, a drug called scopolamine in Troy's system at the time of his death.  Scopolamine is commonly referred to as "juars" or "jars." *Id.* at 1051.

At Arthur's insistence, Arthur represented himself at the third trial, with attorney Henry Walden and Walden's son as co-defense counsel.[2]  The team called four witnesses.  Ronald Spears, an inmate at West Jefferson prison, testified that Green told him that "[t]he cops told me to lie on Tommy re[garding] the .22 bullets."  *Id.* at 1045.  Arthur offered inconsistent explanations for the cash found in his pocket after the murder.  Bruce Carrol, an inmate at St. Clair prison, testified that he lost $6,500 to Arthur in a poker game.  Gene Moon, a resident of Cullman County Jail, stated that an inmate gave him $2000, and Moon slipped it in the coat pocket of Arthur.

At the conclusion of the case, the jury convicted Arthur of the murder of Troy.  Arthur's crime was considered "capital because he had previously been convicted of murder in the second degree in 1977 . . . and . . .  for intentionally causing the death of Troy Wicker by shooting him with

---

[2]  This was a sort of "hybrid representation," as described by the Alabama Court of Criminal Appeals. *Arthur*, 711 So. 2d at 1045.

4

a pistol for pecuniary or other valuable consideration . . . ." *Id.* at 1043 (internal citations omitted).

At the sentencing phase of Arthur's trial, Walden asked the jury to sentence Arthur to life in prison.

However, Arthur followed Walden and asked the jury to sentence him to death.  The jury, by a vote

of 11-1, sentenced Arthur to death for Troy's murder. The conviction and death sentence were

affirmed by the Alabama Supreme Court in 1997.  *See Ex parte Arthur*, 711 So. 2d 1097 (Ala.

1997).[3]

**B.**     ***Procedural History***

**February 1, 1982:**     Troy Wicker found murdered at his Muscle Shoals Home.

**February, 1982:**     Arthur was convicted of murder and sentenced to death.

**May 10, 1985:**     The Alabama Supreme Court reversed Arthur's first conviction. *Ex*
                             *parte Arthur*, 472 So. 2d 665 (Ala. 1985).

**May 13, 1987:**     Arthur was convicted again of murder and sentenced to death.

**May 25, 1990:**     The Alabama Court of Criminal Appeals reversed Arthur's second
                             conviction.  *Arthur v. State*, 575 So. 2d 1165 (Ala. Crim. App.
                             1990).

**December 5, 1991:**     Arthur's   third   trial   resulted   in   another   guilty  verdict  and
                             recommendation of death.

**January 24, 1992:**     The trial court sentenced Arthur to death.

**March 8, 1996:**     The   Alabama   Court   of   Criminal   Appeals  affirmed   Arthur's
                             conviction and death sentence.  *Arthur v. State*, 711 So. 2d 1031

_____

[3]   This was Arthur's third conviction for Troy's murder, and his third death sentence.

(Ala. Crim. App. 1996).

**November 21, 1997:** The Alabama Supreme Court affirmed the Court of Criminal Appeals' decision. *Ex parte Arthur*, 711 So. 2d 1097 (Ala. 1997).

**January 25, 2001:** Arthur filed a Rule 32 Petition in the Circuit Court of Jefferson County, Alabama.

**March 5, 2001:** The Circuit Court of Jefferson County dismissed the Rule 32 petition as being untimely.

**March 23, 2001:** The Alabama Supreme Court set April 27, 2001, as Arthur's execution date.

**March 28, 2001:** Arthur filed a motion to reconsider the denial of his Rule 32 motion.

**April 20, 2001:** Arthur filed his Petition for Writ of Habeas Corpus and motion to stay the execution in the Northern District of Alabama.

**April 25, 2001:** The Northern District of Alabama stayed the execution date.

**April 25, 2001:** The Alabama Court of Criminal Appeals affirmed the denial of Arthur's Rule 32 petition. *Arthur v. State*, 820 So. 2d 886 (Ala. Crim. App. 2001).

**November 2, 2001:** The Alabama Supreme Court denied certiorari on the Rule 32 petition.

**May 13, 2002:** The United States Supreme Court denied certiorari on the Rule 32 petition.

**December 4, 2002:** Judge Edwin Nelson of the United States District Court for the Northern District of Alabama denied Arthur's Habeas petition as

6

being untimely.

**December 18, 2002:**  Arthur filed a motion for reconsideration of Judge Nelson's denial.

**June 5, 2003:**  Judge Scott Coogler of the United States District Court for the Northern District of Alabama denied Arthur's motion for reconsideration.

**August 6, 2003:**  Arthur filed a motion for a certificate of appealability**.**

**August 11, 2003:**  The United States District Court for the Northern District of Alabama granted Arthur's certificate of appealability.

**June 21, 2006:**  The Eleventh Circuit affirmed the district court's denial of Arthur's habeas petition. *Arthur v. Allen*, 452 F.3d 1234 (11th Cir. 2006).

**August 14, 2006:**  The Eleventh Circuit modified its June 21, 2006 opinion. *Arthur v. Allen*, 459 F.3d 1310 (11th Cir. 2006).

**April 12, 2007:**  Arthur filed the instant § 1983 complaint seeking access to various pieces of evidence to have it tested for DNA and other testing.

**April 16, 2007:**  The United States Supreme Court denied certiorari in *Arthur v. Allen*, 459 F.3d 1310 (11th Cir. 2006).

**June 22, 2007:**  The Alabama Supreme Court set Arthur's execution date for September 27, 2007.

## II.  STANDARD FOR DISMISSAL

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: " a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Dismissal of an unnecessarily delayed § 1983 action by

7

a death row inmate can be an appropriate remedy.  *See Grayson v. Allen*, __ F.3d __, No.07-12364, 2007 WL 2027903 (11th Cir. July 16, 2007).

## III.  DISCUSSION

On April 12, 2007, over fifteen years after his third conviction for the capital murder of Troy, Arthur filed this § 1983 action seeking access to biological and other evidence used at trial. Arthur's complaint alleges that the failure or refusal of the defendants to provide the evidence he requests is a violation of his Fourteenth Amendment right to due process, his Eighth Amendment right not to be subjected to cruel and unusual punishment, his right to access to the courts, and his clemency rights.  Defendants argue that Arthur's § 1983 complaint should be dismissed for a variety of reasons, including that he has no constitutional right to post-conviction DNA testing, that his claim is barred by the two year statute of limitations and that his claim is barred by laches.  Arthur's execution date is set for September 27, 2007, which raises the issue of whether the merits of this case can be fully litigated without the entry of a stay of execution.  The consideration of Arthur's right to a  stay in order to fully adjudicate the merits of his claim disposes of the motion before the court.[4]

The considerations surrounding the granting of a stay of execution in § 1983 cases are well and recently established in the Eleventh Circuit.  This is an equitable exercise.   "[W]here petitioner's scheduled execution is imminent, there is no practical difference between denying a stay on equitable grounds and denying injunctive relief on equitable grounds in a § 1983 lawsuit." *Rutherford v. Crosby*, 438 F. 3d 1087, 1092 (11th Cir. 2006) (*Rutherford I*), *vacated on other*

---

[4]  Because the court has determined that Arthur is not entitled to a stay of execution to litigate his claims, the court need not address the merits of the defenses of statute of limitations and laches.

grounds, *Rutherford v. McDonough*, __ U.S. __, 126 S. Ct. 2915 (2006) (mem.).[5] "[T]here is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Id.* at 1090-91 (citation omitted). The Supreme Court recognized that federal courts "have invoked their equitable powers to dismiss [§ 1983] suits they saw as speculative or filed too late in the day." *Hill v. McDonough*, __ U.S. __, 126 S. Ct. 2096, 2104 (2006). "While the Supreme Court did not pass judgment on these § 1983 cases, it recognized the 'significant' problem created by such delay and stated that 'federal courts can and should protect States from dilatory or speculative suits . . . .'" *Grayson*, 2007 WL 2027903, at * 3 (quoting *Hill*, 126 S. Ct. at 2101). "[B]efore granting a stay, a district court must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004). As will be seen, Arthur's request cannot be litigated without entry of a stay of execution. Arthur fails to overcome the strong equitable presumption against the grant of a stay.[6]

---

[5] *Rutherford* was a challenge to the method of execution case. In the analysis of equitable considerations, the court finds no logical or precedential reason to treat a § 1983 request for injunctive relief for purposes of DNA or other testing any differently than a § 1983 challenge to the method of execution.

[6] In two recent decisions in this district, death row inmates filed their respective § 1983 complaints alleging that Alabama's method of execution is unconstitutional. *Jones v. Allen*, 483 F. Supp. 2d 1142 (M.D. Ala. 2007), *aff'd* 485 F.3d 635 (11th Cir. 2007); *Grayson v. Allen*, No. 2:06-cv-1032-WKW, 2007 WL 1491009 (M.D. Ala. May 21, 2007), *aff'd* __ F.3d __, No. 07-12364 (11th Cir. July 16, 2007). In *Jones*, Judge Myron Thompson denied an inmate's motion to stay his execution because he was dilatory in bringing his challenge. 483 F. Supp. 2d 1142. The inmate filed his complaint "nearly 28 years after he was first found guilty of capital murder and sentenced to death . . . [and] six years after he filed his habeas petition . . ." *Id.* at 1152. In *Grayson*, this court found that an inmate who waited twenty-five years after he was first found guilty and ten years after filing his habeas petition was dilatory in bringing his claim. 2007 WL 1491009. Although the decision to grant a stay is not strictly a comparison of delays in other cases, it is the duty of the court to ascertain whether Arthur has been dilatory in filing his § 1983 claim for post-conviction access to DNA and other testing, and in view of his delay, whether he can establish that a stay is warranted.

Nine weeks after this action was filed, the Alabama Supreme Court set Arthur's execution date for September 26, 2007.  Although Arthur has not requested a stay of execution, he also has not requested expedited action on his complaint. His complaint comes late in the litigation day, after the exhaustion, over the span of twenty-five years, of all state and federal avenues of relief, including direct appeal (two of which successfully resulted in reversals and new trials) and collateral appeal in state court, and a habeas action in federal court, just concluded in August 2006. In this circuit, consideration of the merits of a § 1983 action brought by a death row inmate means full adjudication, entailing a sufficient period to conduct discovery, depose experts, and litigate the issues on the merits, including any appeals.  *Jones v. Allen*, 483 F. Supp. 2d at 1152.  "Where full adjudication is not possible, the result is either a stay or an execution."  *Grayson*, 2007 WL 1491009, at * 4.  As will be seen, there is no guaranteed right to trial evidence for DNA testing in this circuit for an inmate in Arthur's procedural posture.  Even though Arthur requests only injunctive relief (Compl. ¶ 10), the court finds, for reasons that appear below,  that it would take many more months, if not years, to fully litigate this claim in its present posture.[7]  A stay of execution is therefore implicated, and the court will address the equitable considerations raised: Arthur's likelihood of success on the merits, the relative harm to the parties, and the delay in bringing the action.

**A.    *Likelihood of Success***

Arthur cannot demonstrate a substantial likelihood of success on the merits in his DNA and other testing claim.  He has not demonstrated that he has a constitutional right to such testing in the

---

[7]  At the habeas stage, which included the same issue raised in this § 1983 action, Arthur's case required five years for resolution in the district and circuit courts.

circumstances presented here, and his claim to such testing has been previously considered by other courts and rejected.  Each of the constitutional grounds advanced by Arthur will be examined in turn, followed by a review of the actions of other courts on Arthur's previous request for access to the same evidence requested here.

1.   Due Process Right to DNA Testing

The defendants argue that Arthur has no procedural or substantive due process right to post-conviction DNA testing pursuant to the Eleventh Circuit's opinion in *Grayson v. King*, 460 F.3d 1328 (11th Cir. 2006), and that such claim should be summarily dismissed.  Arthur responds that his is an extraordinary case and is distinguishable from the facts of *Grayson*.  Moreover, Arthur avers he has more than adequately stated a claim under both *Brady v. Maryland*, 373 U.S. 83 (1963), and *Mathews v. Eldridge*, 424 U.S. 319 (1976).  The court finds that Arthur's case is not so extraordinary as to fall outside the holding of *Grayson*, and, similarly, that he does not have a due process right to post-conviction DNA testing under *Brady* or the balancing test of *Mathews*.

*a. Brady v. Maryland*

The Eleventh Circuit, in interpreting *Brady*, has held that "[t]he *Brady* rule is grounded in a defendant's right to a fair trial." *Grayson*, 460 F.3d at 1337.  The cornerstone question of a *Brady* violation is whether the prosecution withheld material evidence from the defense.  *See Brady*, 373 U.S. at 87. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

In *Grayson*, the Eleventh Circuit held that a death row inmate did not have a due process right under *Brady* to obtain evidence, post-conviction, for DNA testing.    Darrell Grayson and Victor Kennedy burglarized the home of Mrs. Annie Laura Orr, repeatedly raped her, and suffocated her with a pillowcase.  Grayson filed a § 1983 complaint asking for DNA evidence pursuant to *Brady* and its progeny.  The Eleventh Circuit held that Grayson did not have a post-conviction right to DNA testing.  The crux of the Eleventh Circuit's holding was that Grayson made no argument that the alleged exculpatory evidence was suppressed at trial; he had freely admitted his guilt as to his role in the crime; the DNA testing would not exonerate him, even if it produced a favorable result; and there was overwhelming evidence, outside of his confession, of Grayson's role in the murder of Mrs. Orr.  While the Eleventh Circuit specifically stated that its decision did "not foreclose the possibility that a § 1983 plaintiff could, under some extraordinary circumstances, be entitled to post-conviction access to biological evidence for the purpose of performing DNA testing," *Grayson*, 460 F.3d at 1340,  this court does not find that Arthur's case is one of those with extraordinary circumstances to which the Eleventh Circuit alludes.

First, like Grayson, Arthur does not argue that the evidence he wishes to test for DNA was suppressed by the prosecution, either in bad or good faith, at his trial.  On the contrary, the evidence, according to Arthur's complaint, was submitted by the prosecution to the state forensics lab and some was placed into evidence at the trial. There is no assertion by Arthur that the prosecution ever received a DNA report on the evidence in question and withheld it from the defense.  Second, the *Brady* decision is grounded upon a defendant's right to a fair trial, and from a review of the opinions of the Alabama Supreme Court, the Alabama Court of Criminal Appeals, the Northern District of Alabama, and the Eleventh Circuit Court of Appeals, all of which analyzed  the evidence submitted

at the third trial, there is no reason to conclude that there was a *Brady* violation resulting in an unfair trial.     Third, there was overwhelming evidence linking Arthur to Troy's murder.  Although she was the prosecution's most important witness, Judy was not the only witness that the jury heard.  Thirteen witnesses testified for the State, many of whom corroborated Judy's testimony.  Various witnesses testified to events outside of Judy's testimony that implicated Arthur in Troy's murder.  Of particular interest is the testimony that twenty one hundred dollar bills were found in Arthur's coat pocket after Troy's murder; that Tynes observed Arthur throw a garbage bag into the Tennessee River on the day of the murder in order to "get rid of some old memories;" that Green obtained .22 long rifle bullets for Arthur on the day before the murder; that Arthur told Green that someone would be murdered; that the bullet found in Troy's body and the shell casings found at the scene were from .22 long rifle bullets; and that Reagan could not testify as to the whereabouts of Arthur on the day of Troy's murder.  Even though these and other witnesses recalled various events involving Arthur on the day of and days leading up to the murder, he maintains that no direct evidence was ever discovered that directly placed him at Troy's murder.  This argument fails because direct evidence is not necessary for prosecution and conviction; circumstantial evidence is sufficient.  *See Hallford v. Culliver*, 459 F.3d 1193, 1201 (11th Cir. 2006) (citing *McMillian v. State*, 594 So. 2d 1253, 1263 (Ala. Crim. App. 1991)).

Fourth, like Grayson, Arthur cannot establish that DNA testing, even if the testing results in a favorable outcome, will exonerate him of murder.  In his reply brief, Arthur states that DNA testing "*could* . . . shed light on Mr. Arthur's guilt or innocence by demonstrating that he was nowhere near the Wicker residence on the morning of the murder."  (Arthur's Reply Br. at 10 (emphasis added).) Arthur postulates that the DNA evidence "*could* discredit entirely the only direct testimony linking

Mr. Arthur to the murder, because Judy Wicker's testimony does not allow for the possibility that two persons killed Troy Wicker." ( *Id*. (emphasis added).)    However, Arthur's argument ignores the testimony of the other thirteen witnesses who either corroborated Judy's testimony or offered other incriminating insight into the murder.  The best result that Arthur could hope for is that the DNA evidence does not show that he raped or assaulted Judy.  Arthur, though, was not convicted of the rape or assault of Judy.  The discrediting of Judy's testimony would not  exonerate Arthur of Troy's murder or undermine confidence in the conviction of Arthur in view of the evidence otherwise linking him to the murder.[8]

Finally, unlike Grayson, Arthur argues that he has asserted his innocence since his conviction. Although Grayson confessed to the murder of Mrs. Orr,  Arthur's assertion of innocence is irrelevant in the analysis of an alleged *Brady* violation.  As stated previously, *Brady* speaks only to the suppression of material evidence by the prosecution that, if disclosed, would have undermined confidence in the defendant's conviction.  *Brady* is not grounded in whether a defendant asserts his innocence or confesses his guilt.

In sum, Arthur fails to establish a due process basis for his testing claims under *Brady*.

### b.  Mathews v. Eldridge

Arthur next argues that he has a procedural due process right to DNA testing under the holding of *Mathews v. Eldridge*, 424 U.S. 319 (1976).  Arthur postulates that, absent Judy's testimony, only circumstantial evidence implicated him in the murder of Troy, and that DNA evidence *could* call into

---

[8]  As discussed *infra*, Judges Nelson and Coogler rendered a detailed analysis of the evidentiary value of any DNA or other testing requested by Arthur in his motion for discovery in the habeas proceeding, item by item, concluding that "Arthur's conjectures about the relevance of the evidence to his claim of actual innocence fall far short of specific allegations showing reasons to believe that the fully developed facts might entitle him to relief." *Arthur v. Haley*, Mem. of Op., No. 01-N-0983, at 5 (N.D. Ala. June 4, 2003) (citation and internal quotation marks omitted).

question his conviction.   Defendants respond that the evidence that Arthur murdered Troy is "overwhelming," and that the State has an interest in the finality of convictions.  (Defs.' Reply Br. to Pl.'s Resp. Br. at 11.)

"*Mathews* applies only where an individual has a liberty or property interest that the government seeks to eliminate, and the *Mathews* test concerns the administrative procedures required." *Grayson*, 460 F.3d at 1340.

> [W]here the government seeks to deprive an individual of such an interest, the courts must consider the following factors in determining what administrative safeguards are required: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* (quoting *Mathews*, 424 U.S. at 335).

The *Grayson* court assumed that the inmate had a liberty interest in his life, and rightly so. However, the court affirmed the district court's decision that Grayson did not have a procedural due process right to DNA testing because the second and third *Mathews* factors weighed against him. Similarly, the court acknowledges Arthur's liberty interest in his life but finds that the second and third *Mathews* factors weigh against Arthur in his present complaint.

The second *Mathews* factor – "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards" – weighs against Arthur's claim.  Arthur has had three trials and three convictions that resulted in death sentences (two convictions were reversed in state court proceedings); state and federal habeas proceedings; and a stay of execution.  Arthur has been litigating his convictions for at least twenty-five years; two federal district judges and the Eleventh Circuit weighed the merits of his habeas

proceeding;  and both the Alabama Court of Criminal Appeals and the Supreme Court of Alabama affirmed his third conviction.  The procedural safeguards in place and afforded to Arthur for twenty-five years of litigation are sufficient for the protection of his liberty interest.  *See Grayson*, 460 F.3d at 1341 (holding that the procedural safeguards afforded to Grayson were sufficient when "[h]is liberty interest in his life was already litigated extensively for twenty years").  The same procedural safeguards afforded Grayson were exactly those afforded to Arthur.

The inherent value of an additional safeguard, *i.e.* DNA testing, coupled with Arthur's litigation record and the weight of the evidence against him, is small.  Arthur seeks only to discredit the veracity of the testimony of Judy with the speculative results of DNA evidence.  As stated previously, the circumstantial evidence linking Arthur to Troy's murder is, even if not characterized as overwhelming, more than enough to withstand a favorable DNA result.

The third prong – the government's interest and the burdens of the additional safeguard of DNA testing – also weighs against Arthur's claim.  The Eleventh Circuit recognized that the government had "[c]ompelling interests - e.g., guarding against a flood of requests, protecting the finality of convictions, and ensuring closure for victims and survivors," which outweighed Grayson's request for DNA testing of trial evidence.  *Id.* at 1342.  Arthur argues that the compelling interests of the State are overshadowed by the execution of the innocent.  The court agrees with that statement in the hypothetical, but not with its application to Arthur.  Arthur has had over fifteen years to litigate this death sentence and to persuade a court to accept his arguments, both about actual innocence and the need to test the evidence he now requests.  Arthur now asks this court to overlook the decisions of other courts in their extensive review of his conviction and the review of the very same claims he now makes.  The State has significant interests, discussed more fully in subsection III.B., which

outweigh those advanced by Arthur.  The court concludes that Arthur has no likelihood of success under the *Mathews* analysis.  His due process arguments therefore fail to establish any likelihood of success on the merits.

2.     Cruel and Unusual Punishment

Arthur argues that the refusal of the State to provide him with the requested evidence is violative of the Eight Amendment and constitutes cruel and unusual punishment.  The defendants respond that the Eighth Amendment does not apply to requests for DNA tests.  The court finds no precedent to suggest that the denial of Arthur's requested evidence is violative of the Eighth Amendment.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend VIII.  Neither the United States Supreme Court nor the Eleventh Circuit Court of Appeals has extended the Eighth Amendment's protections against cruel and unusual punishment to DNA testing.  Accordingly, the court refuses to singularly extend the Eighth Amendment to Arthur's claim.  The court therefore finds no likelihood of success on the final merits on the basis of cruel and unusual punishment arguments.

3.     Right of Access to Courts

Arthur claims that his right of access to courts has been violated because the defendants have refused to provide him access to evidence for DNA testing and the results of the testing of the evidence *could* hold the key to his innocence.  The State responds by arguing that Arthur's injury is speculative.  The court agrees that Arthur has failed to establish a claim under the right of access to courts doctrine.

17

It is clearly established that under the Fourteenth Amendment a prisoner has "a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977). *Bounds* and its progeny forbid the interference by state officials with an inmate's right to state a legal claim and have that claim reviewed by a court.   This right, however, like any alleged violation of a constitutional right, has been interpreted to require actual injury to the prisoner.  *See Lewis v. Casey*, 518 U.S. 343, 349 (1996) (holding that the actual injury requirement of *Bounds* is derived from the doctrine of standing). Further, "a litigant asserting an access claim must also prove that he has a colorable underlying claim for which he seeks relief.   The right is ancillary to the underlying claim.   Thus, the plaintiff must identify within his complaint, a "'nonfrivolous,' 'arguable' underlying claim." *Barbour v. Haley*, 471 F.3d 1222, 1226 (11th Cir. 2006) (internal citations omitted).

The fatal flaw in Arthur's argument is that he does not present an underlying claim in which his right of access to courts has been denied.   Because the right of access to courts doctrine is secondary to the underlying claim, Arthur must first establish that he has a right to DNA testing before he can claim that state officials interfered with that right.   Arthur has not established that he has such a right under any of the legal theories propounded in his complaint.   Accordingly, Arthur has failed to establish a likelihood of success under the access to courts doctrine.

4.   Clemency

Arthur claims that his right to clemency proceedings will be hampered if he is not granted access to evidence for DNA testing, and that the denial of such evidence renders the clemency process arbitrary and thus a violation of due process afforded by the Fourteenth Amendment.   The defendants argue that executive clemency is vested in the Governor without recourse  in the courts.   The court finds that even if the State denies the requested evidence, Arthur has not shown that clemency

proceedings under Alabama's constitutional scheme are violative of the Fourteenth Amendment.

The Alabama Constitution provides: "The governor shall have power to grant reprieves and commutations to persons under sentence of death." Ala. Const. art. V, § 124. Under this Amendment, "only the Governor has the power to grant reprieves and commutations to persons under sentence of death. . . ." *Liddell v. State*, 251 So. 2d 601, 606 (Ala. 1971). Under the due process clause, "some *minimal* procedural safeguards apply to clemency proceedings. Judicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 289 (1998) (plurality opinion) (O'Connor, J., concurring).

Arthur argues that "[d]efendants' refusal to permit Mr. Arthur to access to [sic] the physical evidence within their control and to test that evidence, which is irrefutably pertinent to his clemency application, renders the clemency process wholly arbitrary . . . ." (Pl.'s Reply Br. to Defs.' Mot. Dismiss at 25.) Arthur, however, does not establish and cannot establish how the denial of the evidence renders the clemency proceedings arbitrary. Arthur is permitted, unlike the hypotheticals offered by Justice O'Connor, to access the clemency process. Arthur further suggests that under Alabama Code § 12-17-184(16), the State has a duty to provide to the Governor all pertinent information at clemency hearings, which Arthur contends includes the requested DNA testing. Arthur interprets the statute more broadly than is required. To sustain Arthur's argument, a DNA test must have been done on the evidence with the results subsequently withheld from the Governor. However, no testing has been done on the evidence to this court's knowledge. Moreover, the Governor, in his discretion in the clemency process, has the executive authority to order DNA testing on the evidence

19

if he deems it pertinent to his decision.

Arthur's clemency argument demonstrates no likelihood of success on the merits of the case

5.    Previous Consideration by Other Courts

In his 2001 habeas petition, Arthur filed a motion for discovery in which he asked for the identical evidence that he seeks in the instant action.  Judge Edwin Nelson analyzed Arthur's theory for asking for the discovery, the facts underlying the evidence he sought to test, and the speculation of Arthur that the test results "might support this alternate version of events."  *Arthur v. Haley*, Mem. of Op., Dec. 4, 2002, No.CV01-N-0983-S, at 6 (N.D. Ala. Dec. 4, 2002) (Nelson, J).  Judge Nelson found that Arthur's claim of actual innocence would not be viable, even if the tests supported Arthur's version of the events surrounding the murder, when viewed under either the "more likely than not" standard or the "clear and convincing" standard. *Id.*  Judge Nelson also wrote: "*Isaacs v. Head*, 300 F.3d 1232 (11th Cir. 2002) further indicates that Arthur's request for release of the physical evidence is due to be denied *because he failed to exercise 'due diligence' in pursuing the facts during the state proceedings*." *Id.* at 7 n.7 (emphasis added).  Subsequently, Judge Scott Coogler took up the matter on Arthur's motion to alter or amend  Judge Nelson's judgment.  Having further analyzed Arthur's claims with respect to each particular piece of evidence sought to be tested by Arthur, Judge Coogler found:

> The physical evidence Arthur seeks to test includes Judy Wicker's bloody clothing, a rape kit created the day of the murder, a wig and hair samples from the Wicker residence, the bullet removed from the victim's body, spent cartridge casings found at the murder scene, and a pillowcase found beneath the victim's head.  None of this evidence is new or was unknown to Arthur during the state court proceedings.  *Arthur belatedly claims he diligently sought to test this evidence during state court proceedings,* and points to a motion made by counsel at his third trial . . . .  A similar one-time request was found to be *insufficient evidence of diligence* in *Williams v. Taylor*, 529 U.S. at 439-40.

20

*Arthur v. Haley*, Mem. of Op., No. 01-N-0983, at 5 (N.D. Ala. June 4, 2003) (citation and internal quotation marks omitted) (emphasis added).

On appeal, the findings of the district court were upheld.  *Arthur v. Allen*, 452 F.3d 1234 (11th Cir.), modified on reh'g, 459 F.3d 1310 (11th Cir. 2006).  Addressing Arthur's entitlement to a hearing and discovery, the Eleventh Circuit held that generally "[a] habeas petitioner is not entitled to discovery as a matter of ordinary course, but [only] . . . upon a showing of good cause to believe that the evidence sought would raise sufficient doubt about [his] guilt to undermine confidence in the result of the trial."  *Arthur*, 459 F.3d at 1310 (internal quotation marks and citations omitted.)  Further, "good cause for discovery cannot arise from mere speculation" or on "the basis of pure hypothesis. . . ."  *Id.*   Rejecting the "wounded" affidavits Arthur now again relies upon, the Circuit Court found that Arthur failed to furnish "good cause to believe that the facts, if fully developed through discovery sought [DNA and other testing], would be any different from those found at trial." *Id.*

Thus, two district judges and the Eleventh Circuit (a mere twelve months ago) have already determined as fact that Arthur was not diligent in pursuing the testing of this evidence *before 2002,* and that even if he were to be given the evidence for DNA and other testing, the outcome of his trial would be intact.  Arthur has presented no new evidence or other credible reason why this court should ignore the findings of another district court and the very court which will in all likelihood review this opinion.

## B.     *Relative Harm to the Parties*

It goes without saying that Arthur faces irreparable harm without a stay of execution.  However, irreparable harm is not necessarily harm that is avoidable.  In the parlance of equity, the

harm may only be avoided by entry of a stay of execution if the considerations in Arthur's favor outweigh the considerations of the State of Alabama in seeing its judgments honored. As noted in *Grayson, Jones, Rutherford, and Nelson*, Arthur's is a heavy burden because of a strong equitable presumption against entry of a stay. Arthur fails to carry this burden for several reasons. First, Arthur has delayed filing this action until his execution is imminent a second time.[9] The first time was his execution date of April 26, 2001, stayed after he filed his habeas petition less than a week before his execution date. This weighs against Arthur when Troy's murder occurred over twenty-five years ago, and Arthur's *third conviction* happened over fifteen years ago. By his unreasonable delay, Arthur "leaves little doubt that the real purpose behind his claim is to seek a delay of his execution . . . ." *Jones*, 485 F.3d at 640 (quotation marks and citation omitted).

Another factor weighing against Arthur is the likelihood that a stay will result in another reprieve of several years while his request to conduct DNA and other testing is litigated. As noted above, the right to DNA testing is nowhere guaranteed except in extraordinary cases, *Grayson*, 460 F.3d 1339, and this is not one. Arthur has failed to raise other grounds of relief with a substantial likelihood of success. The conclusion is almost inescapable that the only outcome of a stay would be further delay, to the prejudice of the State.

The State would be prejudiced in other ways as well. The State's interest in meting out a sentence of death in a timely manner acquires "an added moral dimension" when post-trial

---

[9] The Eleventh Circuit affirmed the denial of Arthur's habeas petition on June 21, 2006, *Arthur v. Allen*, 452 F.3d 1234 (11th Cir. 2006), and modified on August 14, 2006, *Arthur v. Allen*, 459 F.3d 1310 (11th Cir. 2006). Yet Arthur did not file this action until April 12, 2007, nearly ten months after the Eleventh Circuit decided the habeas outcome. Arthur "should have foreseen that the execution date would likely be set promptly upon completion of collateral review." *Jones*, 485 F.3d at 639 n.2. "Waiting to file suit until the Supreme Court has denied *certiorari* review of an inmate's federal habeas petition, or, as Jones did, waiting until a petition for *certiorari* has been pending for over three months, is simply too late to avoid the inevitable need for a stay of execution." *Id.* Like Jones, Arthur waited too long to file.

proceedings have run their course.  *See Calderon v. Thompson*, 523 U.S. 538, 556 (1988).  "To unsettle these expectations is to inflict a profound injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike."  *Id.* (internal citation and quotation marks omitted).  Even a cursory review of Eleventh Circuit precedent affirms this interest*.  See, e.g., Jones*, 485 F.3d at 641 ("We will not interfere with the State's strong interest in enforcing its judgment in this case."); *Grayson*, 460 F.3d at 1342 ("[T]he government has a strong interest in the finality of duly adjudicated criminal judgments."); *Thompson v. Wainwright*, 714 F.2d 1495, 1506 (11th Cir. 1983) ("Each delay, for its span, is a commutation of a death sentence to one of imprisonment.").  The court cannot ignore this firmly rooted sentiment.

The injunctive relief Arthur seeks in this lawsuit is merely temporal.  He claims:  "The relief requested is injunctive in nature.  Arthur also disclaims any attempt to challenge his conviction and sentence of death with this lawsuit, and instead focuses solely on the search for and release of physical evidence as described below for DNA and other testing."  (Compl. ¶ 10.)[10]  The statement foretells yet another § 1983 action or habeas petition resting on the presumptive, but not asserted here, claim that the testing will produce evidence of actual innocence requiring future court activity in new cases.  The prospect of still more litigation following the instant case, after so long a delay, is highly prejudicial to the interests of the State in the finality and enforcement of its judgments.

The State would be further prejudiced by rewarding a dilatory and late-filing plaintiff with a stay.  This case does not exist in a vacuum.  Arthur's success here would encourage other death row inmates to wait late in the litigation day to file similar actions. Costs to the State are increased

---

[10]  Obviously, this statement in the complaint is offered to avoid the charge of a successive habeas action, but the remainder of the complaint is couched almost exclusively in terms of speculative actual innocence claims. *See Bradley v. Pryor*, 305 F.3d 1287 (11th Cir. 2002).

by the requirements of last-minute filings, expedited discovery, motion and trial schedules, and expedited appeals. Arthur seeks to establish such a precedent, but "the government has a strong interest in the finality of duly adjudicated criminal judgments . . . .  Compelling interests - *e.g.*, guarding against a flood of requests, protecting the finality of convictions, and ensuring closure for victims and survivors - support the State's position in this case."  *Grayson,* 460 F.3d at 1342 (citations omitted).  The same interests are present here.

Weighing the relative harm to the parties, the weight of relevant considerations clearly favors the State and operates against the entry of a stay of execution.

### C.    *Unreasonable Delay*

Arthur was first convicted of Troy's murder in February 1982.  With two successful appeals and resulting new trials in state court, Arthur was convicted a second time on May 13, 1987, and a third time on December 5, 1991.[11]  After an execution date was set in 2001, Arthur filed his habeas petition on April 20, 2001, and received a stay of execution from the District Court of the Northern District of Alabama on April 25, 2001.  *Arthur v. Haley*, 248 F.3d 1302, 1303 (11th Cir. 2001) (denying the motion to vacate the stay).  Arthur has had fifteen years since his third conviction, six years after he filed his habeas petition, and more than four years since § 1983 was recognized in *Bradley*, 305 F.3d 1287, as the proper vehicle to obtain access to evidence for DNA testing.  Moreover, DNA testing has been available since 1986, more than twenty years before Arthur sought testing in this action, a period which includes his last two capital trials.  *See Grayson*, 460 F.3d 1328 at 1335.  Arthur could have sought  full access to test items for DNA, but he did not diligently pursue the procedure either at his second or third trial.

---

[11]   The convictions were reversed on grounds not relevant to the issues under consideration here.

There are other reasons to find Arthur's delay unreasonable. In Arthur's habeas petition, two district judges and the Eleventh Circuit found not only that the evidence Arthur now seeks to test is insufficient to sustain the gateway claim of actual innocence, but that Arthur was not diligent in pursuing access to the evidence *before 2002.* It strains the meaning of plain language to say that an identical request five years later in 2007, under the guise of § 1983 and under yet another shadow of execution, can somehow be honestly construed as timely.

*Bradley* was decided on September 23, 2002. Eleven months later, on August 18, 2003, counsel for Arthur wrote defendant King seeking access to the evidence sought in this suit for DNA testing. (Compl., Ex. Twenty Six.**)** Exhibits six through twenty-five to the complaint contain a series of letters dated in November and December, 2003, requesting the evidence at issue from various state and local officials on behalf of Arthur. Obviously, Arthur was unsuccessful in his requests. He offers no explanation why he delayed nearly five years after the ruling in *Bradley,* and over three years after his demand letters, to bring this complaint on April 12, 2007. The court finds that Arthur's delay in bringing his § 1983 complaint is unreasonable, a factor that also weighs against him in a stay of execution analysis.

## IV. CONCLUSION

No aspect of the equitable analysis of the entry of a stay of execution for a death row inmate in a § 1983 action favors Arthur. He demonstrates no likelihood of success on the merits, the relative harm factors weigh against him, and his delay in bringing the action is found to be unreasonable under the precedent of this circuit. Accordingly, the court must apply the strong equitable presumption against a stay of execution. The equities now lie with the State of Alabama to enforce its criminal judgment. The appropriate remedy is dismissal of the action.

For the foregoing reasons, it is ORDERED that the defendants' Motion to Dismiss (Doc. #

8) is GRANTED and that this case is dismissed.  An appropriate judgment will be entered.

DONE this 17th day of August, 2007.

_____/s/   W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE