IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

-------------------------------------------------------x
        :

THOMAS D. ARTHUR,              :
        :
           Plaintiff,    :
        :
    v.        :
        :
TROY KING, ATTORNEY GENERAL  :
FOR THE STATE OF ALABAMA,    :
in his official capacity,         :
        :
BRYCE U. GRAHAM, JR., DISTRICT   :
ATTORNEY FOR COLBERT COUNTY, :      No. 2:07-cv-319-WKW
in his official capacity,         :
        :
RONNIE MAY, SHERIFF FOR      :
COLBERT COUNTY,         :
in his official capacity,         :
        :
M. DAVID BARBER, DISTRICT    :
ATTORNEY FOR JEFFERSON COUNTY,:
in his official capacity,         :
        :
           Defendants.    :
        :
-------------------------------------------------------x

**THOMAS D. ARTHUR'S MOTION TO ALTER OR AMEND JUDGMENT**

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Plaintiff

Thomas D. Arthur, through his undersigned counsel, respectfully moves this Court to

amend or alter its August 17, 2007 Memorandum Opinion and Order ("Order")

dismissing his Complaint brought pursuant to 42 U.S.C. § 1983.

**I.    A New Affidavit from an Alibi Witness Provides Powerful Evidence of
Mr. Arthur's Innocence.**

In dismissing the Complaint, this Court held that Mr. Arthur "cannot

demonstrate a substantial likelihood of success on the merits in his DNA and other testing

claim." (Order at 10.) Relying primarily on the decisions of other courts in connection with Mr. Arthur's habeas corpus proceedings, this Court concluded that "discrediting" the testimony of Judy Wicker—a convicted murderer who obtained early parole in exchange for her testimony against Mr. Arthur—with the "speculative results of DNA evidence" would not "undermine confidence in the conviction of Arthur in view of the evidence otherwise linking him to the murder." (*Id*. at 14, 16.) In light of the new testimony of an alibi witness that Mr. Arthur was nowhere near the Wicker residence on the morning of the murder, Mr. Arthur should be granted access to physical evidence for DNA testing.

        In connection with his habeas proceedings, Mr. Arthur submitted the affidavit of Ray Melson who recalled specific details of Mr. Arthur's visit on the morning of Troy Wicker's murder. (Attached hereto as Exhibit A). The State of Alabama subsequently submitted a second affidavit by Mr. Melson claiming that he was on "some strong medication, pain and otherwise" when he signed his original affidavit and did not know when he saw Mr. Arthur. (Attached hereto as Exhibit B.) Although Mr. Arthur's investigator submitted a detailed affidavit highlighting critical questions that could only be resolved through live testimony (attached hereto as Exhibit C), Mr. Arthur's request for a hearing was denied. *After* this Court issued its Order, counsel for Mr. Arthur was able to obtain an affidavit from Mr. Melson that finally explains the discrepancies between his first and second affidavits, and confirms that he saw Mr. Arthur in Decatur on the morning of Troy Wicker's murder in Muscle Shoals. (Attached hereto as Exhibit D.)

As set forth in his third affidavit, when representatives of the State of Alabama visited him, Mr. Melson had recently taken pain medication and told them what he thought they wanted to hear so that they would just leave him alone allowing him to feel the effects of the medication undisturbed.  (Exhibit D at ¶ 8.)  Mr. Melson felt intimidated and was afraid to mention to the State representatives that he was on drugs. (*Id*. at ¶ 9.)  Mr. Melson stopped taking pain medication in 2003 (*id*. at ¶ 10), and today he recalls clearly Mr. Arthur's visit to Copper Mobile Homes in Decatur on the morning of the murder.  That day was memorable because Mr. Melson helped deliver a double-wide trailer to the Birmingham area, which he had done only two or three times in his life, and the trailer got stuck in mud while it was being transported.  (*Id*. at ¶¶  12, 13.)

Mr. Melson remembers that Mr. Arthur stopped by between 8 a.m. and 9 a.m. offering to help with this delivery but his help was not needed, and that there was nothing unusual about Mr. Arthur's behavior.  (*Id*. at ¶ 15.)  Mr. Melson also remembers that when he learned that Mr. Arthur had been arrested for the murder of a man in Muscle Shoals, he put "two and two together" at the time and realized that the day of the murder was the same day that Mr. Arthur had visited Copper Mobile Homes offering to help deliver the double-wide trailer.  (*Id*. at ¶ 17.)  Mr. Melson—who has not seen or spoken to Mr. Arthur in the past 25 years—has no reason to lie.  (*Id*. at ¶ 19.)

Consistent with Judy Wicker's testimony at her own trial, Mr. Melson's third affidavit demonstrates that Mr. Arthur was nowhere near the Wicker residence on the morning of Troy Wicker's murder.  In light of this powerful evidence of Mr. Arthur's innocence, DNA testing would not be "speculative."  Such testing would do much more than merely show that Mr. Arthur did not "rape[] or assault[] Judy."  (Order at 14.)  If the

3

test results of Judy Wicker's rape kit that was prepared on the same day as the murder matched the DNA sample of a convicted felon from the national DNA database, this would substantially undermine confidence in Mr. Arthur's conviction.  Mr. Arthur respectfully submits that the other "overwhelming evidence linking Arthur to Troy's murder"—consisting entirely of circumstantial evidence— is *not* "more than enough to withstand" (Order at 13, 16) DNA test results demonstrating that Judy Wicker was raped by someone who was previously convicted of a violent crime, and that this person fit the description of her husband's murderer that she provided during her own trial.  Because favorable DNA test results—together with Mr. Melson's third affidavit—would provide powerful evidence of Mr. Arthur's innocence completely outweighing any contrary circumstantial evidence, this Court should grant Mr. Arthur's request to test the physical evidence.

## II.    *Grayson* **Is Factually Distinguishable.**

In rejecting Mr. Arthur's procedural due process right to DNA testing, this Court found that the "same procedural safeguards afforded Grayson were exactly those afforded to Arthur."  (Order at 16.)  Mr. Arthur respectfully disagrees.  Both state and federal courts, including the Eleventh Circuit, substantively reviewed and rejected Grayson's claims raised in post-conviction proceedings.  *Grayson* v. *Thompson*, 257 F.3d 1194 (11th Cir. 2001).  Grayson even received a hearing in state habeas court.  Unlike Grayson, Mr. Arthur *never* received any state or federal post-conviction review on the merits of his trial and death sentence because his petitions were dismissed as untimely. Although this Court concluded that the "procedural safeguards in place and afforded to

Arthur for twenty-five years of litigation are sufficient for the protection of his liberty interest" (Order at 16), such "safeguards" are not sufficient under these circumstances.

As the Supreme Court has stressed, procedural safeguards are particularly necessary where the punishment is death. *See, e.g.*, *Woodson* v. *North Carolina*, 428 U.S. 280, 305 (1976) (because the "penalty of death is qualitatively different" from even a life sentence, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case"). To ensure that the death penalty is imposed reliably, collateral review of convictions and sentences is an essential part of the death penalty appellate process. *See Murray* v. *Giarratano*, 492 U.S. 1, 14 (1989) (Kennedy, J., concurring in the judgment). Indeed, in Mr. Arthur's case, post-conviction proceedings should have provided the first real opportunity to present ineffective assistance of trial and appellate counsel claims, but Mr. Arthur was unable to file timely petitions because the State of Alabama failed to provide him with counsel to prepare a petition or access to an adequate law library. It is only through a rigorous review of collateral claims that finality in capital litigation can be justly achieved. Because Mr. Arthur stands to be executed without ever having received any substantive collateral review of his trial or death sentence, the risk of erroneous deprivation of Mr. Arthur's liberty interest in his life is unacceptably high.

## III.    Mr. Arthur Did Not Unreasonably Delay in Seeking DNA Testing.

In finding that Mr. Arthur's delay was unreasonable, this Court concluded that Mr. Arthur could have sought DNA testing at his second or third trial but failed to do so, and relied on the diligence analysis of the courts dismissing Mr. Arthur's habeas

5

petition as untimely.  Mr. Arthur respectfully submits that neither basis is sufficient to warrant such a finding of delay.

First, relying on *Grayson*, this Court stated that "DNA testing has been available since 1986, more than twenty years before Arthur sought testing in this action, a period which includes his last two capital trials."  (Order at 24.)  *Grayson*, however, merely noted that exhibits attached to the complaint "indicate[d]" that DNA testing was available as early as 1986 but did not even take judicial notice of this.  *Grayson* v. *King*, 460 F.3d 1328, 1335 (11th Cir. 2006).  Such an observation cannot serve as the basis for finding that DNA testing was available to Mr. Arthur during his trials in Alabama. Moreover, although the Court faulted Mr. Arthur for failing to "diligently pursue the procedure either at his second or third trial" (Order at 24), such assertion ignores the fact that Mr. Arthur has been deprived of any opportunity to litigate the merits of his claims that his trial and appellate counsel were constitutionally ineffective.  *See Murray* v. *Carrier*, 477 U.S. 478, 488 (1986) (defendant represented by constitutionally effective counsel does not bear the risk of attorney error); *Cross* v. *United States*, 893 F.2d 1287, 1290 (11th Cir. 1990) ("Although defendant generally bears the risk of attorney error that results in procedural default, such error cannot be attributed to the defendant when counsel's performance is constitutionally ineffective.").

Second, relying on the decisions of the "two district judges and the Eleventh Circuit" that Mr. Arthur was "not diligent in pursuing access to the evidence before 2002" (Order at 25), this Court found that these "other reasons" support a finding

of unreasonable delay.[1]  The diligence analysis in these habeas decisions, however, is not good law.  As this Court is aware (Order at 7), on Mr. Arthur's petition for rehearing and rehearing en banc, the Eleventh Circuit modified its decision by holding that the diligence requirement of 28 U.S.C.§ 2254(e)(2) does *not* apply to a first federal habeas petition seeking review of defaulted claims based on a showing of actual innocence.  *Arthur* v. *Allen*, 459 F.3d 1310, 1311 n.1 (11th Cir. 2006).  Accordingly, because these habeas courts erroneously relied on a diligence analysis in denying Mr. Arthur's requests for discovery and a hearing, such diligence analysis cannot serve as "other reasons" for this Court's finding of "unreasonable delay."  In short, "unreasonable delay" should not be a basis for denying Mr. Arthur's request for DNA testing under these circumstances, especially because DNA testing has become more precise and reliable with the passage of time.

---

[1]  This Court also noted that Mr. Arthur requested the physical evidence in a series of letters in 2003 but offered "no explanation why he delayed nearly five years after the ruling in *Bradley*, and over three years after his demand letters, to bring" his § 1983 action.  (Order at 25.)  In the interest of judicial economy, Mr. Arthur did not file the Complaint while his request for physical evidence was being litigated in habeas proceedings.

## CONCLUSION

For the foregoing reasons, the Court should amend its Memorandum

Opinion and Order and grant Mr. Arthur's request for access to physical evidence.


Dated: August 27, 2007

Respectfully submitted,

Charles E. Vercelli, Jr. (VER003)
VERCELLI & ASSOCIATES, P.C.
1019 S. Perry Street
Montgomery, AL 36104
Telephone: (334) 834-8805
Facsimile: (334) 834-8807
cvercelli@vercelli-law.com

/s/ Suhana S. Han
Suhana S. Han
Jennifer L. Parkinson
Sara L. Manaugh
Jordan T. Razza
Sultana Bennett

125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

**CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to the following:

J. Clayton Crenshaw
Assistant Attorney General
Montgomery, Alabama

/s/  Suhana S. Han_____
SUHANA S. HAN

ADDRESS OF COUNSEL:
125 Broad Street
New York, New York  10004
(212) 558-4000

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| THOMAS D. ARTHUR, | ) | |
| Petitioner, | ) | |
| vs. | ) | Case No. CV-01-N-983-S |
| MICHAEL HALEY, | ) | |
| Commissioner, Alabama Department of Corrections, | ) | |
| Respondent. | ) | |

## AFFIDAVIT OF RAY MELSON

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) ss: |
| COUNTY OF MORGAN | ) |

Ray Melson, being first duly sworn to oath, deposes and says:

1.    In 1982, I worked for Alphonso High, who at the time owned Copper Mobile Homes in Decatur. One morning in 1982, as we were preparing for a trip to Birmingham to set up a double-wide trailer, Tommy Arthur visited Copper Mobile Homes between 8 a.m. and 9 a.m. We had just finished our breakfast of biscuits and coffee.

2.    We talked with Tommy for about 20 to 30 minutes. He did not appear nervous and seemed like his usual self. Tommy asked us where we were going, and Alphonso told him that we were on our way to Birmingham to set up a trailer.

Tommy volunteered to go with us but Alphonso said that he did not need additional help. On our way to Birmingham, Alphonso joked about how Tommy tried to get himself hired. After we had set up the trailer, we returned to Decatur and played a game of Rook.

   3.    The day after Tommy visited Copper Mobile Homes, I heard on the television news that a man had been shot while sleeping and that the murder had occurred the previous day (on the day of Tommy's visit). I later learned that the man who had been shot was Troy Wicker.

   4.    When I heard that Tommy had been arrested for Troy Wicker's murder, I realized that I had seen Tommy on the morning of the murder. In fact, at the time, Alphonso and I discussed that we had seen Tommy on the morning of Troy Wicker's murder, and that we would have expected Tommy to be nervous or agitated, but he wasn't.

   5.    I have not spoken to anybody in the past 20 years about my conversation with Tommy Arthur on the morning of Troy Wicker's murder.

   6.    I did not tell Tommy's trial and appellate lawyers about my conversation with Tommy on the morning of Troy Wicker's murder because they never approached me.

7.    I have reviewed this affidavit and its contents are true to the best of my knowledge.

Dated: August 2, 2002

_Ray Melson_
Ray Melson

SWORN TO AND SUBSCRIBED before me this 2nd day of August, 2002.

Notary Public _Kelly Dean_
My Commission Expires: _____

My Commission . . . . . . . . . . 01/05

3

STATE OF ALABAMA    )
                       )
COUNTY OF *Morgan* )

## AFFIDAVIT OF RAY MELSON

      Before me, the undersigned authority, this day personally appeared Ray Melson, who is known to me and who after being by me first duly sworn does depose and says as follows:

      "My name is Ray Melson. I have previously provided an affidavit in a federal habeas proceeding relating to Thomas D. Arthur."

      "About a month ago or so, I was contacted by Stephen J. Gustat. Mr. Gustat told me that he was an investigator for Tommy Arthur. I met with Mr. Gustat a couple of times. During one of the times that I met with Mr. Gustat, I signed the affidavit that I referred to above. The affidavit was prepared for me and provided to me by Mr. Gustat. On the day that I signed the affidavit, I was on some strong medication, pain and otherwise. The medication was for a nerve block. Because of the medication, I really do not remember much of what happened that day. I do remember telling Mr. Gustat about the medication. I reviewed today the affidavit that I provided previously. But, until today, I did not really remember what was in the affidavit, or if I even read it the day that I signed it."

      "On September 20, 2002, an individual from the Alabama Attorney General's Office and the Colbert County District Attorney's Office came to my house. As it turns out, the gentleman from the Attorney General's Office was David Clark. The gentleman from the District Attorney's Office was Rocky Holden. I spoke to them voluntarily. I understood that I did not have to speak to them. At no point did I ever feel pressured or intimidated during my meeting with Mr. Clark and Mr. Holden."

      "After reading the affidavit that I provided previously, I have decided to provide this affidavit in an effort to clarify some things. I am providing this affidavit voluntarily. I must also say that I am not on any medication today that would impair my ability to understand what I am attesting to in this affidavit. Essentially, what I said in the previous affidavit about Tommy coming over on the day that we delivered the mobile home to Birmingham was true and correct. I must say, though, that Tommy came over that day some time between 7:30 or 10:00 that morning. I cannot say exactly what day it was that Tommy came over (the day we were going to deliver the mobile home to Birmingham). All I can say is that it was cold that day. I can't even say what month it was exactly. But, the information in paragraphs three and four of my previous affidavit is not correct. I do not believe that I said those things to Mr. Gustat. As I stated previously, on the day I signed that affidavit, I was on some strong medication and do not remember much of what happened that day."

"I remember hearing about Troy Wicker's murder. My memory is that the murder occurred in the beginning part of 1982. I do not remember when it was that I heard about Troy Wicker's murder. I know that in my previous affidavit that I said that I saw Tommy on the morning that Troy Wicker was murdered, but I cannot say that with any certainty now. I do not believe that that is what I told Mr. Gustat. I was on the medication the day I signed that affidavit, and so I really did not understand what was going on. Certainly, if I can say with any confidence that I was with Tommy on the morning that Troy Wicker was murdered, I would be the first to go to court and tell that to the judge. But, I cannot say that the morning I saw Tommy - the day we delivered the mobile home to Birmingham - was the same day that Troy Wicker was murdered. I just don't know if I saw Tommy the morning Troy Wicker was murdered. I really do not believe that I can say anything that would either hurt or help Tommy."

Further affiant sayeth not.

Ray Melson

STATE OF ALABAMA        )
                        )
COUNTY OF Morgan        )

Sworn to before me on this the 20 day of September, 2002.

NOTARY PUBLIC

My commission expires: _____
My Commission Expires 12-20-2003

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

THOMAS D. ARTHUR,

              Petitioner,

    v.

MICHAEL HALEY,

            Commissioner, Alabama
            Department of Corrections

            Respondent.

:
:
:
:
:
:
:
:
:
:
:
:

Case No: CV-01-N-983-S

**AFFIDAVIT OF STEPHEN J. GUSTAT**

STATE OF FLORIDA       )
                         ) ss:
COUNTY OF HILLSBOROUGH  )

        STEPHEN J. GUSTAT, being first duly sworn to oath, deposes and says:

        1.      I am a licensed private investigator and have been retained to investigate potential mitigation and exculpation issues relevant to Mr. Thomas Arthur's case. I have worked as an investigator in similar matters for more than twenty years. I received a Master of Science degree in criminal justice administration from Troy State University in Alabama, which is where I also received my Bachelor of Science degree in criminal justice. In addition, I have received certifications from the International Association of Chiefs of Police, the Florida Institute for Law Enforcement, and the National Defender Investigator Association, as well as training in Florida Police Standards.

2.    I am currently an adjunct professor in the Criminology Department at the University of Tampa in Florida, where I teach courses in criminal defense investigation, criminal procedure, and introduction to criminology and juvenile delinquency. I have written articles in various newsletters, including the National Defender Investigator Association Newsletter, the Capital Concerns Newsletter, and the Florida Public Defender Investigator Association Newsletter.

3.    I, was previously the chief investigator at the State of Florida's Capital Collateral Regional Counsel, Middle District, where I supervised eleven investigators and oversaw all investigations. Earlier, I worked as an investigator at the Volunteer Lawyers' Resource Center in Tallahassee, Florida and at the Tenth Judicial Circuit Public Defenders' Office in Bartow, Florida, where I was recognized as the "Investigator of the Year" by the Florida Public Defenders Association. Prior to working at the Public Defenders' Office, I was a police officer at the Sebring Police Department in Florida for five years. I served with the U.S. Army, including a tour of duty in Vietnam.

4.    In my experience in law enforcement and capital investigations, I have interviewed more than one thousand individuals.

**First Meeting with Ray Melson**

5.    On August 1, 2002, I interviewed Mr. Ray Melson for approximately an hour and a half at his home. His wife, Ann Melson, was also present. Mr. Melson mentioned that he was experiencing some back pain but would wait to take medication until after we were finished. At all times during the interview, Mr. Melson was alert and coherent and did not exhibit any signs of being under the influence of pain medication. In fact, although Mrs. Melson interrupted us on several occasions, Mr.

-2-

Melson had no problem resuming our discussion and expressing himself clearly; I did not have to repeat any of my questions.

6.     During the interview, I explained to Mr. Melson that I was investigating Thomas Arthur's case. I asked him to describe the last time he had seen Mr. Arthur. Mr. Melson told me that he had seen Mr. Arthur one morning in 1982 at Copper Mobile Homes on a day that he, Alphonso High and others were preparing to deliver a mobile home to Gardendale, a suburb of Birmingham. Mr. Melson told me that shortly after they had started their trip, Mr. High had joked that Mr. Arthur was trying to get himself hired. Mr. Melson also mentioned that while they were trying to set up the trailer, its wheels had gotten stuck in clay. I include these details to illustrate the sorts of facts, relayed by Mr. Melson, that suggested to me, as a trained and experienced investigator, that Mr. Melson's recollections were coherent, credible and inconsistent with his being on medication.

7.     I asked Mr. Melson whether he could remember the time of Mr. Arthur's visit and he told me that it was between 8 a.m. and 9 a.m. Mr. Melson explained that he usually arrived to work at 7:30 a.m. and ate breakfast with the other workers. On the day of Mr. Arthur's visit, it was his turn to buy breakfast. Mr. Melson told me that he had bought breakfast for the group and went to Mr. High's office; they finished breakfast around 8:15 a.m. Mr. Melson also told me that Mr. Arthur arrived after everyone had finished their breakfast and that he stayed for about 20 to 30 minutes.

8.     I asked Mr. Melson whether he could remember the date of Mr. Arthur's visit but he was unable to do so. However, Mr. Melson did recall that the day after Mr. Arthur's visit he had heard on the news that a man was murdered while sleeping

and that the murder had occurred the day before. Mr. Melson also recalled that after he had learned about Mr. Arthur's arrest for Troy Wicker's murder, at that time he and Mr. High talked about Mr. Arthur. They discussed the fact that they had seen Mr. Arthur on the morning of the murder.

9.    After Mr. Melson told me that he had seen Mr. Arthur between 8 a.m. and 9 a.m. on the morning of Troy Wicker's murder, he asked me how this information was helpful. I told him that the murder had occurred around 9 a.m. Mr. Melson commented that Mr. Arthur could not be in two places at the same time. He explained that in 1982 the speed limit was 55 miles per hour, the roads had only two lanes, and that the trip between Decatur and Muscle Shoals probably would have take longer than an hour.

10.    At the end of the interview, I asked Mr. Melson whether he was certain that he had seen Mr. Arthur on the morning of Troy Wicker's murder. Mr. Melson stated that he was sure in his recollections, mentioned that he would be willing to testify, and emphasized that everything he had told me was the truth. He added that he would not lie for anyone, a view adamantly supported by Mrs. Melson. Mr. Melson also mentioned that he would be willing to take a lie detector test. I asked Mr. Melson whether he would sign an affidavit and he agreed to do so.

**Second Meeting with Ray Melson**

11.    On August 2, 2002, I met Mr. Melson for the purpose of showing him a draft of an affidavit that counsel had prepared based on the information he had given me on August 1st. During the hour and a half that I was with Mr. Melson, he was

alert and coherent. He did not exhibit any signs of being under the influence of pain medication or any other drug, but instead complained of back pain.

12.    We had originally decided to meet at Mr. Melson's home but he was not there when I stopped by at the agreed-upon time. Mr. Melson called me later and explained that he had gone to the hospital the previous night due to his back pain. We decided to meet at my hotel instead of his home. During our telephone conversation, I offered to give him directions but he did not need them; he asked whether my hotel was located across the street from Williams Travel Center and I told him that he was correct. Mr. Melson and Mrs. Melson arrived together early afternoon and we talked in my hotel room for about 30 to 40 minutes. They mentioned that they had just come from a tanning salon. I teased Mr. Melson that he looked like a lobster, and he joked that the new bulbs at the salon caused him to burn a little.

13.    I gave Mr. Melson a draft of his affidavit and asked him to review it carefully and make any corrections. He noticed that his last name was misspelled – "Nelson" instead of "Melson." He also explained that on the day of Mr. Arthur's visit, he was headed to Gardendale to set up a double-wide trailer and he asked why Gardendale was not mentioned in the affidavit. I asked him whether Gardendale was a suburb of Birmingham and he answered yes; I then pointed out that Birmingham was included in the affidavit. Mr. Melson also noted that the affidavit did not mention that the trailer had gotten stuck in clay. The details Mr. Melson relayed on August 2nd were in all respects identical to those he had described during our initial meeting.

14.    After Mr. Melson reviewed the draft, counsel prepared a revised draft that incorporated the corrections requested by Mr. Melson and faxed that draft to

my hotel. I pointed out the changes to Mr. Melson and asked him to review them carefully. As he read every page slowly, he nodded his head. Mr. Melson told me that all the information was accurate and that he was ready to sign it. I asked him to wait because he needed to sign the affidavit in the presence of a notary. Mr. Melson also mentioned that his back was hurting and that he would have to go home to take pain medication. I told him that I would try to finish as quickly as possible.

15. In separate cars, we left my hotel to look for a notary. We first went to Regions Bank in Priceville. Mr. Melson and I approached a bank teller and inquired about a notary. The teller asked me if I had an account and I responded no. The teller then asked Mr. Melson if he had an account and he said no but also pointed out that he cashes checks at this bank. The teller informed us that without an account we could not use the bank's notary service. We then went to the City Office of Priceville and found a notary. The notary asked Mr. Melson for identification, he pulled his driver's license from his wallet, and then he executed his affidavit. While at the City Office, Mr. Melson mentioned that his back was hurting him and wanted to sit down.

### Third Meeting with Ray Melson

16. Sometime between August 2 and August 14, 2002, I met with Mr. Melson at his home for about 30 minutes. I informed him that counsel wanted to meet with him to discuss the contents of his affidavit and asked him whether an August 15th meeting would be convenient. Mr. Melson indicated that such a meeting would be fine. He also gave me his telephone number and told me that his phone would be hooked up soon. Mr. Melson did not say anything during this brief meeting that suggested that he believed his affidavit to be inaccurate in any way.

**Fourth Meeting with Ray Melson**

17.    On August 15, 2002, counsel and I met with Mr. Melson at his home for approximately 30 to 45 minutes. When we arrived, Mrs. Melson told us that he had just taken some medication and was resting. We asked whether we could speak to him briefly. Mrs. Melson announced our arrival and Mr. Melson got up and welcomed us into his home. In response to our question, he said he felt fine and did not mind meeting with us. Although he complained of back pain, Mr. Melson again appeared alert and coherent.

18.    During the interview, counsel asked Mr. Melson about the contents of his affidavit and reviewed with him in detail what he had told me earlier. Mr. Melson reaffirmed the contents of his original affidavit. At no point did he tell us that he had been under any medication or other drug when he had signed the affidavit. Mr. Melson again mentioned that he would be willing to testify and added that he would need a subpoena to show his employer so that he could get off from work. Mr. Melson also emphasized that he was "just telling the truth" in his affidavit and again offered to take a lie detector test.

**Meetings with Ray Melson After Submission of His Second Affidavit**

19.    When I received a copy of Mr. Melson's second affidavit submitted by the State, dated September 20, 2002, I decided that a further inquiry was warranted. On October 6, 2002, Mr. Arthur's counsel and I stopped by Mr. Melson's home and Mrs. Melson told us that he was in the shower and asked us to return later. When we did return, however, Mr. Melson refused to speak to us and ordered us off his property.

20.    On October 7, 2002, we returned to Mr. Melson's home and requested a brief meeting. We stood on his porch and saw him through a clear screen-like door. He again refused to talk to us. I told him that we were just interested in the truth. He then called the police, who arrived shortly thereafter. When the police arrived, Mr. Melson came outside and ordered us off his property. As we were leaving, Mr. Melson waved what appeared to be a white business card and announced that he was answerable only to David Clark, who is an assistant Attorney General for the State of Alabama.

**Meeting with Alphonso High**

21.    In May 2002, I met with Mr. Alphonso High at his home for about 30 minutes. During the interview, I informed Mr. High that I was investigating Thomas Arthur's case and asked him to describe the last time he had seen Mr. Arthur. Mr. High told me that he had seen Mr. Arthur around the time before Mr. Arthur was arrested for murder. I asked him about the circumstances and he told me that Mr. Arthur had stopped by his place of business around 9 a.m. on a day that he was heading to Birmingham to set up a trailer. I mentioned to Mr. High that he has a great memory, and he told me that with age his long-term memory has become better than his short-term memory. Mr. High added that Mr. Arthur drove his Ford LTD on the day of his visit and there was nothing unusual about his behavior.

22.    I asked Mr. High how close to the day of the murder for which Mr. Arthur was arrested did he see Mr. Arthur. Mr. High recalled hearing about that murder the day after Mr. Arthur had visited him. Mr. High told me that after he had learned about Mr. Arthur's arrest, he had made a connection and realized that he had seen Mr.

Arthur on the morning of the murder. Mr. High was so certain that he pounded his fist on the kitchen table. *After* Mr. High unequivocally told me that he had seen Mr. Arthur that morning, I mentioned that Troy Wicker had been murdered on February 1, 1982. At no point did I supply Mr. High with any information that led him to recall Mr. Arthur's visit on the morning of the murder. Mr. High remembered that fact on his own without any reference to a date and he relayed the details of the visit to me.

23.    Based on twenty years' experience as an investigator and my observations of Ray Melson and Alphonso High – including their demeanor and detailed recollections – I believed and continue to believe that the contents of their original affidavits were truthful. In my opinion, neither Mr. Melson nor Mr. High had a motive to lie in their original affidavits. Moreover, before signing their original affidavits, Mr. Melson and Mr. High had not spoken to each other about Mr. Arthur's visit on the morning of Troy Wicker's murder, and yet Mr. Melson was able to recount the very same facts included in Mr. High's initial affidavit.

Dated: October 28, 2002

Stephen J. Gustat

SWORN TO AND SUBSCRIBED before
me this 28 day of October, 2002.

Notary Public

My Commission Expires:



EBELYNDA BATIZ
MY COMMISSION # DD 005000
EXPIRES: February 27, 2005
Bonded Thru Notary Public Underwriters

Ebelynda Batiz

## AFFIDAVIT OF RAY MELSON

STATE OF ALABAMA             )
                                 :  ss.
COUNTY OF MORGAN       )

RAY MELSON, being duly sworn, deposes and says:

1.      I previously submitted two affidavits, dated August 2, 2002 and September 20, 2002, in connection with Tommy Arthur's case. I am submitting this third affidavit to clarify my testimony in the two prior affidavits and to explain the discrepancies between them.

2.      In my first affidavit, I swore that I saw Tommy Arthur on the morning of Troy Wicker's murder. I said I specifically remembered seeing Tommy at Copper Mobile Homes in Decatur between 8 a.m. and 9 a.m. that day. In 1982, I worked for Alphonso High, who at the time owned Copper Mobile Homes.

3.      When I signed the first affidavit, I was not on pain medication; in fact, I remember that I was in pain that day. My mind was clear on that day and my memory of the incidents I described in the affidavit was unimpaired.

4.      My memory of the day that I signed my first affidavit is also clear. I recall that earlier in the day I had gone to a tanning salon. I also recall that I reviewed the affidavit and corrected the spelling of my last name.

5.      In my second affidavit, obtained by representatives of the State of Alabama who came to my home, I swore that when I signed the first affidavit I had been on strong medication. I also swore that I could not be certain that I saw Tommy at Copper Mobile Homes on the morning of Troy Wicker's murder.

6.      Although I swore in my second affidavit that I was not on any medication at the time I signed the second affidavit, that statement was <u>not</u> correct. At the time I signed the second

affidavit, I had recently taken—and was feeling the effects of—the pain medication hydrocodone (10 milligrams, three times per day), the muscle relaxer Soma, and a nerve block injection, and I had been taking medication for neck and back pain for years. As a result of taking these medications, when the State representatives visited me I felt like what was going on around me was a dream, and my judgment was highly impaired.

7.      I do not remember any of the questions that I was asked by the representatives of the State in connection with the second affidavit. Sitting here today, I cannot believe that I actually said the things contained in the second affidavit about not being sure whether I saw Tommy on the morning Troy Wicker was murdered. Those statements were not true then and they are not true now.

8.      If I did say the things that are contained in my second affidavit, I believe that I did so because the medication that I was on at the time I signed it made it difficult for me to think clearly or to focus on anything beyond the sensations caused by the medications. Although I do not remember saying the things that are contained in my second affidavit, I remember wishing at the time that the State representatives would leave me alone and allow me to experience the effects of the medications without being disturbed. I remember thinking at the time that if I said what I thought the State representatives wanted to hear, they would more quickly go away and leave me in peace.

9.      I also remember that I felt intimidated by the State representatives. Although I did not feel like talking to the State representatives, because of the effects of the medications I had taken, I was not able to assert myself by asking them to leave. Furthermore, because they were wearing badges, I did not dare to tell them that I was on drugs. I didn't want to make them mad—I just wanted them to leave.

10.    I stopped taking pain medication in 2003 because I became unhappy with the effect the medication had on my mind and in my daily life.  Today I am not taking any pain medication and my mind and memory are clear and unimpaired.

11.    In spite of what I said in my second affidavit, I remember very clearly the chain of events that makes me certain that I saw Tommy on the morning of Troy Wicker's murder.

12.    It is easy for me to remember the day in question, because on that day in late winter or early spring, I helped deliver a double-wide trailer to Gardendale, Alabama, near Birmingham.  Such a delivery is memorable because it was unusual: only two or three times in my life have I ever delivered a double-wide trailer to the Birmingham area.

13.    That day was also memorable because of how difficult the work was: the trailer got stuck in the mud while we were transporting it, and we did not return until dark.

14.    I remember having seen Tommy at Copper Mobile Homes before we left to deliver the trailer, which would not have been later than 9 a.m. because we knew the job would take all day and we did not want to return too late.

15.    I remember clearly that Tommy was at Copper Mobile Homes that day, because he offered to help us with the delivery.  Alphonso told Tommy that he didn't need his help.  I am certain that Tommy stopped by for about thirty minutes and that he arrived some time between 8 a.m. and 9 a.m.  We had just finished our breakfast of biscuits and coffee.  Tommy acted like his usual self and did not appear nervous at all.

16.    A day or two after we delivered the double-wide trailer, I heard about the murder of a man in his home in Muscle Shoals, who I now know to have been Troy Wicker.

17.    I later learned, I believe by watching the news, that Tommy had been arrested in connection with the murder of the man in Muscle Shoals. I remember at that time putting two

and two together, and realizing that the day of the murder was the same day that Tommy visited

Copper Mobile Homes in Decatur when we were preparing to deliver a double-wide trailer. I

also recall that at the time I heard that Tommy was arrested, Alphonso and I discussed that we

had seen Tommy on the morning of the murder and that we were surprised that Tommy had not

seemed nervous or agitated.

18.    I did not think that Tommy's visit to Copper Mobile Homes was significant at the

time I heard about Tommy getting arrested because I did not know at what time of day the

murder was committed. Tommy's trial and appellate lawyers never contacted me to ask me

about the day of the murder or anything else.

19.    I am swearing to these facts because they are true, and for no other reason. I

have not seen or spoken to Tommy in the past 25 years, and I would not lie to help Tommy. In

the past 25 years, I also have never discussed with Alphonso our conversation about Tommy

after we learned that he had been arrested.

20.    I have carefully reviewed this affidavit, and its contents are true to the best of my

knowledge. *I, Ray Melson, I was willing to swear this before a notary, but no notary was available at 8:30 PM in Decatur, Alabama.*

Dated: ~~July ___, 2007~~ *Aug 22/2007*                    _____
                                                                  Ray Melson

Sworn to before me this
____th day of July 2007

_____
            Notary Public